## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

RAFAEL HERNANDEZ, individually and on
behalf of all others similarly situated,

|                                                   | Case No.                  |
|---------------------------------------------------|---------------------------|
| Plaintiff,                                        | **CLASS ACTION**          |
| v.                                                |                           |
| SAZERAC COMPANY INC.,                             | **JURY TRIAL DEMANDED**   |
| Defendant.                                        |                           |

## CLASS ACTION COMPLAINT

Plaintiff Rafael Hernandez ("Plaintiff"), individually and on behalf of all others similarly situated, by and through undersigned counsel, hereby files this Class Action Complaint against Defendant Sazerac Company, Inc. ("Defendant" or "Sazerac"), and alleges the following upon personal knowledge as to Plaintiff's own acts and upon information and belief as to all other matters:

### NATURE OF THE ACTION

1.     This is a putative consumer class action alleging violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") by the maker of Fireball Cinnamon Whisky ("Fireball Whisky"), one of the top-selling and instantly recognizable whisky brands in the United States.

2.     Sazerac capitalized off the goodwill and consumer trust it built off its highly successful Fireball brand with a classic "bait-and-switch" scheme intended to deceive consumers with Fireball-Whisky-branding to get them to unknowingly purchase an indistinguishable malt-based knockoff that **contained no whisky** and **only half the amount of alcohol** (ABV).



REAL WHISKY     KNOCKOFF MALT

3.     This action is one of several virtually identical class actions filed against Sazerac in federal courts throughout the country that arise from the same deceptive conduct. The facts alleged here have already withstood multiple Rule 12 pleading challenges before federal courts in the Middle District of Florida, the Southern District of New York, and the Northern District of California, and those courts from California and New York have already certified classes of consumers from those respective states who were also harmed by Defendant's conduct at issue here. Plaintiff here brings this action to protect the rights and obtain justice for a proposed Class of Florida consumers who were similarly harmed by Defendant's deceptive conduct.

4.     As alleged in all these cases, the facts of Defendant's shameless deception here are pretty simple and straightforward: After 36 years of marketing and selling Fireball Whisky and

attaining viral popularity of the Fireball Whisky brand, Sazerac launched a knockoff cinnamon-flavored product that was ***made of malt instead of whisky***, which could be sold as an impulse purchase item in stores where whisky could not ("Fireball Malt"). In order to get consumers to buy the new, unknown, and inferior Fireball Malt product, Sazerac packaged the new Fireball Malt product in identical bottles and labels as the original Fireball Whisky product.

5.      Defendant knew that the miniature 50 mL and 100 mL bottles of knockoff Fireball Malt product displayed beside cash registers around the country would be an impulse purchase for consumers. Defendant knew that consumers would immediately recognize the iconic Fireball branding and product labeling and would assume it was Fireball Whisky. Defendant also knew—and even admitted in an unrelated litigation—that the two different products could not be distinguished from one another at a distance.

6.      Armed with this knowledge, Defendant quietly slipped the new look-alike Fireball Malt product into the market, betting that consumers making an impulse purchase decision at the register would be fooled and would unknowingly buy an inferior, non-whisky product containing half the amount of alcohol while believing that they were buying original Fireball Whisky.

7.      Defendant deliberately designed Fireball Malt to deceive consumers about the two facts that are of primary important to any consumer's decision of whether to purchase an alcoholic beverage: (i) the ***type*** of alcohol in the product, (ii) and the ***amount*** of alcohol in the product.

8.      Like the other consumers who filed similar class actions against Sazerac, Plaintiff and thousands of other consumers in Florida were misled by Defendant's deceptive marketing, labeling, and sale of Fireball Malt and unknowingly purchased the malt-based beverage with a 16.5% ABV when they believed they were purchasing—and had intended all along to purchase—

the visually indistinguishable whisky product with a 33% ABV that Defendant has sold under the "Fireball" brand for decades.

9.      Thus, Defendant's misrepresentations and omissions of fact and false and deceptive practices in connection with its marketing, labeling, and sale of Fireball Malt is likely to deceive a reasonable consumer in violation of the FDUTPA.

10.     Had Plaintiff and the other similarly situated Florida consumers known that Fireball Malt was not Fireball Whisky and that it contained no whisky and only half the amount of alcohol, they either would not have purchased it, or they would not have agreed to pay as much as they did for the product.

11.     This action seeks justice, damages, and equitable relief available under the law to hold Defendant accountable to Plaintiff and a proposed Class of similarly situated Florida consumers who Plaintiff seeks to represent.

## JURISDICTION

12.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (1) the amount in controversy exceeds $5 million, exclusive of interest and costs; (2) the proposed Class includes more than 100 members; and (3) there is minimal diversity of citizenship between Plaintiff and Defendant.

13.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and Defendant.

14.     This Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts with the state of Florida and purposely availed itself of the Florida markets through the promotion, marketing, distribution, and sale of its products to Florida

consumers in Florida, such that this Court's exercise of personal jurisdiction over Defendant is reasonable and comports with traditional notions of fair play and substantial justice. The claims of Plaintiff and the Class arise out of Defendant's contacts with Florida, as Defendant's deceptive sales of Fireball Malt occurred in Florida and caused injury to Florida consumers.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims alleged herein occurred in this District, including the promotion, marketing, distribution, and sale of its products in this District.

## PARTIES

16.     Plaintiff Rafael Hernandez is an individual consumer and resident of Miami-Dade County, Florida.

17.     Sazerac Company, Inc. ("Sazerac" or "Defendant") is a corporation organized under the laws of Louisiana, with its principal place of business located in Louisville, Kentucky.

## SUBSTANTIVE ALLEGATIONS

### *The Fireball Whisky Brand*

18.     Defendant Sazerac is a major alcoholic beverage company that manufactures, advertises, and sells Fireball Cinnamon Whisky, a cinnamon-flavored whisky (distilled spirit) that has achieved nationwide fame and popularity.

19.     Fireball Whisky is sold in various sizes (ranging from 50 mL bottles and up) and is a fixture in bars, liquor stores, and retail outlets that are licensed to sell distilled liquor.

20.     Since its launch in 1984, the Fireball brand has offered a single flagship product: cinnamon-flavored whisky with a standard 33% ABV. During the brand's reign, the labeling and trade dress of Fireball Whisky products have remained largely unchanged.



21.     As the natural and intended consequence of Defendant's expansive and widespread marketing and branding efforts, consumers have come to uniformly and instantly identify the Fireball brand and trade dress as a cinnamon-flavored ***whisky*** product.

### *Fireball Malt: Defendant's New Fireball Whisky Knockoff*

22.     In 2020, after years of selling cinnamon-flavored whisky under the Fireball brand, Defendant introduced a new cinnamon-flavored alcoholic beverage that looked and tasted like the original Fireball Whisky but contained no actual whisky and contained only half the amount of alcohol as the original.

23.     Unlike Fireball Whisky, Fireball Malt contains no whisky. It is a malt-based beverage with added cinnamon syrup, sweeteners, and whisky flavoring. Real whisky, by law, is a distilled spirit. By contrast, malt is produced through fermentation to create a neutral base to which flavors and colors may be added. Fireball whisky contains 33% ABV while Fireball Malt contains only half the ABV at only 16.5%.

24.     In unrelated litigation involving a dispute over exclusive distribution rights for the Fireball brand, Defendant admitted that it introduced Fireball Malt so that it could sell a product with the same viral popularity of Fireball Whisky in places where whisky could not be sold. *See PAN AM Props. v. Sazerac Co., Inc.*, 2025 PR App. LEXIS 1706, *14 (Puerto Rico Court of Appeal) (unofficial translation: "In some U.S. states Fireball whisky cannot be sold in convenience stores. Therefore, [Sazerac] introduced Fireball Cinnamon Malt Beverage to sell Fireball product in states where whisky could not be sold in convenience stores.").[1]

25.     Defendant further admitted that its strategy with Fireball Malt was not to make efforts to differentiate it from Fireball Whisky, but rather, to focus on market access. *Id.* (unofficial translation: "[Sazerac] acknowledges that its strategy is not to make efforts to differentiate Fireball Cinnamon Malt Beverage products from Fireball Cinnamon Whisky products but rather to focus on market access.").

26.     Consistent with Defendant's admitted strategy, the packaging, labeling, and trade dress of the original Fireball Whisky product and the knockoff Fireball Malt product are virtually ***identical***.

27.     Both products are the same golden-caramel color glowing through transparent 50 mL or 100 mL distilled spirit bottles sealed with red caps, with a similarly colored label that resembles burnt paper, with printed text in a similar typeface, and an image of a red dragon splitting a fireball, set between the words "red" and "hot."

28.     Defendant's own website concedes that the ***only*** way a consumer could visually distinguish the knockoff Fireball Malt from the original Fireball Whisky is to pay close attention

---

[1] Attached as **Exhibit A** is an unofficial translation of *PAN AM Props.* That were generated by ChatGPT.

to the small print under the red dragon design and notice whether the text says, "Cinnamon Whisky" (the original product), or if it only says, "Cinnamon," (malt knockoff).[2]



### *Fireball Malt's Packaging, Labeling, and Trade Dress are Deceptive*

29.     Reasonable consumers are deceived by the marketing, labeling, and trade dress of Fireball Malt and believe that the knockoff product is the original Fireball Whisky product made of whisky and containing double the amount of alcohol.

30.     Indeed, based on the identical features of both products—the same golden-caramel color glowing through transparent 50 mL or 100 mL distilled spirit bottles sealed with red caps, with a similarly colored label that resembles burnt paper, with printed text in a similar typeface, and an image of a red dragon splitting a fireball, set between the words "red" and "hot"—a Puerto Rico Court of Appeals affirmed a lower court's order preliminarily enjoining the distribution of Fireball Malt in Puerto Rico made a finding of fact that ***an average consumer would find it difficult to distinguish*** between the two products. *See PAN AM Props.*, 2025 PR App. LEXIS 1706, *11 (unofficial translation: "Given the great similarity between the presentation used for Fireball Cinnamon Malt Beverage and that of the 50 ml Fireball Cinnamon Whisky, ***an average consumer would find it difficult to distinguish between the two products***.") (emphasis added).

31.     Sazerac itself acknowledged to the court in that litigation that, "at a distance the 50 mL size ***cannot be identified as one or the o***ther." *Id.*, at *10 (unofficial translation) (emphasis added).

32.     As the Puerto Rico court found, "[t]he possible confusion between Fireball Cinnamon Malt Beverage and Fireball Cinnamon Whisky ***is common, reasonable, and predictable***[.]" *Id.*, at *12 (unofficial translation).

33.     Indeed, as noted above, Defendant concedes that the only way a consumer can visually tell the two products apart is by the label's inclusion or omission of the single word, "whisky."

34.     But practically speaking, no reasonable consumer would be able to tell the two products apart at the point of sale.

35.     Consumers uniformly associate the Fireball brand with one thing: the most well-known cinnamon-flavored whisky in the United States. And the Fireball brand has been a whisky brand for decades until Defendant introduced Fireball Malt just five years ago.

36.     So consumers would have no reason to know or suspect that they should confirm that a product that looks exactly like Fireball Whisky is, in fact, whisky and not another product that is not distilled whisky.

37.     In addition, consumers associate miniature 50 mL bottles of alcohol with distilled spirits. These bottles contain a single 1.5 ounce "shot" serving, whereas, by contrast, the typical serving size for a malt beverage is between 8 and 10 ounces.



Each drink shown above represents one U.S. standard drink and has an equivalent amount (0.6 fluid ounces) of "pure" ethanol.

38.     Moreover, as the Puerto Rico court found in *PAN AM Props.*, Sazerac's marketing strategy for 50 mL bottles of Fireball Malt was to position the product as an impulse purchase. *Id.*, at *11. An impulse purchase, by definition, does not involve close scrutiny of the purchased product. Instead, consumers trust and rely on familiar and well-established brands to assure the consumer that a product is the same product that is typically associated with that brand. Consumers who see the decades-old Fireball brand instantly identify the product inside as the country's most

popular cinnamon-flavored whisky, and they have no reason—or legal obligation—to look beyond that well-known branding.



39.     And even if a hypothetical consumer were so inclined to scrutinize the Fireball Malt product more closely, they would likely be unable to compare the product to a bottle of the original Fireball Whiskey since Defendant designed the knockoff Fireball Malt so it could be sold in convenience stores, gas stations, and other places where the original Fireball Whisky could not.

40.     The obvious and predictable consumer deception from Defendant's practices is demonstrated by social media reactions from Florida consumers mistakenly believing that the Fireball Malt product they encountered for sale at gas stations and convenience stores was Fireball Whisky and questioning how a whisky product could be legally sold at such locations that cannot sell distilled spirits.

41.     For example, Holly Brooke from Ocala, Florida, turned to social media to ask her several-hundred-thousand followers, "Can someone please explain HOW TF they are selling liquor at a gas station in Florida?"[3]



42.     A liquor store owner described how he and colleagues were "very upset" and "not thrilled to see a product that's pretty high proof and packaged to look like a liquor bottle next to Kit Kats, Tic Tacs, and throat lozenges that children pass by."[4]

43.     Andrew Pentland and Dylan Phelps from Gator Beverage in Gainesville, Florida, observed so much customer confusion they took to TikTok from @liquorstore352 to explain that Fireball Malt did not contain Fireball Whisky.[5] Phelps commented that "[t]hese liquor companies are getting sneakier," and Pentland concurred, noting that "strange things are afoot at the Circle

---

[3] Like what?? #fireball #gasstation #florida, @hollybrooke92, Apr. 5, 2022.
[4] Sazerac Co. Rolls Out Malt-Based Fireball And Southern Comfort Variants, MarketWatch Mag, June 18, 2021.
[5] Naomi Volcy, Liquor, laughs and lessons: Gator Beverage workers go viral on TikTok, The Independent Florida Alligator, Oct. 10, 2022.

K."[6] Pentland recognized that, though "[t]he[] two bottles of fireball may look exactly the same, [] that couldn't be farther from the truth."



***Defendant's Deceptive Acts and Practices Harmed Consumers***

44.     The product Defendant sells as Fireball Malt is not a whisky at all, but a flavored malt beverage with added cinnamon flavoring. It contains only around 16% ABV—roughly half the ABV of Fireball Whisky (33% ABV). It also contains no actual whisky, only "whisky flavor." In many jurisdictions (including Florida), liquor laws prohibit the sale of distilled spirits like whisky in gas stations, convenience stores, and grocery stores. Defendant exploited these regulations by selling the knockoff Fireball Malt in those outlets, knowing that consumers would recognize the familiar "Fireball" branding in such locations and assume the product was whisky––as it has been for decades until just recently.

---

[6] FIREBALL HAS BEEN FOOLING US!!! #liquorstore #liquorstore352 #fireball #whisky #falseadvertising #deception #cinnamon, @liquorstore352, Jan. 28, 2024.

45.     Sales of Fireball Malt are driven by the Fireball Whisky brand reputation; by deceptively trading on that reputation, Defendant sold vast quantities of Fireball Malt to unwitting consumers.

46.     Deceived consumers who purchase Fireball Malt on the mistaken belief that the product is Fireball Whisky, instead, receive a product that contains no whisky and that only contains half the amount of alcohol they thought they were purchasing.

47.     Had these consumers known the truth, they would not have purchased the Fireball Malt product, or they would not have paid the same price.

48.     Plaintiff and the Class members deceived by Defendant's scheme suffered actual harm and economic injury by paying money for a knockoff Fireball product that they were misled to believe was Fireball Whisky with 33% ABV.

49.     The difference in value between the product as represented and the product as sold constitutes a financial loss to consumers, who did not receive the benefit of the bargain.

50.     Defendant's misleading practices have caused thousands of consumers to mistakenly purchase Defendant's inferior Fireball Malt product thinking that they are purchasing a full serving of True Fireball Whisky. However, the Product has less than half the proof of true whisky beverages. Thus, consumers receive less than half the alcohol that they believe that they are purchasing.

51.     This action seeks to hold Defendant accountable for its unfair and deceptive marketing, labeling, and sale of Fireball Malt to consumers in violation of the FDUTPA, to recover damages for affected consumers, and to stop Defendant from continuing to mislead the public with its deceptive scheme.

*Plaintiff's Experiences*

52.    Plaintiff's preferred alcoholic beverages are distilled spirits, specifically rum and whisky.

53.    Plaintiff is a consumer of whisky brands that include Jack Daniel's, Johnnie Walker, Buchanan's, and Fireball.

54.    Plaintiff has purchased Fireball Whisky in large bottles from liquor stores and is familiar with the Fireball Whisky branding, packaging, and labeling.

55.    Plaintiff also unknowingly purchased miniature bottles of Fireball Malt at various times during the Class Period.

56.    Plaintiff typically made these purchases of Fireball Malt at various gas stations along his commute home from work.

57.    The miniature bottles of Fireball Malt that Plaintiff purchased displayed all of the same branding elements and trade dress as the original Fireball Whisky product (described above) that Plaintiff is familiar with and has purchased in the past. As such, Plaintiff believed that the bottles of Fireball Malt he purchased were Fireball Whisky.

58.    Plaintiff expected the Fireball Malt products he purchased to contain whisky and to contain the alcohol volume of a single serving of whisky.

59.    At the time of each of his purchase(s) of Fireball Malt, Plaintiff did not know that the Fireball Malt he purchased in reliance on Defendant's deceptive labeling were deceptively labeled and that the product he purchased was not whisky but a malt beverage flavored to taste like whisky but with half the alcohol.

60.    The value of the malt beverage with 16.5% ABV known as Fireball Malt that Plaintiff unknowingly purchased was materially less than the value Plaintiff paid for a whisky

beverage with 33.5% ABV known as Fireball Whiskey that Plaintiff believed he was purchasing and intended to purchase.

61.     Plaintiff would not have purchased Fireball Malt, or at a minimum, would have paid less for the product, had he known of Defendant's false and misleading misrepresentations and omissions regarding the product.

62.     Plaintiff is currently unable to rely on the labeling of Fireball products because he cannot be sure whether those products are what they purport to be.

63.     Plaintiff intends to purchase and will purchase Fireball products again when he can rely on Defendant to make truthful representations about its products.

### Defendant's Deceptive Acts and Practices Are
### Being Challenged in Multiple Certified Class Actions

64.     Defendant's misleading marketing, labeling, and sale of Fireball Malt has prompted a wave of consumer protection lawsuits across the country, underscoring the pervasive and uniform nature of the deception. Courts in multiple jurisdictions have already validated the viability of these claims and the uniformity of the issues. For instance, in *Puig v. Sazerac Co.*, No. 2:23-cv-856, 2024 U.S. Dist. LEXIS 40712 (M.D. Fla. Mar. 8, 2024), *Puig v. Sazerac Co.*, No. 2:23-cv-856, 2024 U.S. Dist. LEXIS 107649 (M.D. Fla. Jun. 18, 2024), and *Puig v. Sazerac Co.*, No. 2:23-cv-856, 2024 U.S. Dist. LEXIS 164086 (M.D. Fla. Sept. 12, 2024), a court in the Middle District of Florida denied Sazerac's Rule 12(b)(6) motion to dismiss complaints that pled allegations substantially similar to the allegations in this case.

65.     A court in the North District of California had already denied a similar motion by Sazerac on May 17, 2023, in *McKay v. Sazerac Co.*, No. 23-cv-00522, 2023 U.S. Dist. LEXIS 86621 (N.D.Cal May 17, 2023). And a court in the Southern District of New York followed suit

on September 25, 2024, in *Pizzaro v. Sazerac Co.*, 23-CV-2751, 2024 U.S. Dist. LEXIS 175828 (S.D.N.Y Sept. 25, 2024).

66.     More recently, the court in the *McKay* action certified a class, however, maintained that order under seal. *See Myers v. Sazerac Co., Inc*., No. 3:23-cv-522, ECF No. 79 (N.D.Cal. Feb. 12, 2025) (granting plaintiff's motion for class certification). The court in the *Pizzaro* action followed suit and certified a class of New York purchasers of Fireball Malt on September 18, 2025, in *Pizzaro v. Sazerac Co.*, 23-cv-2751, 2025 U.S. Dist. LEXIS 187959 (S.D.N.Y Sept. 18, 2025).

67.     Notably, in January of this year, another court in the Southern District of New York certified a class of New York purchasers of Sazerac malt-knockoff of its popular Southern Comfort brand whisky based on the same deceptive bait-and-switch scheme that Sazerac ran on Florida purchasers of Fireball Malt that is at issue in this case. *See Andrews v. Sazerac Co.*, No. 23-cv-1060, 2025 U.S. Dist. LEXIS 397 (S.D.N.Y. Jan. 2, 2025).

68.     These decisions from different courts reflect judicial consensus that the allegations of deception here are plausible and suitable for class treatment. Defendant is well aware of these developments, yet it has failed to remedy its conduct, making it all the more urgent for Florida consumers to receive protection and relief through this action.

## CLASS ALLEGATIONS

69.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a proposed Class of consumers (the "Class"), defined as follows:

> **All persons who purchased Fireball Malt in the State of Florida during the period beginning four years prior to the filing of this action and the date of an order granting class certification.**

70.     Plaintiff reserves the right to expand or narrow the class based on facts learned through discovery.

71. Excluded from the Class are: (a) Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, and executives; (b) governmental entities; (c) the Court, Court personnel, and any member of their immediate families; and (d) any person who timely and properly opts out of the Class.

72. **_Numerosity_**: The members of the Class are so numerous that joinder of all members is impracticable. While the precise number of Class members is presently unknown to Plaintiff, Defendant's Fireball Malt product is sold in hundreds of retail locations across Florida (including gas stations, convenience stores, and grocery stores), and on information and belief thousands of consumers in Florida have purchased Fireball Malt during the relevant period. The Class is therefore sufficiently numerous to warrant class treatment.

73. **_Commonality_**: There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions include, but are not limited to:

  a. whether Defendant's labeling and packaging of Fireball Malt is likely to mislead reasonable consumers;

  b. whether Defendant made misrepresentations or omissions of material fact regarding Fireball Malt;

  c. whether Defendant's conduct as alleged violates the Florida Deceptive and Unfair Trade Practices Act (FDUTPA);

  d. whether Defendant's conduct was willful or knowing, such that additional penalties or damages may be warranted;

  e. whether Plaintiff and Class members suffered a loss due to Defendant's misrepresentations and omissions; and

f.     whether Plaintiff and the Class were damaged by Defendant's conduct and the amount of such damages.

74.     **_Typicality_**: Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all Class members, purchased Fireball Malt in Florida and was deceived by the uniform misleading packaging and labeling employed by Defendant. Plaintiff and all Class members have the same legal claim under FDUTPA, based on the same course of conduct by Sazerac. The injuries of Plaintiff and the Class were caused by the same deceptive practices of Defendant, and no unique defenses apply to Plaintiff that would not apply equally to Class members.

75.     **_Adequacy_**: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no conflicts of interest with other Class members and seeks relief common to the Class. Plaintiff has retained counsel experienced in prosecuting consumer protection and complex class action cases, including cases involving false advertising. Plaintiff's counsel are competent and committed to vigorously representing the interests of the Class and have the necessary resources to do so. Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously on behalf of the Class and have every incentive to maximize the Class's recovery.

76.     **_Predominance and Superiority_**: This class action is appropriate for certification because common questions predominate over any individual questions, and class treatment is a superior method for the fair and efficient adjudication of this controversy. The injury suffered by each individual Class member is relatively small, making individual litigation economically infeasible. Separately litigating hundreds or thousands of identical consumer claims would be judicially inefficient and risk inconsistent judgments. By contrast, proceeding as a class action will permit a single court to resolve the predominant common issues and to ensure a uniform outcome for all similarly situated consumers. A class action will also redress the harm to consumers that

would likely go unremedied if individual actions were required. There are no significant difficulties anticipated in the management of this case as a class action.

## CAUSES OF ACTION

### COUNT I

**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. §§ 501.201, *et seq*.**
**(On behalf of Plaintiff and the Class)**

77. Plaintiff re-alleges and incorporates by reference the paragraphs above as though fully set forth herein.

78. FDUTPA "shall be construed liberally to promote the following policies: (1) To simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices; (2) To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce; [and] (3) To make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(2).

79. Plaintiff and the Class members are each a "consumer" within the meaning of the FDUTPA.

80. Defendant sells "goods" within the meaning of the FDUTPA.

81. Defendant is engaged in "trade or commerce" within the meaning of the FDUTPA.

82. Fla. Stat. § 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

83.     Fla. Stat. § 501.204(2) states that "it is the intent of the Legislature that, in construing subsection (1) due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to [section] 5(a)(1) of the Federal Trade Commission Act."

84.     As alleged herein, Defendant violated the FDUTPA by knowingly and intentionally misrepresenting and concealing and/or failing to disclose material facts regarding its Fireball Malt product—specifically, that Fireball Malt was not Fireball Whisky, that the product contained no whisky like Fireball Whisky, and that the product contained half the amount of alcohol as Fireball Whisky.

85.     By knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts regarding Fireball Malt, as detailed above, Defendant engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices prohibited by the FDUTPA.

86.     Defendant's unfair and deceptive acts or practices, including its misrepresentations, concealments, omissions, and suppression of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiff and the Class members, into believing that Fireball Malt was Fireball Whisky, that Fireball Malt contained whisky, and/or that Fireball Malt contained 33% ABV.

87.     The facts that Defendant knowingly and intentionally misrepresented, omitted, concealed, and/or failed to disclose would be considered material to a reasonable consumer, and were, in fact, material to Plaintiff and the Class members, who consider such facts to be important to their purchase decision.

88.     Defendant owed Plaintiff and Class members a duty to not create an unfair, false, deceptive, or misleading impression regarding Fireball Malt. Defendant possessed exclusive knowledge of the true facts but intentionally concealed those facts from Plaintiff and the Class members, and/or made misrepresentations that were rendered misleading because they were contradicted by undisclosed facts.

89.     Defendant's conduct was also unfair within the meaning of FDUTPA. Marketing a malt beverage as if it were a famous whisky is unscrupulous and injurious to consumers. Defendant's practices offend established public policy, and the practices are unethical and substantially injurious to consumers. The injury to consumers (monetary loss and unwitting consumption of a different product than intended) is not outweighed by any countervailing benefit. No legitimate rationale exists for making Fireball Malt look identical to Fireball Whisky other than to confuse consumers and increase sales through deception. Thus, Defendant's conduct was unfair in addition to being deceptive.

90.     Plaintiff and the Class reasonably relied on Defendant's representations and omissions to their detriment. Florida's FDUTPA does not require strict proof of individualized reliance; it is sufficient that Defendant's material misrepresentations were likely to deceive a consumer acting reasonably, and that Plaintiff and Class members were in fact exposed to and deceived by the misrepresentations. Here, Plaintiff and all Class members were exposed to the uniform packaging and labeling of Fireball Malt at the time of purchase. The decision to purchase the Fireball Malt was made in reliance on the overall false impression that it was Fireball Whisky (or contained whisky). Plaintiff and the Class would not have purchased Fireball Malt, or would have paid less for the product, if Defendant had disclosed the true nature of Fireball Malt. Therefore, Defendant's deceptive and misleading conduct was the cause of Plaintiff's and Class

members' injuries. There is a direct causal nexus between Defendant's practices and the harm suffered by consumers.

91.     As a result of Defendant's FDUTPA violations, Plaintiff and Class members sustained actual damages. Under FDUTPA, "actual damages" are measured by the difference in the market value of the product as delivered versus the product as advertised. Here, Fireball Malt as delivered (a 50 mL malt beverage of 16.5% ABV) is worth significantly less than a 50 mL serving of Fireball Whisky as advertised or implied by the packaging. Plaintiff and the Class paid a price that was inflated due to Defendant's misrepresentations, or they purchased a product they otherwise would not have purchased at all. Economic analyses can be performed to quantify this price premium on a class-wide basis. On information and belief, the price of Fireball Malt was maintained at a level that reflects the brand value of Fireball Whisky, which would not have been possible had Fireball Malt been marketed truthfully as a malt beverage. Plaintiff and Class members thus overpaid and did not receive the benefit of their bargain. These monetary losses are a direct result of Defendant's conduct and are recoverable as actual damages under FDUTPA.

92.     Defendant's actions were willful, knowing, and committed with reckless indifference to the rights of consumers. Defendant showed no hesitation in misleading the public to turn a profit. Accordingly, Plaintiff and the Class seek all relief available under FDUTPA, including but not limited to, an award of actual damages, appropriate injunctive relief to stop Defendant's deceptive practices, and an award of attorneys' fees and costs pursuant to Fla. Stat. § 501.2105, as Defendant's FDUTPA violations have necessitated this enforcement action. Plaintiff also seeks any additional relief that the Court deems just and proper given the egregious nature of Defendant's conduct.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in favor of Plaintiff and the Class and against Defendant as follows:

A.   Certifying this action as a class action under Rule 23, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.   Awarding injunctive and other equitable relief to stop Defendant's deceptive campaign and to order Defendant to engage in a corrective advertising campaign;

C.   Awarding actual damages, restitution, disgorgement of profits, and/or other monetary relief to compensate Plaintiff and Class members for the economic losses caused by Defendant's conduct, in an amount to be proven at trial, including any applicable statutory damages or multiples as permitted by law;

D.   Awarding pre- and post-judgment interest;

E.   Awarding reasonable attorneys' fees, costs, and expenses as authorized by FDUTPA and other applicable laws (including Fla. Stat. § 501.2105) and/or as equity may require; and

F.   Awarding such further relief as the Court deems just and proper.


Dated: October 4, 2025                     Respectfully submitted,


                                           */s/ Christopher Gold*
                                           Christopher Gold, Esq.
                                           Florida Bar No. 088733
                                           **GOLD LAW, PA**
                                           350 Lincoln Rd., 2nd Floor
                                           Miami Beach, FL 33139

Tel: 305-900-4653
chris@chrisgoldlaw.com

*/s/ Garrett Berg*
Garrett Berg, Esq.
Florida Bar No. 1000427
**Garrett Berg Law, P.A.**
555 NE 15th St., PH A
Miami, FL 33132
garrett@gberglegal.com

*Counsel for Plaintiff and the Proposed Class.*

# EXHIBIT A

# UNOFFICIAL ENGLISH TRANSLATION

Prepared by counsel for convenience of the Court. In case of any discrepancy between this translation and the original Spanish decision, the Spanish version controls.

Reporter

PAN AM v. Co., Inc.

Puerto Rico Court of Appeals, San Juan Judicial Region

Parties:

Sazerac

June 27, 2025

KLCE202500119

2025 PR App. LEXIS 1706 *; 2025 LX 299654; 2025 WL 2048234

PAN AMERICAN PROPERTIES, CORP., Respondent v. SAZERAC COMPANY, INC. AND CC1 BEER DISTRIBUTORS, INC., Petitioners

Prior History: [*1] CERTIORARI from the Court of First Instance, Bayamón Superior Part. Case No. BY2024CV03030. On: PRELIMINARY INJUNCTION; DECLARATORY JUDGMENT; LAW 75; BREACH OF CONTRACT; DAMAGES; TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS; CONTRACT TO THE DETRIMENT OF A THIRD PARTY; UNFAIR COMPETITION.

Judges: SPECIAL PANEL. Panel composed of its presiding judge, Judge Rivera Colón, Judge Monge Gómez, and Judge Cruz Hiraldo.

Opinion by: Cruz Hiraldo

Opinion

Cruz Hiraldo, Writing Judge

JUDGMENT

In San Juan, Puerto Rico, on June 27, 2025.

The petitioners, Sazerac Company, Inc. and CC1 Beer Distributors, Inc., appear seeking review of a Resolution and Order issued on February 4, 2025 by the Court of First Instance, Bayamón Superior Part, which granted the preliminary injunction requested by the respondent, Pan American Properties, Corp. Accordingly, it prohibited petitioners from "selling Fireball Cinnamon Malt Beverage products in Puerto Rico during the pendency of the captioned suit."

Petitioners filed a Motion in Aid of Jurisdiction, which we granted on February 7, 2025. Our resolution had the effect of staying the February 4, 2025 Resolution and Order.

We proceed to decide with the benefit of the parties' briefs and the stipulated transcript of the oral evidence.

-I-

On May 24, 2024, respondent filed a Complaint against petitioners, alleging impairment of its exclusive distribution contract in violation of the Distribution Contracts Act, Act No. 75 of June 24, 1964, as amended, 10 LPRA § 278, et seq. (First Cause of Action); Declaratory Judgment (Second Cause of Action); damages for violation of Act 75 (Third Cause of Action); tort damages (Fourth Cause of Action); breach of contract (Fifth Cause of Action); tortious interference with a contractual relationship (Sixth Cause of Action); and damages for violations of the pertinent provisions of the Civil Code relating to bad faith, unfair competition, and unjust enrichment (Seventh Cause of Action). In sum, the claims rest on an alleged impairment of the contractual relationship between the parties wherein petitioners "seek to unjustly profit from the efforts, reputation, and good name cultivated by Pan American over more than ten (10) years of efforts related to the Fireball Cinnamon Whisky brand in Puerto Rico." Respondent also sought a preliminary injunction under Article 3-A of Act No. 75, 10 LPRA § 278b-1.

At a hearing held May 31, 2024, the court denied petitioners' motion to dismiss the preliminary-injunction request and set a Preliminary-Injunction Hearing on the merits. The hearing occurred on June 10, 12, 14, 18, 20, and 21, 2024. The parties stipulated certain facts and several exhibits. They also presented documentary, demonstrative, and testimonial evidence at the hearing.

Respondent's testimonial evidence consisted of the testimony of Mr. Alberto Fernández González, executive vice-president of Pan American; Mr. Luis Eduardo Albandoz Acevedo, vice-president of sales at Pan American; and Mr. Javier Alejandro Calancha Figueras, customer business manager of Pan American's Spirits Division. Petitioners presented the testimony of Mr. Juan Carlos Román Hernández, commercial director for Central America and the Caribbean at Sazerac, and Mr. Adrián Jorge Rivera Cebollero, CC1's vice-president of sales and marketing. After the hearing, the trial court made the following findings of fact:

1. SCI designated Pan American as distributor of Fireball Cinnamon Whisky and Chila Orchata in Puerto Rico by a communication dated August 1, 2013. (Stipulated)

2. That communication stated, in relevant part:

"Our company, Sazerac Company, Inc. ("SCI"), is the rightful owner of the trademark rights for Fireball Cinnamon Whisky and Chila Orchata and, as such, has the worldwide authority to appoint and terminate its distributors, importers, and agents at its sole discretion.

Therefore, we are pleased to confer to your company, Pan American Properties Corp ("Distributor"), whose main purpose is the distribution of alcoholic beverages in Puerto Rico, authorization to sell the brands noted above in the country of Puerto Rico. This privilege is effective immediately and valid unless sooner terminated by SCI for any reason.

Distributor shall use its best effort to sell, promote, merchandise, and grow overall business in accordance with Puerto Rico laws, and in keeping with SCI's sales and marketing guidelines and budgets. Distributor agrees to provide SCI with all reporting sales and other information as requested by SCI.

Distributor acknowledges that SCI is the owner or licensee, as applicable, of all brands, formulas, labels, designs, trademarks, trade names, trade dress, designs and other indicia of ownership, origin and quality of the Products ("Intellectual Property") and all of the goodwill attributable thereto. Distributor may make use of the Intellectual Property only as authorized by SCI in writing and any use shall inure solely to the benefit of SCI or its affiliated companies. Distributor further acknowledges that nothing in this Agreement or in

its relationship with SCI gives Distributor any right, title or interest in or to such Intellectual Property, other than as a distributor of the Products pursuant to this Agreement. Distributor shall make no contrary representations or claims. Distributor shall cease all use of the Intellectual Property upon the termination of this Agreement either in part with respect to a particular Product or in full."

3. The communication further provided, among other things, that Pan American would use its "best efforts" to sell, promote, merchandise, commercialize, and grow the business related to Fireball Cinnamon Whisky and Chila Orchata, in accordance with Puerto Rico law and SCI's sales and marketing guidelines. (Stipulated)

4. CC1 currently distributes Fireball Cinnamon Malt Beverage in Puerto Rico. (Stipulated)

5. Pan American distributes Fireball Cinnamon Whisky in Puerto Rico. (Stipulated).

6. In compliance with the distribution agreement with SCI, Pan American introduced the Fireball Cinnamon Whisky brand to the Puerto Rico market.

7. Before 2013, SCI's Fireball Cinnamon Whisky brand had no presence and had not been sold in the Puerto Rico market.

8. From 2013 until the introduction of Fireball Cinnamon Malt Beverage in May 2024, only Pan American had distributed Fireball Cinnamon-brand products in Puerto Rico.

9. From 2013 to the present, Pan American developed the Fireball Cinnamon Whisky brand throughout Puerto Rico through its distribution team's work and significant financial investments.

10. Pan American's efforts related to Fireball Cinnamon Whisky include, among others, creation of a special marketing fund in which SCI and Pan American split costs equally (50/50).

11. When Pan American began selling Fireball Cinnamon Whisky in Puerto Rico, it created the "flavored whiskeys" category.

12. By 2022, Fireball Cinnamon Whisky represented 97% of sales in that category in Puerto Rico. That is, Pan American took the product from zero to 97% between 2013 and 2022.

13. Pan American positioned Fireball Cinnamon Whisky as the number three (3) whisky brand in the Puerto Rico market from 2019 to 2022.

14. Pan American achieved distribution of Fireball Cinnamon Whisky in 98% of off-premise channels in Puerto Rico, in 99% of large store chains, 91% of small store chains, and 96% of liquor stores.

15. From 2013 to the present, the distribution relationship for Fireball Cinnamon Whisky between SCI and Pan American has continued uninterrupted. Likewise, Pan American's efforts continued despite Puerto Rico's recent difficulties, such as hurricanes, earthquakes, and the COVID-19 pandemic.

16. After many years of relationship, SCI increased the products to be distributed by Pan American, and in 2017 and 2018, respectively, granted Pan American distribution in Puerto Rico of other products such as Black Magic rum and Fris Vodka.

17. Since the start of their relationship in 2013, SCI's and Pan American's conduct has recognized an exclusive relationship for distribution of Fireball Cinnamon Whisky in Puerto Rico.

18. The only entity that has distributed Fireball Cinnamon Whisky in Puerto Rico has been Pan American.

19. The contractual bond between Pan American and SCI for the exclusive distribution of Fireball Cinnamon Whisky in Puerto Rico is documented by transactions between the entities, Pan American's efforts in the Puerto Rico market, and communications exchanged on related topics.

20. In late 2019, Pan American negotiated with Puerto Rico Supply, a distributor of products and alcoholic beverages, to distribute Fireball Cinnamon Whisky to gas stations and small businesses known in the distribution chain as "down the trade".

21. SCI, as expressed by its representative at that time, Ken Chapman, agreed with that strategy.

22. As a result of that strategy, hundreds of points of sale were added for distribution of the product.

23. For those customers where Puerto Rico Supply delivers products, Pan American pays promotions and negotiates prices. Those businesses sell at the same retail price; any Puerto Rico Supply cost hits Pan American's margin and does not affect the consumer sale price.

24. Around September 2021, through Mr. Ken Chapman, SCI contacted Pan American about introducing into the Puerto Rico market a new product called Fireball Cinnamon Malt Beverage to be sold in 50 ml containers.

25. Fireball Cinnamon Malt Beverage would sell at a lower price than Fireball Cinnamon Whisky. The intent was to sell the malt product in the 50 ml bottle for ninety-nine cents ($0.99).

26. Fireball Cinnamon Malt Beverage is not whisky, but a malt beverage with whisky flavoring and 16.5% alcohol by volume, compared with 33% for Fireball Cinnamon Whisky.

27. Pan American and SCI exchanged multiple communications regarding contracting for the introduction and distribution of the malt product in Puerto Rico.

28. After multiple communications, no agreement was finalized for Pan American to distribute the new Fireball Cinnamon Malt Beverage because they could not agree on pricing so the product could retail at $0.99 and without using sub-distributors, per SCI's strategy.

29. The 50 ml Fireball Cinnamon Malt Beverage is very similar to the 50 ml Fireball Cinnamon Whisky. Both labels share multiple identical distinctive elements, such as: yellow color; a figure of a red dragon or demon spitting a fireball; the words "red" and "hot" on each side; the border design resembling burnt paper; the typeface, size, and color of the words Fireball, hot, and red; placement of text and background colors; the placement of key elements (border, demon, words red, hot, Fireball and Cinnamon) in the label's composition; cinnamon flavor, among others. In addition, the 50 ml bottle for both products is the same size and shape, has a red cap, and the liquid inside is the same amber color.

30. Given the great similarity between the presentation used for Fireball Cinnamon Malt Beverage and that of the 50 ml Fireball Cinnamon Whisky, an average consumer would find it difficult to distinguish between the two products.

31. SCI acknowledges that, due to their similarity, both products can compete when sold in the same size. It also acknowledges that at a distance the 50 ml size cannot be identified as one or the other.

32. According to SCI, Fireball Cinnamon Malt Beverage is made to have the same taste and provide the consumer a similar experience to the whisky product.

33. SCI knows that in the Puerto Rico market the consumer knows both products (the malt and the whisky) as Fireball.

34. The differences between the two products are: price; alcohol by volume (whisky 33% and the 50 ml malt 16.5%); the nature of the product by its method of production (distilled vs. fermented); and treatment by fiscal authorities for labeling and taxation requirements.

35. In Puerto Rico, as in other jurisdictions, Fireball Cinnamon Whisky is sold in 50 ml bottles. It is also sold in 200 ml, 750 ml, 1 liter, and 1.75 liter.

36. Pan American's best-selling size is 750 ml. Sales of that size account for 90% of total product sales.

37. SCI's plans regarding distribution of Fireball Cinnamon Malt Beverage in Puerto Rico include selling it in 50 ml bottles, and it is currently sold in that size.

38. SCI's plans regarding distribution of Fireball Cinnamon Malt Beverage in Puerto Rico include selling it in outlets where 50 ml Fireball Cinnamon Whisky is also sold, such as gas

stations, convenience stores, kiosks, and other "down the trade" businesses. It is currently sold that way.

39. The marketing strategy for 50 ml Fireball Cinnamon Whisky is as an impulse purchase. The strategy for the new Fireball Cinnamon Malt Beverage is also as an impulse purchase.

40. The possible confusion between Fireball Cinnamon Malt Beverage and Fireball Cinnamon Whisky is common, reasonable, and predictable and has been the subject of multiple federal lawsuits in other jurisdictions.

41. Prior to Fireball Cinnamon Malt Beverage, the only products with SCI's "Fireball Cinnamon" designation sold in Puerto Rico had been distributed by Pan American.

42. Fireball Cinnamon Malt Beverage products are an extension and derivative of the "Fireball Cinnamon" brand.

43. Fireball Cinnamon Malt Beverage products constitute a new model of the "Fireball" and "Fireball Cinnamon" brand.

44. SCI's representations to Pan American about Fireball Cinnamon Malt Beverage included that it would be a "game changer" and that they would sell over fifty thousand (50,000) cases of the product.

45. As part of the negotiations to distribute the malt product, SCI expressly asked Pan American to prepare Fireball Cinnamon Malt Beverage labels for use in Puerto Rico in conformity with the applicable local regulations.

46. Pan American undertook the steps to obtain approval of the Fireball Cinnamon Malt Beverage labeling from the Puerto Rico Department of the Treasury and obtained the necessary governmental approval to import the products into Puerto Rico.

47. SCI approved the labeling for Fireball Cinnamon Malt Beverage specifically for Puerto Rico, which included Pan American as the product's distributor.

48. On November 23, 2021, SCI representatives conducted an in-person "market visit" to Puerto Rico along with Pan American representatives.

49. During that visit they specifically discussed introducing Fireball Cinnamon Malt Beverage products into the Puerto Rico market. Pan American expressed concerns that the alcohol by volume (ABV) of Fireball Cinnamon Malt Beverage is lower than that of Fireball Cinnamon Whisky and the impact that difference could have on consumer perception of the brand.

50. In some U.S. states Fireball whisky cannot be sold in convenience stores. Therefore, SCI introduced Fireball Cinnamon Malt Beverage to sell Fireball product in states where whisky could not be sold in convenience stores.

51. SCI's nationwide pricing and marketing strategy for the malt beverage is to sell it (1) at an affordable price to prompt purchase and (2) at points of sale such as grocers and gas stations, without any sub-distributor involved.

52. SCI acknowledges that its strategy is not to make efforts to differentiate Fireball Cinnamon Malt Beverage products from Fireball Cinnamon Whisky products but rather to focus on market access.

53. SCI acknowledges that, in analyzing strengths, threats, weaknesses, and opportunities of Fireball Cinnamon Whisky, one of the threats is malt products.

54. On December 17, 2021, Pan American submitted to SCI a purchase order to acquire 432 cases of Fireball Cinnamon Malt Beverage from SCI (the "First Purchase Order").

55. The First Purchase Order for Fireball Cinnamon Malt Beverage products was never delivered to Pan American by SCI.

56. In June 2022, Mr. Juan Carlos Román, SCI's Commercial Director for Central America and the Caribbean, visited Puerto Rico and met with Pan American representatives. During the visit he met with Mr. Alberto Fernández and stated that he wanted to negotiate termination of the exclusive distribution relationship between Pan American and SCI for Fireball Cinnamon Whisky in Puerto Rico. He said he was unhappy with Pan American's performance and that SCI wanted to consolidate all its products with a single distributor, but that it would not be Pan American. Pan American, for its part, confirmed it had no interest in relinquishing its rights as SCI's exclusive distributor.

57. On June 20, 2022, SCI sent a letter to Pan American stating in writing that it was dissatisfied with its brand sales in Puerto Rico, including Fireball Cinnamon Whisky. SCI indicated it was evaluating and analyzing its distribution channels in Puerto Rico and considering all viable options to reach a solution beneficial to both parties, including terminating the relationship by a negotiated resolution.

58. After July 2022, Pan American remained SCI's largest distributor in Puerto Rico.

59. SCI has not notified any dissatisfaction with Pan American's performance after July 2022.

60. On July 8, 2022, Pan American submitted to SCI a second purchase order to acquire 216 cases of Fireball Cinnamon Malt Beverage from SCI (the "Second Purchase Order").

61. The Second Purchase Order for Fireball Cinnamon Malt Beverage was never delivered to Pan American by SCI.

62. On July 26, 2022, SCI sent a letter to Pan American indicating that there continued to be a "misalignment" as to the best strategy to sell and market its products in Puerto Rico. It stated it would continue to honor purchase orders for SCI products previously sold to Pan

American, but would not accept purchase orders for products not previously sold to Pan American, including Fireball Cinnamon Malt Beverage products.

63. In or around October 2023, Pan American learned that SCI had notified certain businesses that it would be distributing Fireball Cinnamon Malt Beverage in Puerto Rico through another entity.

64. On October 20, 2023, Pan American sent a communication to SCI and CC1, through counsel, notifying the acts it considered illegal by both SCI and CC1 and asserting its rights as the exclusive distributor of the Fireball Cinnamon Whisky brand in Puerto Rico under Act 75.

65. On December 26, 2023, SCI sent a communication to Pan American denying that Pan American was an exclusive distributor under Act 75. It further indicated that regardless of any exclusivity that might exist for the distribution of Fireball Cinnamon Whisky products, Pan American would not distribute Fireball Cinnamon Malt Beverage products in Puerto Rico because Pan American used sub-distributors.

66. On February 15, 2024, Pan American responded to that letter, detailing the reasons it believed SCI's position was erroneous and reiterating its intent to defend its rights as exclusive distributor under Act 75.

67. On April 23, 2024, SCI sent a formal written communication to Puerto Rico supermarket chains stating that SCI, as exclusive supplier of Fireball Cinnamon Malt Beverage in Puerto Rico, was informing that CC1 would be the distributor and marketer of Fireball Cinnamon Malt Beverage for all of Puerto Rico.

68. CC1 is a distributor of alcoholic beverages with full knowledge of the Puerto Rico market and a direct competitor of Pan American.

69. In late 2021, CC1 began distributing in Puerto Rico Sheepdog whisky, a SCI product.

70. CC1 agreed to assume exclusive distribution of Fireball Cinnamon Malt Beverage in Puerto Rico.

71. CC1 knew that Pan American is the exclusive distributor of Fireball Cinnamon Whisky in Puerto Rico when it entered into an agreement with SCI for distribution of Fireball Cinnamon Malt Beverage products in mid-2023.

72. SCI designated CC1 as the exclusive distributor of Fireball Cinnamon Malt Beverage in Puerto Rico while Pan American continued as distributor of Fireball Cinnamon Whisky on the Island.

73. CC1 began selling the malt product in Puerto Rico on May 22, 2024.

74. CC1 distributes Fireball Cinnamon Malt Beverage at points of sale in Puerto Rico where Pan American distributes Fireball Cinnamon Whisky.

75. SCI sells CC1 a case of 50 ml bottles at $54.00, a price never offered to Pan American.

76. CC1 does not use sub-distributors to sell Fireball Cinnamon Malt Beverage.

77. The retail price of 50 ml Fireball Cinnamon Malt Beverage at points of sale is mostly one dollar ($1.00).

78. Under its contract with SCI, CC1 committed to buy 50,000 cases in one year.

79. As of June 21, 2024, 4,104 cases of the malt product had already arrived in Puerto Rico.

80. The price at which CC1 sells to its retailers is $6.50 per 10-bottle pack. Each case has 12 ten-packs.

81. CC1 has already paid the excise tax for the 4,104 cases received.

82. CC1's gross sales related to the 4,104 cases already purchased are $320,112.00. Projected to 50,000 cases, the total would be $3,900,000.00.

83. The total sales CC1 would make if it sold the target 50,000 cases would be $3,900,000.00.

84. CC1's annual sales in Puerto Rico for 2023 were $700 million. Therefore, if CC1 fully executed its sales strategy, total sales of Fireball Cinnamon Malt Beverage would represent less than half of 1% of CC1's annual sales.

85. CC1's advertising acknowledges that the malt product is a new Fireball because another Fireball exists. However, it does not highlight that the product is malt-based nor its alcohol by volume percentage. What it emphasizes is the Fireball demon and bottle and a price of $0.99 plus sales tax.

86. After the introduction of Fireball Cinnamon Malt Beverage into the Puerto Rico market, some businesses stopped ordering 50 ml Fireball Cinnamon Whisky from Pan American and others reduced their order quantities.

87. Pan American distributes Fireball Cinnamon Whisky to the supermarket chain locations in Puerto Rico.

88. Some supermarkets identify the ten-pack of 50 ml bottles with the Fireball Cinnamon Malt Beverage label simply as Fireball Cinnamon.


The court denied petitioners' motion for reconsideration. Still dissatisfied, petitioners appear and assign the following errors:

— The Court of First Instance erred by issuing a preliminary injunction in favor of a party that is not and has never been the distributor of the Fireball Malt product.

— The Court of First Instance erred in determining that the alleged possibility of confusion between Fireball Malt and Fireball Whisky constitutes an impairment of the distribution relationship under Act 75 that justifies granting a statutory injunction.

— The Court of First Instance erred by granting a preliminary injunction that is ineffective and inconsistent with the amended complaint.

— The Court of First Instance erred by issuing the requested preliminary injunction even though the balance of interests rendered that provisional remedy improper.

The parties filed their respective briefs and stipulated the transcript of the oral evidence. We proceed to decide with the benefit of the parties' positions, the transcript, and the applicable law.

-II-

-A-

The Distribution Contracts Act, Act No. 75 of June 24, 1964, as amended, 10 LPRA § 278, et seq. ("Act No. 75-1964") provides a damages remedy when domestic and foreign principals terminate or impair without just cause the established commercial relationships with their distributors, dealers, or agents. See Statement of Motives, Act No. 75-1964. The law creates a cause of action in damages available to distributors when they are stripped, without just cause, of the business they developed for the introduced product. Next Step Medical v. Bromedicon et al., 190 DPR 474, 489 (2014); Cruz Marcano v. Sánchez Tarazona, 172 DPR 526, 540 (2007); Medina & Medina v. Country Pride Foods, Ltd., 122 DPR 172, 189 (1988). Under Article 2 of the Distribution Contracts Act, 10 LPRA § 278a, a principal may not terminate an existing relationship under a distribution contract or take direct or indirect acts impairing the established relationship or refuse to renew the contract at its normal expiration, unless there is just cause as defined by the statute. Next Step Medical v. Biomet, Inc., 195 DPR 739, 747 (2016); Sistema de PR v. Interface Int'l, Inc., 123 DPR 379, 386 (1989).

The principal bears the burden to demonstrate just cause to avoid liability. Next Step Medical v. Biomet, Inc., supra, p. 754. The Supreme Court explained:

"Act No. 75 was designed with the express purpose of protecting the legitimate rights of distributors and remedying the harms caused to them—this, in relation to abusive practices by principals who, without just cause, arbitrarily impair contractual relations with distributors as soon as the distributors create a favorable market for their products and services. The statutory scheme prevents a principal from unjustly appropriating the added value ('plusvalía') of a business after a local distributor has conquered a market and clientele through their entrepreneurial efforts. In light of the foregoing, we have repeatedly stated that Act No. 75 creates a cause of action in favor of distributors to stop the principal's breach and be compensated in damages when, after introducing products in the market and achieving social recognition and sufficient sales, they are stripped, without just cause, of the business they developed."

The legislature empowered courts to grant provisional remedies or injunctive measures during litigation under Act No. 75-1964. The aim is "to avoid acts that could produce irreparable harm while the existence, or not, of just cause for termination of the contractual relationship is adjudicated." The statute seeks to foster stability in distribution relationships in Puerto Rico and eradicate practices that affect the parties' legitimate expectations in such relationships. The purpose of these remedies also is to "avoid weakening the distributor at this crucial stage of the conflict and level the parties' real power. As a first aid, it is akin to a tourniquet that prevents the distributor from bleeding out while asserting rights enshrined in Act No. 75."

Article 3-A of Act No. 75-1964, 10 LPRA § 278b-1, provides that the court may grant provisional remedies or injunctive measures through which the terms of the distribution contract shall remain in force while the court decides the merits regarding just cause for terminating the distribution agreement and whether remedies lie under Article 3 of Act No. 75-1964. Article 3-A reads:

"In any suit in which the termination of a distribution contract or any act impairing the relationship established between the principal or grantor and the distributor is directly or indirectly involved, the court may, during the pendency of the suit, grant any provisional remedy or injunctive measure to do or refrain from doing, ordering either or both parties to continue, in all its terms, the relationship established by the distribution contract, and/or to refrain from any act or omission impairing the same. In every case in which the provisional remedy herein provided is requested, the court shall consider the interests of all parties involved and the public-policy purposes underlying this chapter."

The aggrieved distributor must prove the negative impact on its business operations due to the impairment or termination of distribution, as the case may be, to obtain an injunction in its favor. The movant for the remedy need not necessarily prove: (1) irreparable harm; (2) lack of just cause for impairment or termination; and (3) likelihood of success on the merits. The principal, for its part, must rebut the movant's arguments or show the detriment that will befall its own business, products, or services if ordered to maintain the relationship pendente lite. The judge must evaluate each party's position in light of the statute's socioeconomic purpose.

The remedy contemplated by Article 3-A is provisional. The statute limits its application to a defined period. It expressly provides that the court may grant any interlocutory measure "during the pendency of the suit."

-B-

The writ of certiorari is the extraordinary procedural vehicle used so that a higher court may correct an error of law committed by a lower court. Unlike an appeal, the higher court has discretion to issue the writ of certiorari, as interlocutory matters are ordinarily involved. However, our discretion must be exercised reasonably, always seeking a just solution, as we have noted.

Rule 40 of this Court's Rules sets forth the criteria we must consider when addressing a request to issue a writ of certiorari. The Rule provides:

"The Court shall consider the following criteria in determining whether to issue a writ of certiorari or an order to show cause:

A. Whether the remedy and disposition of the challenged decision, as opposed to its reasoning, are contrary to law.

B. Whether the factual situation presented is the most suitable for analysis of the problem.

C. Whether there has been prejudice, partiality, or a gross and manifest error in the trial court's evaluation of the evidence.

D. Whether the matter requires more detailed consideration in light of the original record, which should be elevated, or more elaborate briefs.

E. Whether the stage of the proceedings is the most propitious for consideration.

F. Whether issuing the writ or the order to show cause will not cause undue fragmentation of the case and undesirable delay in the final resolution.

G. Whether issuing the writ or the order to show cause avoids a failure of justice."

-III-

Through their four assignments of error, petitioners argue that the provisional injunction authorized by the court is improper. They contend the contractual relationship between the entities does not concern exclusive distribution of Fireball Cinnamon Malt Beverage. Therefore, the injunctive remedy cannot be available to respondent with respect to a product it never distributed. According to petitioners, the provisional remedy has the effect of rewriting the parties' contractual relations and also contravenes Article 3-A of the Distribution Contracts Act, Act No. 75-1964, 10 LPRA § 278b-1. They argue the legal bond between Pan American and Sazerac pertains solely to distribution of Fireball Cinnamon Whisky in Puerto Rico, and not the Fireball Cinnamon Malt Beverage product. Thus, petitioners invite us to revisit the contours governing the injunction set forth in Act No. 75-1964.

The interpretive doctrine of Article 3-A delineates the confines under which the court must adjudicate a petition of that nature. Analysis of the issuance of this extraordinary remedy requires the respondent, at the threshold, to establish its status as a distributor and, therefore, that it is covered by Act No. 75-1964. To a large extent, the propriety of the injunctive remedy requested and the likelihood that respondent will prevail under the action brought pursuant to the statute will depend on that showing.

In this case there is no dispute about respondent's status as distributor with respect to Fireball Cinnamon Whisky in Puerto Rico. Petitioners appointed respondent as agent and exclusive distributor of several of their products in Puerto Rico, including Fireball Cinnamon Whisky. The contract does not specify a term for the commercial relationship. Product prices are set by mutual agreement. Respondent is responsible for promoting the product and both parties share advertising expenses. Therefore, respondent is a distributor protected by Act No. 75-1964.

The purpose of the preliminary injunction at issue here is to prevent violations of Act No. 75-1964. For that reason, the scrutiny regarding its issuance or denial must be limited to whether the remedy complies with the statute's provisions and requirements. Within those bounds, respondent also had to prove the negative impact on its business operations due to the alleged impairment. In other words, to show an impairment and that such conduct negatively affected respondent's commercial operation.

Respondent's brief sets out an alleged decrease in customers and sales of Fireball Cinnamon Whisky because Sazerac introduced the 50 ml Fireball Cinnamon Malt Beverage into the market through a different distributor, CC1. In particular, respondent asserted decreased sales, product confusion, and CC1's piggybacking on the market Pan American Properties created for Fireball Cinnamon Whisky.

Respondent's executive vice-president, Mr. Alberto Fernández González, testified about the corporation's efforts to introduce Fireball Cinnamon Whisky into the local market in 2013 (excerpts omitted for brevity in this translation). Evidence established the substantial marketing and distribution efforts Pan American undertook to create consumer demand for the product. Additional testimony by Mr. Alejandro Calancha Figueras, customer business manager, corroborated that Fireball became the preferred "shot" product and the third best-selling whisky in Puerto Rico by 2019–2022, based on IRI market share data.

Evidence showed a positive sales trend until the 50 ml Fireball Cinnamon Malt Beverage entered the Puerto Rico market. Testimony reflected that some customers stopped purchasing or reduced purchases of the 50 ml whisky after the malt product launched and that both products were offered side-by-side at points of sale. Pan American presented sales data showing a decline in 2024, including a reported 26.5% decrease in its Fireball 50 ml customer base year-over-year for April–May.

Notably, petitioners initially contemplated that Pan American would distribute the new malt beverage. The parties negotiated for years; Pan American obtained label approvals and placed purchase orders in 2021 and 2022 which SCI did not fulfill. In April 2024, SCI advised it would distribute the malt product through CC1. Meanwhile, CC1 agreed to purchase 50,000 cases, began selling on May 22, 2024, and priced ten-packs to retailers at $6.50, with retail around $1 per 50 ml unit.

Petitioners' own admissions established that the 50 ml malt product was designed to compete with the whisky, that both share branding elements (e.g., "Fireball," red demon,

"Red Hot," cinnamon flavor), that the consumer experience was intended to be similar, and that malt-based products were identified in planning documents as a "threat" to the whisky line. The trial court concluded this strategy sought to leverage the market Pan American built for the whisky and to maintain product confusion to increase sales of the lower-priced malt product, which itself constitutes impairment under Act 75.

Balancing the equities, the court found the projected impact of the injunction on CC1 minimal relative to its overall sales, and that maintaining the injunction advanced Act 75's public policy protecting distributors' goodwill and ensuring stability in distribution relationships.

-IV-

For the reasons stated, we issue the writ of certiorari, affirm the challenged Resolution and Order, and vacate our February 7, 2025 Resolution so that the trial court's provisional injunction has full effect while the case concludes. The Court of First Instance need not await the mandate to continue proceedings (Rule 35(A)(1)).

So ordered by the Court, and certified by the Clerk of the Court of Appeals.

Atty. Lilia M. Oquendo Solís

Clerk of the Court of Appeals

End of Document

Translator's Note: This is an unofficial translation prepared for filing convenience. All quotations placed in quotation marks reflect quotations in the source record where applicable.