**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

RAFAEL HERNANDEZ, individually and on behalf of all others similarly situated,

Plaintiff,

v.

SAZERAC COMPANY, INC.,

Defendant.

_______________________________________/

Case No. 1:25-cv-24568-PCH

**CLASS ACTION**

**_CORRECTED_ DECLARATION OF CHRISTOPHER GOLD IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION**

I, Christopher Gold, declare as follows,

1. I am an attorney licensed to practice law in the State of Florida and before this Court, and I am counsel of record for Plaintiff Rafael Hernandez and the proposed Class in this action.

2. I submit this declaration in support of Plaintiff's Renewed Motion for Class Certification and Incorporated Memorandum of Law, to authenticate the exhibits submitted with that motion, and in support of Plaintiff's request under Federal Rule of Civil Procedure 23(g) that the Court appoint me and Gold Law, P.A. as counsel for the Class.

3. I have personal knowledge of the matters stated in this declaration. If called as a witness, I could and would testify competently to each of the matters stated in this declaration.

4. Attached to this declaration are **Exhibits 1 through 19**. Each exhibit bearing a Bates number with the prefix "SAZ-HER-" was produced by Sazerac in this action. Each exhibit consisting of a discovery response was served on Plaintiff by counsel for Sazerac, and I received it in the ordinary course of my representation of Plaintiff.

5. **Exhibit 1** is a true and correct copy of a document produced by Sazerac in this action, bearing Bates number SAZ-HER-00018487. Sazerac produced the workbook in native format, accompanied by a one-page Bates-stamped slip sheet bearing the production number and

a confidentiality legend reading "CONFIDENTIAL – ATTORNEYS' EYES ONLY." Exhibit 1 consists of that slip sheet together with a printout of the native file, to which I have affixed a legend stating the production number and designation associated with the native file.

6. **Exhibit 2** is a true and correct copy of a document produced by Sazerac in this action, bearing Bates numbers SAZ-HER-00060620 through SAZ-HER-00060621. The document is an electronic mail chain dated July 17, 2020 and titled [redacted] Sazerac stamped each page of the document "Confidential."

7. **Exhibit 3** is a true and correct copy of a document produced by Sazerac in this action, bearing Bates numbers SAZ-HER-00020066 through SAZ-HER-00020068. The document is an internal electronic mail dated December 17, 2021 and titled [redacted] Sazerac stamped each page of the document "Confidential."

8. **Exhibit 4** is a true and correct copy of Defendant's Answers to Plaintiff's First Set of Interrogatories, dated June 4, 2026, served on Plaintiff by counsel for Sazerac on June 4, 2026.

9. **Exhibit 5** is a true and correct copy of a document produced by Sazerac in this action, bearing Bates numbers SAZ-HER-00140298 through SAZ-HER-00140302. The document is an electronic mail exchange dated September 16, 2020 and titled [redacted] Sazerac stamped each page of the document "Confidential."

10. **Exhibit 6** is a true and correct copy of Defendant's Answers to Plaintiff's First Requests for Production, dated June 5, 2026, served on Plaintiff by counsel for Sazerac on June 5, 2026.

11. **Exhibit 7** is a true and correct copy of a document produced by Sazerac in this action, bearing Bates numbers SAZ-HER-00126127 through SAZ-HER-00126128. The document is an electronic mail chain dated October 6, 2021 and titled [redacted]

[redacted] Sazerac stamped each page of the document "Confidential."

12. **Exhibit 8** is a true and correct copy of a document produced by Sazerac in this action, bearing Bates numbers SAZ-HER-00127980 through SAZ-HER-00127982. The document is an electronic mail chain dated May 12 through June 17, 2022 and titled [redacted] Sazerac stamped each page of the document "Confidential."

13. **Exhibit 9** is a true and correct copy of a document produced by Sazerac in this action, bearing Bates number SAZ-HER-00003683. The document is a Microsoft Excel workbook titled [redacted] Sazerac produced the workbook in native format, accompanied by a one-page Bates-stamped slip sheet bearing the production number and the legend "Confidential." Exhibit 9 consists of that slip sheet together with a printout of the native file, to which I have affixed a legend stating the production number and designation associated with the native file.

14. **Exhibit 10** is a true and correct copy of a document produced by Sazerac in this action, bearing Bates numbers SAZ-HER-00128191 through SAZ-HER-00128196. The document is a six-page export titled [redacted] Sazerac produced the document as image files in JPEG format, and stamped each page "Confidential." The pages as produced are rotated. They have been rotated for legibility in the exhibit as assembled and are otherwise unaltered.

15. **Exhibit 11** is a true and correct copy of three documents produced by Sazerac in this action, bearing Bates numbers SAZ-HER-00128724 through SAZ-HER-00128726, SAZ-HER-00127104 through SAZ-HER-00127107, and SAZ-HER-00125375 through SAZ-HER-00125381. The documents are [redacted]

[redacted] Sazerac stamped each page of each document "Confidential."

16. **Exhibit 12** is a true and correct copy of a document produced by Sazerac in this action, bearing Bates numbers SAZ-HER-00125444 through SAZ-HER-00125447. The document is an electronic mail chain dated May 1, 2023 and titled [redacted] Sazerac stamped each page of the document "Confidential."

17. **Exhibit 13** is a true and correct copy of a document produced by Sazerac in this action, bearing Bates number SAZ-HER-00158989. The document is a Microsoft Excel workbook titled [redacted] Sazerac produced the workbook in native format as the whole of its second production, accompanied by a one-page Bates-stamped slip sheet bearing the production number and a confidentiality legend reading "HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY." Exhibit 13 consists of that slip sheet together with a printout of the native file, to which I have affixed a legend stating the production number and designation associated with the native file.

18. **Exhibit 14** is a true and correct copy of the firm resume of Gold Law, P.A.

19. **Exhibit 15** is a true and correct copy of Defendant's Supplemental Response to Request for Production No. 9, served on Plaintiff by counsel for Sazerac on September 8, 2026. The document is thirty-two pages long and lists 1,296 Bates numbers that Sazerac identified as generally responsive to Plaintiff's request for documents reflecting internal concern about the similarity of the two products and the risk of consumer confusion between them.

20. **Exhibit 16** is a true and correct copy of two documents produced by Sazerac in this action, bearing Bates number SAZ-HER-00127185 and Bates numbers SAZ-HER-00128005 through SAZ-HER-00128008. [redacted]

[redacted] Sazerac stamped each page of each document "Confidential."

21. **Exhibit 17** is a true and correct copy of Defendant's Supplemental Answer to Interrogatory No. 15, served on Plaintiff by counsel for Sazerac on September 8, 2026.

22. **Exhibit 18** is a true and correct copy of the certified English translation of the decision of the Puerto Rico Court of Appeals in *Pan Am Props. Corp. v. Sazerac Co.*, No. KLCE202500119, 2025 PR App. LEXIS 1706.

23. **Exhibit 19** is a true and correct copy of the Complaint filed by Sazerac in *Sazerac Co. v. Stout Brewing Co., LLC*, No. 4:15CV-107-JHM (W.D. Ky. filed Aug. 14, 2015).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 18, 2026, at Miami Beach, Florida.

*/s/ Christopher Gold*
Christopher Gold, Esq

# EXHIBIT

# 1

Filed under seal.

# EXHIBIT

# 2

Filed under seal.

# EXHIBIT

# 3

Filed under seal.

# EXHIBIT

# 4

Filed under seal.

# EXHIBIT

# 5

Filed under seal.

# EXHIBIT

# 6

Filed under seal.

# EXHIBIT

# 7

Filed under seal.

# EXHIBIT

# 8

Filed under seal.

# EXHIBIT

# 9

Filed under seal.

# EXHIBIT

# 10

Filed under seal.

# EXHIBIT

# 11

Filed under seal.

# EXHIBIT

# 12

Filed under seal.

# EXHIBIT

# 13

Filed under seal.

# EXHIBIT

# 14

GOLD LAW

CONSUMER PROTECTION ATTORNEYS

350 Lincoln Rd., 2nd Floor, Miami Beach, FL 33139 • 305-900-GOLD • chris@chrisgoldlaw.com • www.chrisgoldlaw.com

# GOLD LAW, P.A.
## Firm Resume

### FIRM OVERVIEW

Gold Law, P.A. is a boutique litigation firm focused exclusively on representing people against companies in complex and class action litigation, with a particular emphasis on telemarketing, debt collection, privacy, deceptive practices, and other consumer-focused litigation. The firm was founded to combine the sophistication, discipline, and scale of major national class-action practices with the efficiency and hands-on advocacy of a lean litigation team.

Gold Law routinely litigates matters involving novel theories, extensive electronic discovery, expert-driven proof, and coordinated multi-party proceedings. The firm's Founder & Principal has served as lead or co-lead counsel in certified class actions, as a member of the court-appointed Plaintiffs' Steering Committee or other subcommittees in multiple multidistrict litigation matters, and has achieved substantial recoveries for consumers, investors, and governmental entities in state and federal courts across the country. The firm was founded in 2024, prosecutes its cases on a contingency-fee basis, and advances the costs of litigation, including the cost of expert analysis, on behalf of the classes it represents.

### CONSUMER PROTECTION AND TCPA PRACTICE

The core of the firm's current practice is plaintiff-side consumer protection class litigation under the Telephone Consumer Protection Act, 47 U.S.C. § 227, and its implementing regulations at 47 C.F.R. § 64.1200; the Florida Telephone Solicitation Act; the Fair Debt Collection Practices Act; and the Fair Credit Reporting Act, together with data-breach and false-advertising class actions. The firm's TCPA cases regularly turn on the analysis of large messaging-platform and dialer productions, and the firm retains and works directly with data and telecommunications experts to develop that proof.

Gold Law litigates in federal courts nationwide, appearing pro hac vice, and maintains the attorney time, staff, expert, and financial resources necessary to prosecute contested class certification and trial in cases of this kind.

### CHRISTOPHER GOLD — FOUNDER & PRINCIPAL

Christopher Gold, Esq. is the founder and principal of Gold Law, P.A. He is a nationally recognized plaintiff-side class action and complex litigation attorney with extensive experience prosecuting sophisticated matters through trial, settlement, and appeals. Mr. Gold is admitted to practice in Florida and appears pro hac vice in federal courts throughout the United States.

Prior to founding Gold Law, Mr. Gold practiced for more than a decade at one of the nation's most prominent plaintiff-side class action firms, where he became one of the youngest partners in the firm's history. Throughout his career, Mr. Gold has been entrusted with leadership roles in some of the largest and most complex consumer and mass-tort cases in the United States.

His experience includes, among other matters:

- **Trial team member** in *In re Facebook Biometric Information Privacy Litigation* (N.D. Cal.), which resulted in a **$650 million class action settlement**, one of the first major recoveries under the Illinois Biometric Information Privacy Act.
- **Appointment to the Plaintiffs' Steering Committee** in *In re Allergan Biocell Textured Breast Implant Products Liability Litigation* (D.N.J.), a nationwide multidistrict litigation involving complex scientific, medical, and regulatory issues.
- **Service on the Discovery Committee** and **the Government Entities Committee** in *In re Juul Labs, Inc. Marketing, Sales Practices, & Products Liability Litigation* (N.D. Cal.), directly representing the **Miami-Dade County School Board** and the **Broward County School Board**, among other governmental entities.

In addition to consumer and mass-tort litigation, Mr. Gold has represented institutional investors in major U.S. securities-fraud class actions and in international arbitration proceedings before Brazil's São Paulo Stock Exchange (BOVESPA), involving complex cross-border financial disputes.

## PROFESSIONAL RECOGNITION

Mr. Gold's work has been recognized by independent legal publications and peer-review organizations, including:

- **Florida's Most Effective Lawyers in Privacy Law**, American Law Media (2020)
- **Super Lawyers** (multiple selections)
- **National Trial Lawyers – Top 40 Under 40 (Plaintiff)**

## REPRESENTATIVE CLASS ACTION AND COMPLEX LITIGATION RESULTS

Mr. Gold has served as certified class counsel, lead counsel, or a key member of court-appointed leadership teams in cases resulting in substantial class recoveries, including:

- *In re Facebook Biometric Information Privacy Litigation*, No. 3:15-cv-03747-JD (N.D. Cal.) — **$650,000,000**
- *Bobo v. Clover Network, LLC*, No. 2023CH000168 (18th Jud. Cir., DuPage Cnty., IL) — **$15,000,000**
- *Alvarez v. Sunshine Life & Health Advisors, LLC*, No. 2021-020996-CA-01 (11th Jud. Cir., Miami-Dade Cnty.) — **$2,556,000**
- *Borges v. SmileDirectClub, LLC*, No. 2022-CA-010840 (9th Jud. Cir., Orange Cnty., FL) — **$2,950,000**
- *Kirkpatrick v. Genesco Inc.*, No. 2023-003211-CA-01 (11th Jud. Cir., Miami-Dade Cnty.) — **$855,000**

- *Elfstrom v. Aspen Dental*, No. 23-CA-000244 (20th Jud. Cir., Lee Cnty., FL) — **$590,000**
- *Kowlessar v. EZPawn*, No. 2022-008506-CA-01 (11th Jud. Cir., Miami-Dade Cnty.) — **$5,057,220**
- *Ram v. Frank Speech, LLC*, No. 2022-CA-011384 (9th Jud. Cir., Orange Cnty., FL) — **$3,362,925**
- *Darvish v. Aegis Financial, LLC*, No. 2023CH000015 (18th Jud. Cir., DuPage Cnty., IL) — **$2,108,962**
- *Boland v. Gerdau S.A.*, No. 1:16-cv-3925 (S.D.N.Y.) — **$15,000,000** (securities fraud class action)
- *In re Winn-Dixie Stores, Inc. Shareholder Litigation*, No. 16-2011-CA-010616 (Fla. 4th Cir. Ct.) — **$9,000,000**
- *In re AuthenTec, Inc. Shareholder Litigation*, No. 5-2012-CA-57589 (Fla. 18th Cir. Ct.) — **$10,000,000**

## CONCLUSION

Gold Law, P.A. brings big-firm class-action experience to a boutique practice model, enabling the firm to prosecute complex litigation efficiently while maintaining direct attorney involvement at every stage. The firm's results reflect sustained success in high-risk, contingent litigation requiring advanced legal skill, significant resource investment, and careful case management.

# EXHIBIT

# 15

Filed under seal.

# EXHIBIT

# 16

Filed under seal.

# EXHIBIT

# 17

Filed under seal.

# EXHIBIT

# 18

Southeast Spanish, Inc.

Professional Document Translation Services and Worldwide Apostille Services
Main Office: Southeast Spanish, Inc., 11409 Municipal Center Dr., #23002, Knoxville, TN 37933
877-374-0095 (Office), +1 865-777-1177 (International Calls)
**American Translators Association [ATA] Member Number: 264123, expires January 2028**
www.SeSpanish.com, info@sespanish.com

September 17, 2026

To whom it may concern:

RE: Certification of Translation of the following document(s):

- Legal, Court Document from Puerto Rico (United States) – PAN AM Props. v. Sazerac Co._ Inc._2025 PR

## Translator's Declaration and Certification

**I, Daniel N. Hickman, declare that I understand the Spanish language and the English language; that I am competent to translate from Spanish to English**; that I hold advanced degrees from the University of Tennessee and Georgetown University in Modern Foreign Languages, and that I am a professional translator; and that to the best of my knowledge and belief, the statements in the English language in the attached translation, which I have stamped and signed (Translated/Verified by Southeast Spanish, Inc.), have the same meanings as the statements in the Spanish language in the scanned and included document(s), which I have examined and stamped and signed. **Additionally, I certify that the translation of the document mentioned above is true and accurate to the best of my abilities**.

According to the United States Citizenship and Immigration Services (USCIS) and the Department of Homeland Security (DHS), the preceding translation statement certifies the above referenced document. For more information, please see the following site: www.uscis.gov.

This document has not been translated by a family member, friend or business associate.

**Translation Certification Statement**

This translation was verified by the following individual:
Daniel N. Hickman, Ph.D. (on behalf of Southeast Spanish, Inc.)

September 17, 2026

[Signature] [Date]

CERTIFICATE OF ACKNOWLEDGMENT OF NOTARY PUBLIC
This document was acknowledged before me, Caleb J. Brush, by Daniel N. Hickman.

CALEB J. BRUSH
STATE OF TENNESSEE NOTARY PUBLIC
COUNTY OF KNOX

September 5, 2027

(Signature of Notarial Officer) My commission expires:

Copyright © 2007—2026 Southeast Spanish, Inc.

LexisNexis

**User Name:** Christopher Gold
**Date and Time:** Thursday, September 17, 2026 1:42 PM EDT
**Job Number:** 296064873

## Document (1)

1. PAN AM Props. v. Sazerac Co., Inc.

**Client/Matter:** -None-
**Search Terms:**
**Search Type:** Natural Language
**Narrowed by:**

| Content Type | Narrowed by |
| --- | --- |
| | -None- |



seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

## ***PAN AM Props v. Sazerac Co., Inc.***

Puerto Rico Court of Appeals, San Juan Judicial Region
June 27, 2025
KLCE202500119

**Reporter:**
2025 PR App. LEXIS 1706 *; 2025 LX 299654; 2025 WL 2048234

PAN AMERICAN PROPERTIES, CORP., Respondent, v. SAZERAC COMPANY, INC. and CCI BEER DISTRIBUTORS, INC., Petitioners

**Prior History: [*1]** CERTIORARI arising from the Court of First Instance, Bayamon Superior Court. Case No. BY2024CV03030. Subject matter: PRELIMINARY INJUNCTION; DECLARATORY JUDGMENT; LAW 75; BREACH OF CONTRACT; DAMAGES; TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS; CONTRACT TO THE DETRIMENT OF A THIRD PARTY; UNFAIR COMPETITION.

**Judges**: SPECIAL PANEL. Panel composed of its president, Judge Rivera Colon, Judge Monge Gomez, and Judge Cruz Hiraldo.

**Opinion by**: Cruz Hiraldo

**Opinion**

Cruz Hiraldo, Presiding Judge

**JUDGMENT**

In San Juan, Puerto Rico, on June 27, 2025.

Petitioners Sazerac Company, Inc. and CCI Beer Distributors, Inc. appear before us seeking review of a Resolution and Order issued on February 4, 2025, by the Court of First Instance, Bayamon Superior Court. In that order, the trial court granted the preliminary injunction requested by respondent Pan American Properties, Corp. Accordingly, it prohibited the petitioners from "selling Fireball Cinnamon Malt Beverage products in Puerto Rico during the pendency of the above-captioned case."

The petitioners also filed a Motion in Aid of Jurisdiction, which we granted on February 7, 2025. Our resolution**[*2]** had the effect of staying the enforcement/effects of the *Resolution and Order* issued on February 4, 2025.

We now proceed to resolve the matter based on the parties' submissions and the stipulated transcript of the oral evidence.

I

On May 24, 2024, respondent filed a Complaint against the petitioners, alleging impairment of its exclusive distribution agreement in violation of the Distribution Contract Act, Law No. 75 of June 24, 1964, as amended, 10 L.P.R.A. § 278 et seq. (First Cause of Action); Declaratory Judgment (Second Cause of Action); damages for violation of Law No. 75 (Third Cause of Action); damages (Fourth Cause of Action); breach of contract (Fifth Cause of Action); tortious interference with contractual relations (Sixth Cause of Action); and damages for violations of the applicable provisions of the Civil Code

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

concerning bad faith, unfair competition, and unjust enrichment (Seventh Cause of Action). In summary, the causes of action are based on an alleged impairment of the contractual relationship between the parties, in which the petitioners allegedly "seek to unjustly profit from the efforts, reputation, and goodwill cultivated by Pan American**[*3]** over more than ten (10) years through its efforts relating to the Fireball Cinnamon Whisky brand in Puerto Rico." The petitioners also requested a preliminary injunction, as provided under Article 3-A of Law No. 75, 10 L.P.R.A. § 278b-1.

At the hearing held on May 31, 2024, the trial court denied the petitioners' motion to dismiss the request for a preliminary injunction and set a date for the merits hearing on the preliminary injunction. The hearing took place on June 10, 12, 14, 18, 20, and 21, 2024. The parties stipulated certain facts and several pieces of evidence. The parties also presented documentary, demonstrative, and testimonial evidence during the hearing.

The respondent's testimonial evidence consisted of the testimony of Mr. Alberto Fernandez Gonzalez, Executive Vice President of Pan American; Mr. Luis Eduardo Albandoz Acevedo, Vice President of Sales of Pan American; and Mr. Javier Alejandro Calancha Figueras, Customer Business Manager for Pan American's Liquor Division. The petitioners' testimonial evidence consisted of the testimony of Mr. Juan Carlos Roman Hernandez, Commercial Director for Central America and the Caribbean at Sazerac**[*4]**, and Mr. Adrian Jorge Rivera Cebollero, Vice President of Sales and Marketing at CC1. After the hearing, the Court of First Instance made the following findings of fact:

1. SCI designated Pan American as the distributor of Fireball Cinnamon Whisky and Chila Orchata in Puerto Rico through a communication dated August 1, 2013. *(Stipulated.)*

2. The aforementioned communication provided, in relevant part, as follows:

> Our company, Sazerac Company, Inc. ("SCI"), is the rightful owner of the trademark rights for Fireball Cinnamon Whisky and Chila Orchata and, as such, has the worldwide authority to appoint and terminate its distributors, importers, and agents at its sole discretion.
>
> Therefore, we are pleased to confer to your company, Pan American Properties Corp. ("Distributor"), whose main purpose is the distribution of alcoholic beverages in Puerto Rico, authorization to sell the brands noted above in the country of Puerto Rico. This privilege is effective immediately and valid unless sooner terminated by SCI for any reason.
>
> Distributor shall use its best effort to sell, promote, merchandise, and grow overall business in accordance with Puerto Rico laws, and in keeping with SCI's sales and marketing guidelines and budgets. Distributor agrees to provide SCI with all reporting sales and other information as requested by SCI.
>
> Distributor acknowledges that SCI is the owner or licensee, as applicable, of all brands, formulas, labels, designs, trademarks, trade names, trade dress, designs and other indicia of ownership, origin and quality of the Products ("Intellectual Property") and all of the goodwill attributable thereto. Distributor may make use of the Intellectual Property only as authorized by SCI in writing and any use shall inure solely to the benefit of SCI or its affiliated companies. Distributor further acknowledges that nothing in this Agreement or in its relationship with SCI gives Distributor any right, title or interest in or to such Intellectual Property, other than as a distributor of the Products pursuant to this Agreement. Distributor shall make no contrary representations or claims. Distributor shall cease all use of the Intellectual Property upon the termination of this Agreement either in part with respect to a particular Product or in full.

3. The aforementioned communication established, among other things, that Pan American would use its "best**[*6]** efforts" to sell, promote, market, merchandise, and grow the business related to Fireball Cinnamon Whisky and Chila Orchata, in accordance with Puerto Rico law and SCI's sales and marketing guidelines. (Stipulated.)

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

4. CC1 currently distributes Fireball Cinnamon Malt Beverage in Puerto Rico. *(Stipulated.)*

5. Pan American distributes Fireball Cinnamon Whisky in Puerto Rico. *(Stipulated.)*

6. In compliance with its distribution agreement with SCI, Pan American introduced the Fireball Cinnamon Whisky brand to the Puerto Rico market.

7. Prior to 2013, SCI's Fireball Cinnamon Whisky brand had no presence and had not been sold in the Puerto Rico market.

8. From 2013 until the introduction of Fireball Cinnamon Malt Beverage in May 2024, Pan American was the only entity that had distributed Fireball Cinnamon-branded products in Puerto Rico.

9. From 2013 to the present, Pan American has developed the Fireball Cinnamon Whisky brand throughout Puerto Rico through the work of its distribution team and through significant monetary investments.

10. Pan American's efforts relating to Fireball Cinnamon Whisky include**[*7]**, among other things, the creation of a special marketing fund under which SCI and Pan American share the costs equally (50/50).

11. When Pan American began selling Fireball Cinnamon Whisky in Puerto Rico, it created the "flavored whiskeys" category.

12. By 2022, Fireball Cinnamon Whisky accounted for 97% of sales in that category in Puerto Rico. In other words, Pan American took the product from zero to 97% between 2013 and 2022.

13. Pan American succeeded in positioning Fireball Cinnamon Whisky as the number-three (3) whiskey brand in the Puerto Rico market from 2019 through 2022.

14. Pan American achieved distribution of Fireball Cinnamon Whisky in 98% of "off-site" distribution channels in Puerto Rico, 99% of large retail chains, 91% of small retail chains, and 96% of liquor stores.

15. From 2013 to the present, the distribution relationship between SCI and Pan American for Fireball Cinnamon Whisky has continued without interruption. Likewise, Pan American's efforts have continued despite the difficulties Puerto Rico has experienced in recent years, including **[*8]** hurricanes, earthquakes, and the COVID-19 pandemic.

16. After many years of business relationship, SCI increased the number of its products distributed by Pan American. In 2017 and 2018, respectively, SCI awarded Pan American distribution rights in Puerto Rico for additional products, including Black Magic rum and Fris Vodka.

17. From the beginning of their relationship in 2013, the conduct of SCI and Pan American recognized that there was an exclusive distribution relationship for Fireball Cinnamon Whisky in Puerto Rico.

18. The only entity that has distributed Fireball Cinnamon Whisky in Puerto Rico has been Pan American.

19. The contractual relationship between Pan American and SCI concerning the exclusive distribution of Fireball Cinnamon Whisky in Puerto Rico is documented through the transactions conducted between the two entities, Pan American's activities in the Puerto Rico market, and their communications concerning related matters.

20. In late 2019, Pan American negotiated with Puerto Rico Supply, a distributor of alcoholic products and beverages, to distribute Fireball Cinnamon Whisky to gas stations and small businesses, known within the distribution chain as "down**[*9]** the trade."

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

21. SCI, as represented by its representative at the time, Ken Chapman, agreed with that strategy.

22. As a result of that strategy, hundreds of points of sale were added for distribution of the product.

23. With respect to the customers to whom Puerto Rico Supply delivers the products, Pan American pays for the promotions and negotiates the prices. Those businesses sell the products to consumers at the same retail price. Any costs charged by Puerto Rico Supply are deducted from Pan American's profit margin and do not affect the retail price paid by the consumer.

24. Around September 2021, through Mr. Ken Chapman, SCI contacted Pan American regarding the introduction into the Puerto Rico market of a new product called Fireball Cinnamon Malt Beverage, to be sold in 50 ml containers.

25. Fireball Cinnamon Malt Beverage would be sold at a lower price than Fireball Cinnamon Whisky. The intention was to sell the 50 ml malt beverage bottle for ninety-nine cents ($0.99).

26. Fireball Cinnamon Malt Beverage is not whisky, but rather a malt beverage with a whisky flavor and an alcohol-by-volume level of 16.5%, compared **[*10]** with 33% for Fireball Cinnamon Whisky.

27. Pan American and SCI exchanged multiple communications concerning the arrangement for the introduction and distribution of the malt beverage product in Puerto Rico.

28. After multiple communications, an agreement for Pan American to distribute the new Fireball Cinnamon Malt Beverage product was not reached, because the parties could not agree on the price necessary for the product to be sold at retail for $0.99 and without the use of subdistributors, in accordance with the strategy established by SCI.

29. The 50 ml Fireball Cinnamon Malt Beverage product is very similar to the 50 ml Fireball Cinnamon Whisky product. The labels of both products share multiple identical distinctive elements, including: the yellow color; a figure of a red dragon or demon spitting a fireball; the words "red" and "hot" on either side of that figure; a label-border design resembling burned paper; the typeface, size, and color of the words "Fireball," "hot," and "red"; the placement of the text and the colors used in the background; the placement of the principal elements (the border, demon, the words "red," "hot," "Fireball," and "Cinnamon") within the label design**[*11]**; the cinnamon flavor, among other similarities. In addition, the 50 ml bottles for both products are the same size and shape, have a red cap, and the liquid inside both has the same amber color.

30. Given the substantial similarity between the presentation of Fireball Cinnamon Malt Beverage and that of the 50 ml Fireball Cinnamon Whisky, an average consumer would have difficulty distinguishing between the two products.

31. SCI acknowledges that, because of their similarity, the two products may compete with each other when sold in the same size. SCI also acknowledges that, from a distance, it is not possible to identify which of the two 50 ml products is which.

32. According to SCI, Fireball Cinnamon Malt Beverage is formulated to have the same taste and provide consumers with an experience similar to that of the whisky product.

33. SCI is aware that, in the Puerto Rico market, consumers refer to both products—the malt beverage and the whisky—as "Fireball."

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

34. The differences between the two products are: their price; alcohol by volume (ABV) (the whisky has 33%, while the 50 ml malt beverage has 16.5%); the nature of the product based on its method of manufacture (distilled versus fermented); and the treatment by tax authorities **[*12]** with respect to labeling and taxation requirements.

35. In Puerto Rico, as in other jurisdictions, Fireball Cinnamon Whisky is sold in 50 ml bottles. It is also sold in 200 ml, 750 ml, 1-liter, and 3-quart bottles.

36. The size that Pan American sells the most is 750 ml. Sales of that size account for 90% of total product sales.

37. SCI's plans concerning the distribution of Fireball Cinnamon Malt Beverage in Puerto Rico include selling it in 50 ml bottles, and it is currently sold in bottles of that size.

38. SCI's plans concerning the distribution of Fireball Cinnamon Malt Beverage in Puerto Rico include selling it in establishments where 50 ml Fireball Cinnamon Whisky is also sold, such as gas stations, convenience stores, chinchorros, and other "down the trade" businesses. It is currently sold in this manner.

39. The marketing strategy for 50 ml Fireball Cinnamon Whisky is based on it being an impulse purchase. The strategy for the new Fireball Cinnamon Malt Beverage product is likewise based on it being an impulse purchase.

40. The potential for confusion between Fireball Cinnamon Malt Beverage and Fireball Cinnamon Whisky is common, reasonable, and foreseeable, and has **[*13]** been the subject of multiple federal lawsuits in other jurisdictions.

41. Before the introduction of Fireball Cinnamon Malt Beverage, the only products bearing SCI's "Fireball Cinnamon" designation sold in Puerto Rico had been distributed by Pan American.

42. The Fireball Cinnamon Malt Beverage products are an extension and derivative of the "Fireball Cinnamon" brand.

43. The Fireball Cinnamon Malt Beverage products constitute a new version of the "Fireball" and "Fireball Cinnamon" brands.

44. SCI's representations to Pan American regarding Fireball Cinnamon Malt Beverage included statements that it would be a "game changer" and that they would sell more than 50,000 cases of the product.

45. As part of the negotiations concerning distribution of the malt beverage product, SCI expressly asked Pan American to prepare the applicable labels for Fireball Cinnamon Malt Beverage to be used in Puerto Rico, in accordance with applicable local regulations.

46. Pan American took the necessary steps to obtain approval of the Fireball Cinnamon Malt Beverage labeling from the Puerto Rico Department of the Treasury, and obtained the government approval necessary **[*14]** to import the products into Puerto Rico.

47. SCI approved the labeling of Fireball Cinnamon Malt Beverage specifically for Puerto Rico, and that labeling identified Pan American as the distributor of the product.

48. On November 23, 2021, SCI representatives conducted an in-person visit to learn about the Puerto Rico market (a "market visit") together with representatives of Pan American.

49. During that visit, the parties specifically discussed the introduction of Fireball Cinnamon Malt Beverage products into the Puerto Rico market. Pan American expressed concerns about the fact that the ABV of Fireball Cinnamon Malt Beverage was lower than that of Fireball Cinnamon Whisky and about the potential impact that this difference could have on consumers' perception of the brand.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

50. In some states in the United States, Fireball whisky cannot be sold in convenience stores. For that reason, SCI introduced Fireball Cinnamon Malt Beverage, so that Fireball products could be sold in states where whisky could not be sold in convenience stores.

51. SCI's nationwide pricing and marketing strategy for the malt beverage**[*15]** is to sell it (1) at an affordable price in order to encourage its purchase and (2) at points of sale, such as grocery stores and gas stations, without the involvement of any subdistributor.

52. SCI acknowledges that its strategy is not to make efforts to differentiate Fireball Cinnamon Malt Beverage from Fireball Cinnamon Whisky products, but instead to focus on "market access."

53. SCI acknowledges that, when analyzing the strengths, threats, weaknesses, and opportunities of the Fireball Cinnamon Whisky product, malt products are among the threats.

54. On December 17, 2021, Pan American submitted a purchase order to SCI for 432 cases of Fireball Cinnamon Malt Beverage (the "First Purchase Order").

55. SCI never delivered the First Purchase Order for Fireball Cinnamon Malt Beverage to Pan American.

56. In June 2022, Mr. Juan Carlos Roman, SCI's Commercial Director for Central America and the Caribbean, visited Puerto Rico and met with representatives of Pan American. During that visit, the SCI representative met with Mr. Alberto Fernandez and told him**[*16]** that he wanted to negotiate the termination of the exclusive distribution relationship between Pan American and SCI for Fireball Cinnamon Whisky in Puerto Rico. He stated that SCI was not satisfied with Pan American's performance and that SCI was interested in consolidating all of its products under a single distributor, but clarified that Pan American would not be that distributor. For its part, Pan American confirmed that it was not interested in relinquishing its rights as SCI's exclusive distributor.

57. On June 20, 2022, SCI sent Pan American a letter stating in writing that it was dissatisfied with the sales of its brands in Puerto Rico, including Fireball Cinnamon Whisky. SCI stated that it was in the process of evaluating and analyzing its distribution channels in Puerto Rico and was considering all viable options to reach a solution beneficial to both parties, including terminating the relationship through a negotiated resolution.

58. After July 2022, Pan American continued to be SCI's largest distributor in Puerto Rico.

59. SCI has not communicated any dissatisfaction with Pan American's performance after July 2022.

60. On July 8, 2022, Pan American submitted a second purchase **[*17]** order to SCI for 216 cases of Fireball Cinnamon Malt Beverage (the "Second Purchase Order").

61. SCI never delivered the Second Purchase Order for Fireball Cinnamon Malt Beverage to Pan American.

62. On July 26, 2022, SCI sent Pan American a letter stating that there continued to be a "misalignment" regarding the best strategy for selling and marketing its products in Puerto Rico. The letter stated that SCI would continue honoring purchase orders for SCI products that had previously been sold to Pan American, but that it would not accept purchase orders for products that had not previously been sold to Pan American, including Fireball Cinnamon Malt Beverage products.

63. In or around October 2023, Pan American learned that SCI had notified certain businesses that it would be distributing Fireball Cinnamon Malt Beverage in Puerto Rico through another entity.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

64. On October 20, 2023, Pan American sent a communication to SCI and CC1 through their legal representatives, notifying them of what Pan American considered to be unlawful actions by both SCI and CC1, and asserting its rights as the exclusive distributor **[*18]** of the Fireball Cinnamon Whisky brand in Puerto Rico under Law 75.

65. On December 26, 2023, SCI sent a communication to Pan American denying that Pan American was an exclusive distributor under Law 75. SCI further stated that, regardless of any exclusivity that might exist concerning the distribution of Fireball Cinnamon Whisky products, Pan American would not distribute Fireball Cinnamon Malt Beverage products in Puerto Rico because Pan American used subdistributors.

66. On February 15, 2024, Pan American responded to that letter, setting forth in detail the reasons why it believed SCI's position was incorrect, and reiterated its intention to defend its rights as an exclusive distributor under Law 75.

67. On April 23, 2024, SCI sent a formal written communication to Puerto Rico's supermarket chains stating that SCI, as the exclusive supplier of Fireball Cinnamon Malt Beverage in Puerto Rico, was notifying them that CC1 would be the distributor and merchandiser of Fireball Cinnamon Malt Beverage throughout Puerto Rico.

68. CC1 is an alcoholic-beverage distributor **[*19]** with extensive knowledge of the Puerto Rico market and is a direct competitor of Pan American.

69. In late 2021, CC1 began distributing Sheepdog whisky in Puerto Rico, which is an SCI product.

70. CC1 agreed to assume exclusive distribution of Fireball Cinnamon Malt Beverage in Puerto Rico.

71. CC1 knew that Pan American was the exclusive distributor of Fireball Cinnamon Whisky in Puerto Rico when it entered into an agreement with SCI to distribute Fireball Cinnamon Malt Beverage products in or around mid-2023.

72. SCI designated CC1 as the exclusive distributor of Fireball Cinnamon Malt Beverage in Puerto Rico while Pan American continued to be the distributor of Fireball Cinnamon Whisky on the island.

73. CC1 began selling the malt beverage product in Puerto Rico on May 22, 2024.

74. CC1 distributes Fireball Cinnamon Malt Beverage at Puerto Rico points of sale where Pan American distributes Fireball Cinnamon Whisky.

75. SCI sells CC1 a case of 50 ml bottles for $54.00, a price that SCI had never offered to Pan American.

76. CC1 does not use subdistributors to sell Fireball Cinnamon Malt Beverage.

77. The retail price of 50 ml Fireball Cinnamon Malt Beverage **[*20]** at points of sale is generally one dollar ($1.00).

78. Under its contract with SCI, CC1 committed to purchase 50,000 cases from SCI over a one-year period.

79. As of June 21, 2024, 4,104 cases of the malt beverage product had already arrived in Puerto Rico.

80. The price at which CC1 sells the product to its retailers is $6.50 per case of 10 bottles. Each case contains 12 cartons of 10 bottles each.

81. CC1 had already paid the excise tax on the 4,104 cases received.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

82. CC1's gross sales from the 4,104 cases already purchased amount to $320,112.00. If that figure is projected to 50,000 cases, the total would be $3,900,000.00.

83. The total sales CC1 would generate if it sold the 50,000 cases that constitute its target would be $3,900,000.00.

84. CC1's annual sales in Puerto Rico for 2023 were $700 million. Therefore, if CC1 were to fulfill its entire sales strategy, total Fireball Cinnamon Malt Beverage sales would represent less than one-half of one percent (0.5%) of CC1's total annual sales.

85. CC1's advertising acknowledges that the malt beverage is a new Fireball, because another Fireball product already exists. However, it does not emphasize that the product is malt-based **[*21]** or disclose its alcohol-by-volume (ABV) percentage. Instead, the advertising highlights the Fireball demon, the bottle, and a price of $0.99 plus IVU (sales tax).

86. Following the introduction of Fireball Cinnamon Malt Beverage into the Puerto Rico market, some businesses stopped ordering 50 ml Fireball Cinnamon Whisky from Pan American, while others reduced the quantities of their orders.

87. Pan American distributes Fireball Cinnamon Whisky to locations belonging to supermarket chains throughout Puerto Rico.

88. Some supermarkets identify the ten (10) 50 ml bottles bearing the Fireball Cinnamon Malt Beverage label as "Fireball Cinnamon."

The trial court denied the petitioners' motion for reconsideration. Still dissatisfied, the petitioners appealed to the Court of Appeals and asserted the following errors:

> The Honorable Court of First Instance erred in issuing a preliminary injunction in favor of a party that is not, and has never been, the distributor of Fireball Malt.
>
> The Honorable Court of First Instance erred in determining that the alleged possibility of confusion between the Fireball Malt and Fireball Whisky products constitutes an impairment of the distribution relationship under Law 75 that **[*22]** justifies the granting of a statutory injunction.
>
> The Honorable Court of First Instance erred in granting an injunction that was ineffective and inconsistent with the amended complaint.
>
> The Honorable Court of First Instance erred in issuing the preliminary injunction requested by the respondent, even though the balancing of interests rendered the issuance of that provisional remedy improper.

The parties submitted their respective briefs and stipulated to the transcript of the oral evidence. We proceed to resolve the matter based on the parties' respective positions, the transcript of the evidence, and the applicable law.

***II***

***A***

*The Distribution Contract Act*, Law No. 75 of June 24, 1964, as amended, *10 L.P.R.A. § 278 et seq. ("Law No. 75-1964")*, provides a remedy in damages when domestic and foreign companies eliminate or impair, without just cause, established commercial relationships with their distributors, dealers, or agents. See *Statement of Legislative Intent, Law No. 75-1964*. The statute creates a cause of action for damages available to distributors when they are deprived, without just cause, of the business they developed for the benefit of an introduced product. *Next Step Medical v. Bromedicon et al.*, 190 D.P.R. 474, 489 (2014); *Cruz Marcano v. Sanchez Tarazona*, 172 D.P.R. 526, 540 (2007); *Medina & Medina v. Country Pride Foods,*

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

*Ltd.*, 122 D.P.R. 172, 189 (1988). Pursuant to Article 2 of the *Distribution Contract Act, 10 L.P.R.A. § 278a,* a principal **[*23]** may not terminate an existing relationship arising from a distribution agreement, take direct or indirect actions that impair the established relationship, or refuse to renew the agreement upon its normal expiration, unless there is just cause as defined by the statute. *Next Step Medical v. Biomet, Inc.*, 195 D.P.R. 739, 747 (2016); *Systema de PR v. Interface Int'l, Inc.*, 123 D.P.R. 379, 386 (1989).

The principal bears the burden of demonstrating just cause to avoid liability. *Next Step Medical v. Biomet, Inc.*, supra, p. 754. The Supreme Court explained:

> Law No. 75 was expressly designed for the purpose of protecting the legitimate rights of distributors and remedying the harm caused to them. This, in relation to the abusive practices of principals who, without just cause, arbitrarily impair their contractual relationships with distributors as soon as the latter create a favorable market for their products and services. The aforementioned statutory scheme prevents a principal from unjustly appropriating the goodwill value of a business after a local distributor has captured a market and clientele through its business efforts. In light of the foregoing, we have repeatedly stated that Law No. 75 creates a cause of action in favor of distributors to halt **[*24]** the principal's breach and to be compensated in damages when, after introducing products into the market and achieving market recognition and sufficient sales, they are deprived, without just cause, of the business they developed.
>
> *Next Step Medical v. Bromedicon et al.*, supra, p. 489.

The Legislature granted the court the power to award provisional remedies or injunctive measures during the course of litigation under Law No. 75-1964. See *Next Step Medical v. Biomet, Inc.*, supra. This was because it sought to "prevent the occurrence of acts that could cause irreparable harm while the existence or absence of just cause for termination of the contractual relationship is being determined." *Next Step Medical v. Biomet, Inc.*, supra, p. 490. The statute seeks to promote stability in distribution relationships in Puerto Rico and to eradicate practices that affect the legitimate expectations held by the parties respectively bound by those relationships. *Next Step Medical v. Bromedicon et al.*, supra, p. 488. The purpose of these remedies is also to "prevent the weakening of the distributor at this crucial stage of the conflict and level the actual power of the parties. As a form **[*25]** of first aid, it is equivalent to a tourniquet that prevents the distributor from bleeding out while it asserts the rights conferred by Law No. 75." *Systema de P.R., Inc. v. Interface Int'l*, supra, p. 387.

*Article 3-A of Law No. 75-1964, 10 L.P.R.A. § 278b-1,* provides that the court may grant provisional remedies or injunctive measures through which the terms of the distribution contract are to remain in effect while the court resolves the merits of the controversy concerning just cause for termination of the distribution agreement and whether the granting of remedies under Article 3 of Law No. 75-1964 is warranted. See *Next Step Medical v. Bromedicon et al.*, supra. Article 3-A provides:

> In any action in which the termination of a distribution contract or any act impairing the established relationship between the principal or grantor and the distributor is directly or indirectly involved, the court may, during the pendency of the action, grant any provisional remedy or measure of an injunctive nature to require or prohibit an act, ordering either or both parties to continue, in all its terms, the relationship established by the distribution contract, **[*26]** and/or to refrain from carrying out any act or omission impairing such relationship. In every case in which the provisional remedy provided herein is requested, the court shall consider the interests of all parties involved and the public-policy purposes underlying this chapter.

The aggrieved distributor must prove the negative impact on its business operations caused by the impairment or termination of the distribution relationship, as the case may be, in order to obtain an injunction in its favor. The party seeking the remedy does not necessarily or compulsorily have to prove the following: (1) the existence of irreparable harm; (2) the lack of just cause for the impairment or termination of the contractual relationship; and (3) the likelihood of prevailing on the merits of the underlying action. *Next Step Medical v. Bromedicon*, supra, pp. 497-499. For its part, the principal must refute the arguments presented by the movant or demonstrate the detriment that would befall its business, products, or

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

services if it were required to maintain the relationship *pendente lite*. See *Systema de PR v. Interface Int'l*, supra. The court must evaluate the positions of each party in accordance with the socioeconomic purpose of the statute. **[*27]** *Next Step Medical v. Biomet, Inc.*, supra, p. 755.

The remedy contemplated by Article 3-A is provisional. The statute limits its application to a defined period of time. It expressly provides that the court may grant any interlocutory measure "during the pendency of the action." Article 3-A of Law No. 75-1964, supra.

***-B-***

The writ of *certiorari* is the extraordinary procedural vehicle used to enable a higher court to correct an error of law committed by a lower court. *Pueblo v. Colon Mendoza*, 149 D.P.R. 630, 637 (1999). Unlike an appeal, the higher court has the authority to issue the writ of *certiorari* in its discretion, because it ordinarily concerns interlocutory matters. Nevertheless, our discretion must be exercised reasonably, always seeking to achieve a just resolution, as we have previously stated. *Torres Martinez v. Torres Ghigliotty*, 175 D.P.R. 83, 98 (2008); *Negron v. Srio. de Justicia*, 154 D.P.R. 79, 91 (2001).

For its part, Rule 40 of this Court's Rules of Appellate Procedure establishes the criteria that we must consider when addressing a petition for issuance of a writ of *certiorari*. To that effect, the aforementioned Rule provides:

The Court shall consider the following criteria in determining whether to issue a writ of *certiorari* or an order to show cause:

> A. **[*28]** Whether the remedy and disposition of the decision under review, as opposed to its grounds, are contrary to law.
>
> B. Whether the factual situation presented is the most appropriate for analyzing the problem.
>
> C. Whether prejudice, partiality, or gross and manifest error has occurred in the Court of First Instance's assessment of the evidence.
>
> D. Whether the matter presented requires more careful consideration in light of the original record, which must be transmitted, or of more elaborate briefs.
>
> E. Whether the procedural stage at which the case is presented is the most conducive to its consideration.
>
> F. Whether issuance of the writ or the order to show cause would cause undue fragmentation of the action and undesirable delay in the final resolution of the litigation.
>
> G. Whether issuance of the writ or the order to show cause would prevent a miscarriage of justice.
>
> 4 L.P.R.A. App. XXII-B, R. 40.

**-III-**

Through its four assignments of error, the petitioning party argues that the provisional injunction authorized by the court is improper. As it contends, the contractual relationship between the commercial entities does not concern the exclusive distribution of the Fireball Cinnamon Malt Beverage product. Therefore, the injunctive remedy **[*29]** cannot be available to the respondent with respect to a product it never distributed. According to the petitioner, the provisional remedy issued had the effect of rewriting the contractual relationships between the parties and, moreover, contravenes Article 3-A of the

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

Distribution Contracts Act, Law No. 75-1964, 10 L.P.R.A. § 278b-1. This is because the legal relationship between Pan American and Sazerac concerns solely the distribution of *Fireball Cinnamon Whisky* in Puerto Rico, and not the *Fireball Cinnamon Malt Beverage* product. Thus, the petitioner invites us to review the statutory parameters governing the implementation of the injunction established under Law No. 75-1964.

The interpretive doctrine concerning Article 3-A establishes the parameters within which the court must adjudicate a petition of this nature. The analysis of whether to issue the extraordinary remedy requires, as a threshold matter, that the respondent establish that it is a distributor and, therefore, that it is covered by the provisions of Law No. 75-1964. *Next Step Medical v. Bromedicon*, supra, p. 464. To a great extent, the propriety of the requested injunctive remedy, and the likelihood that the respondent will prevail under the action brought pursuant to the statute, will depend on this. *Id.*, pp. 494-495. **[*30]**

In the present case, there is no dispute regarding the respondent's status as a distributor of the Fireball Cinnamon Whisky product in Puerto Rico. The petitioning party appointed the respondent as the agent and exclusive distributor of several of its products in Puerto Rico, including Fireball Cinnamon Whisky. The contract does not specify the duration of the commercial relationship. The prices of the products are set by mutual agreement. The respondent is responsible for promoting the product, and both parties share advertising expenses. Therefore, the respondent is a distributor protected by Law No. 75-1964. *Id.*

The purpose of the preliminary injunction at issue in this appeal is to prevent violations of the provisions of Law No. 75-1964. For that reason, the scrutiny regarding its issuance or denial must be limited to whether the remedy complies with the provisions and requirements of the statute from which it derives. *Id.*, p. 497. Within these parameters, the respondent was also required to prove the negative impact on its business operations caused by the alleged impairment. In other words, it had to demonstrate an impairment and that such action negatively affected [*31] the respondent's business operations.

The respondent's brief alleges a purported decrease in customers and sales of the Fireball Cinnamon Whisky product resulting from Sazerac's introduction into the market of the 50 ml Fireball Cinnamon Malt Beverage through a different distributor, CC1. Specifically, the respondent asserted a decrease in its sales, confusion between the products, and CC1's taking advantage of the market created by Pan American Grain Properties for Fireball Cinnamon Whisky.

The respondent's Executive Vice President, Mr. Alberto Fernandez Gonzalez, testified regarding the corporation's efforts to introduce the Fireball Cinnamon Whisky beverage into the local market in 2013:

> Q. Explain to the Court what efforts, if any, Pan American Properties made to introduce that Fireball product into the Puerto Rico market.
>
> A. Well, one of the reasons that, when Chapman came to my office, was that he had evaluated the Puerto Rico market, he had seen what we were doing with Gasolina Sangria, and then he said: "You have access to the market, you have very good distribution, and Fireball is going to be a good complement."
>
> So **[*32]** we used that initiative of including Fireball in Gasolina activities and events to introduce the product into the Puerto Rico market.
>
> Q. How many products under the Fireball brand existed at that time?
>
> A. Only one.
>
> Q. Which one was it?
>
> A. Fireball Cinnamon Whisky.
>
> Q. Okay. Can you describe for the Court what that product consists of?

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

> A. It is a whisky liquor flavored with cinnamon.
>
> [...]
>
> Q. What knowledge, if any, do you have regarding the consumers of the Fireball product that you have mentioned, in Puerto Rico?
>
> A. Well, I was personally involved in the launch of Fireball. And I spent many nights at many events, in many nightclubs, when we were figuring out how to introduce the product, because it was a novel product. There was no flavored whisky in the whisky category. And trying to sell it to our customers, "Try a cinnamon whisky," well, at first it was quite difficult to convey that.
>
> One of the strategies we used, at that time there was a product called—which still exists—Jägermeister, which was used a lot as a shot, and so we adopted the strategy of attacking that shot market and putting machines next to Jägermeister, until **[*33]** eventually we practically displaced Jägermeister from the market.[1]

The executive continued his testimony regarding the distribution efforts and marketing investments undertaken to achieve local consumer recognition of the new brand:

> Q. At that initial stage, when you were introducing the product into the Puerto Rico market, around 2013-2014, what investment, if any, do you know Sazerac made to promote that product in Puerto Rico?
>
> A. Well, during those first approximately two initial years, we had agreed that there would be a contribution of five dollars per case, if I remember correctly, which was being divided 50 percent and 50 percent. But that was limited to expenses actually related to free products, promotions conducted at bars, and one or another—purchasing one or another machine of the type used to chill the product for shots at bars.
>
> It did not include, unlike what we had been doing with Gasolina Sangria and with Gasolina, the expenses for billboards, special events, festivals, patron-saint festivities. They did not believe in that, so the 50 percent was limited to that category, which is [*34] what they authorized.
>
> But we incurred other expenses even though we were not reimbursed by Sazerac.[2]

The result of the corporation's efforts was confirmed by the following testimony from the executive vice president:

> Q. And how, if at all, have sales of that product been reported over the years in Puerto Rico?
>
> A. Sales increased to a level at which, at one point, Sazerac told us, through Ken Chapman, "What you are doing in Puerto Rico is not what we do in the United States, because we go more like"—what they call "guerilla"—to the bars. What you are doing is working in Puerto Rico. Sazerac is going to approve going 50 and 50, with all the expenses in full, including billboards, festivals—all the activities that you undertake, we are going to put them in the same pool; they will qualify." And it was because of our performance and the growth in sales that we were experiencing with Fireball in Puerto Rico.[3]

---

[1] Transcription of the oral evidence, pages 31-34

[2] id, pages 35*-36

[3] Id, pages 36-38

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

The remainder of the transcript of the oral and documentary evidence presented during the hearing on the provisional injunction predominantly demonstrates the work, effort, and dedication of the **[*35]** respondent's personnel in creating a local demand for the Fireball whisky beverage. The respondent continued to perform in accordance with its contractual obligations and created a commercial space for the new brand to such an extent that it became one of the highest-demand products in its category. The testimony of the customer business manager of the respondent's Liquor Division, Mr. Alejandro Calancha Figueras, corroborates the foregoing:

> Q. In 2014, when this Fireball Cinnamon Whisky product was introduced into the Puerto Rico market, can you describe what the greatest challenge was in gaining traction with Puerto Rican consumers?
>
> A. Well, first of all, getting people to know it, because nobody here knew what that product was. You know? A product that maybe people in the United States knew, but here it did not have any kind of advertising, nor did people on the outside— you know?, internally, people on the outside saw it.
>
> So here it was about bringing people to that paradigm of, "I'm drinking a whisky with cinnamon," you know? People don't know what that is; people, well, think, "a whisky, but I drink it with water, with coconut, with different"—another mixer. **[*36]** But cinnamon whisky...
>
> And obviously, quite an arduous effort was made in terms of representation and getting people to see it as the product of the party, of the celebration. And that is how it managed to reach—you know?, people started acquiring a taste for the product, you know?, and we kept growing and surpassing the other products that—what were "shooters" at that time; we are talking about Jägermeister or tequila. In other words, these are products that people are accustomed to ordering as shots.
>
> Q. And who led that effort to introduce the Fireball Cinnamon Whisky product into the Puerto Rico market?
>
> A. Pan American. We, Pan American Properties, with the team of...
>
> Q. In the process you have described of introducing the product to customers so that they would develop a taste for cinnamon whisky, what direct involvement did Sazerac have with the customer?
>
> A. Direct involvement?
>
> Q. Yes.
>
> A. Well, it was the communication it had with us, but we were the ones who were out in the field.
>
> Q. Okay.
>
> A. You know? And in the beginning there wasn't really anything, you know?, it wasn't a relationship—it wasn't a relationship; we practically did it ourselves. After the brand had already grown, that was when Sazerac began to participate **[*37]** in terms of expenses jointly with Pan American Properties.
>
> Q. And before Sazerac participated in the promotional expenses for the product in Puerto Rico, who incurred the promotional expenses?
>
> A. Pan American Properties.
>
> [...]
>
> Q. And I ask you: approximately what year was it that Sazerac began sharing or in some way contributing to the promotional expenses for the Fireball product in Puerto Rico?

SeSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

A. Well, I understand that Sazerac's involvement, once we were already incurring a high volume of expenses, was around 2016, possibly toward the end of 2016.[4]

Mr. Calancha Figueras continued his testimony regarding the economic value created for the Fireball brand as a result of the marketing and promotional work performed by the respondent since 2014, when it introduced the Fireball Cinnamon Whisky beverage into the Puerto Rico market:

Q. And what types of advertising investments or promotions has Pan American Properties made throughout all these years to promote the sale and distribution of that Fireball product in Puerto Rico?

A. Many. We are talking about sponsoring events, concerts, customized events for **[*38]** the Fireball brand itself, happy hours, promotional representatives—obviously, support from promotional representatives and sales efforts at different businesses, billboards, conventions, everything that can be done in terms of market support.[5]

The customer business manager also testified regarding the effort undertaken to bring the Fireball Cinnamon Whisky product to an outstanding level of sales in the local market:

Q. Okay. What is the SKU or product package of Fireball currently experiencing the greatest sales growth in Puerto Rico?

A. Currently, the 50 ml.

Q. When did you begin working, or as part of your duties at Pan American Properties, begin working with the Fireball product?

A. From the beginning, in 2014.

Q. What has been the sales trend for that Fireball product in Puerto Rico distributed by Pan American Properties since you began working with the product?

A. Well, when we—since—when I started, it was a product that hardly anyone knew. You know?

We did a lot of work—I say "we," including myself, right?, because I also worked at many event activities with the marketing team and the promotions team [*39] at that time.

Little by little, we brought it to many parties, worked many happy hours, and did a lot of signage in the streets so that it would grow.

And as time went by, from 2014 to 2016, by—well, between 2016 and 2019, we were already talking about it being the preferred shot product in Puerto Rico, because the product is a whiskey, but it is what we call a "shooter," which people are also accustomed to ordering as a shot.

And at that point, we were talking about Fireball already being the leader and the third best-selling whiskey throughout Puerto Rico.

Q. In what—in what years was that?

A. By then—we are talking about around 2019 to 20—2019 to 2021; still—in 2022 it was still the third best-selling whiskey in Puerto Rico.

---

[4] Id, pages 776-778.

[5] Id, pages 779.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

Q. And when you say "the third best-selling whiskey in Puerto Rico," what do you mean when you describe the whiskey category?

A. Well, that is determined by market data compiled by certain companies, in this case IRI, which—periodically they provide data that evaluates sales in different businesses, and there they assign what they call the "market share," which is the **[*40]** sales level of each product in terms of which sells more, which sells less, in different markets.[6]

We were able to verify in the evidence a positive sales trend for the product up until the introduction of the 50 ml Fireball Cinnamon Malt Beverage into the Puerto Rico beverage market. The testimony of the executive vice president demonstrates the effect of the entry of the 50 ml Fireball Cinnamon Malt Beverage into the market on sales of Fireball Cinnamon Whisky:

Q. Okay. What, if anything, have been the findings regarding—what has occurred in the market concerning this Fireball malt product?

A. It is already affecting us in terms of sales. There are customers who are stopping buying from us, and our product is not turning over like—it was not turning over the way it did before the malt version of the product was launched.

Q. Okay. Do you have personal knowledge of how this malt-based product is being sold at gas stations and—and *down the trade*?

A. Well, I happened to go get gas last week—the Thursday or Friday of last week—at the gas station at—at San Patricio, and when I went in, the two products were there, one next to the other, behind **[*41]** the cash register—

Q. And in what package is this product being sold?

A. 50 ml.

Q. The malt one?

A. The malt one.

Q. Okay. I ask whether you have knowledge of—how, if at all, sales of the Fireball whiskey product have been affected as a result of the introduction of this malt product during the past two weeks.

A. The manager—the vice president of sales has also seen a decrease in sales among the—customers.[7]

It is significant to note that, from the outset, the petitioning party contemplated distributing the new malt beverage through the respondent. For several years, the parties negotiated the matter. The respondent completed various governmental procedures to introduce the product into Puerto Rico. The parties preliminarily agreed on the price, a sales plan, and the manner in which the new product would be marketed. Indeed, in mid-2024, the respondent placed the first order for Fireball Cinnamon Malt Beverage. According to the testimony of the executive vice president, Mr. Fernandez Gonzalez, there was a plan under which the 50 ml Fireball Cinnamon Malt Beverage would replace its counterpart, the 50 ml Fireball Cinnamon Whisky, **[*42]** in Puerto Rico:

---

[6] Id, pages 773-775.

[7] Id, pages 329-330.

SeSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

A. When we were planning the strategy with Sazerac, there was [indiscernible] a phase-in of the malt product and a phase-out of the 50 ml whiskey product. But in the end, it was from one of our pockets to another of our pockets. We even discussed transitioning [sic] to the 200 ml format as well—

Q. Transitioning [sic] which product to the 200 ml format?

A. Fireball. First, the 50 ml one was going to be launched, and subsequently the 200 ml one was going to be introduced, also malt-based.[8]

But it was precisely during that phase that difficulties arose between Sazerac and Pan American Properties. Sazerac did not honor the respondent's first order to begin selling the new beverage in Puerto Rico. Suddenly, the respondent's line of credit was insufficient to fulfill the purchase orders. The situation continued for months until, in April 2024, Sazerac notified the respondent in writing of its decision to distribute the new product through another distribution company. The sales data collected by the respondent during that period shows a decrease in sales of the Fireball Cinnamon Whisky product correlated with the introduction of the 50 ml Fireball Cinnamon Malt Beverage at the points of sale served by Pan American Properties. The respondent's vice president of sales, Mr. Luis Eduardo Albandoz Acevedo, testified regarding these matters:

Q. With respect to the Fireball Cinnamon Whisky product in its 50 ml format, in 2023—from January through December 2023—what was the sales trend for that product? Or what was the sales trend for that product?

A. Well, the sales trend for Fireball 50 ml has always been growth. However, in the last two months, if we look at March and April and compare them with March and April of the previous year, we see a decrease of 230 fewer customers, which is a 26.5 percent decrease.

Q. Okay. But in 2023, what was the trend for that format in terms of sales?

A. Growth.

Q. Okay.

A. Yes.

Q. How do you know that information?

A. Because we have sales data, POS [purchase on spot], from each of the customers.

Q. How, if at all, do you collect that sales data?

A. I basically collect that data from the invoices generated for each of the customers.

[...]

Q. What **[*44]** is this document?

A. This document is the historical sales of Fireball 50 ml, 2022 versus 2023.

Q. Okay. Who prepared this document?

A. I—I prepared it.

Q. What product formats are represented in this data?

---

[8] Id, pages 333-334, 336.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

A. Only and exclusively the 50 ml.

Q. And where did you obtain the data to prepare this table?

A. From the historical sales to the customers, which appears at the invoicing level?

Q. And what product formats are represented in this table?

A. Only and exclusively the 50 ml, in the 10-pack format?

[...]

Q. Witness, turning to the contents of this document, could you explain to the Court what you mentioned earlier about the sales trend for this product in the 50 ml format in 2023?

A. Well, in 2023 we see sustained growth of basically 102 percent in January, 46 in February, 87 in March, 255 in April—and there was an increase in every month. However, in July there was a 1.99 percent decrease in sales. And when we look at the total and compare it with the previous year, we see growth of 45.21 percent.

Q. Okay. Explain to the Court, with respect to the percentages, what are you comparing **[*45]** in this table?

A. I am comparing the same month in the previous year.

Q. Okay. And which years?

A. 2022 versus 2023.

Q. Okay. So how many—how many 10-packs of this 50 ml product were sold in total in 2022, according to this table?

A. In 2022 we are talking about 10,085.

Q. Okay. And in 2023?

A. 14,644.

Q. And what was the percentage growth in those sales?

A. 45.21.

Q. Okay. And I ask you, can you explain what you did in the lower portion of this table, of this document that you prepared?

A. In the lower portion, we are comparing 2022 versus 2023 for the months of January through May.

Q. And how many units of this 10-pack had been sold during the first five months of 2023?

A. In the first months: in 2023, 6,100, and in 2024, 5,635.

Q. And what has been the trend when comparing the monthly sales for 2023 and 2024 from January through May?

A. We see a decrease in sales. Basically, in January, 1.72 percent; in February, 5.83 percent; in March, 13.27; April, 5.43 percent negative, and May, 9.02 percent negative.[9]

---

[9] Id, pages 686-693.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

The vice president of sales continued his explanation of the deterioration in sales of the Fireball Cinnamon Whisky product resulting from **[*46]** the entry of the 50 ml Fireball Cinnamon Malt Beverage into the market:

> Q. Okay. Mr. Albandoz, what knowledge, if any, do you have regarding the Fireball Cinnamon Malt product in Puerto Rico—and its sale in Puerto Rico?
>
> A. Knowledge of the sales?
>
> Q. No, what knowledge do you have regarding that product?
>
> A. Well, that product entered the market in April of this year, and it is a product that has 16.5 percent alcohol versus Fireball Whisky, which has 33.
>
> Q. And who is distributing that product in Puerto Rico?
>
> A. CC1.
>
> Q. Okay. Now, you say that product began in April 2024.
>
> A. Correct.
>
> Q. The table you prepared reflects a reduction in sales beginning in January 2024. Can you explain to the Court why—what you attribute that reduction to since January?
>
> A. Well, that decrease since January, we are seeing it—it has behaved that way because the category, as far as 50 ml is concerned, is already quite mature given the length of time it has been on the market. And this year it was basically flat at the beginning. However, in the last two months, which are April and May, we see a decrease in sales beyond what these numbers show; when we compare the 841 customers **[*47]** who purchased during that period, there was a decrease of 231 customers in the data. This means that there is a 26.5 percent decrease in the customer base for Fireball 50 ml Whisky.
>
> [...]
>
> Q. Explain to me again. In other words, what—what trend have you observed in terms of customers?
>
> A. Customers?
>
> Q. Yes.
>
> A. 26.5 percent fewer customers purchasing, compared with the same period in the previous year.
>
> Q. In other words, 26.5 percent of your existing customers are purchasing less of the product this year, 2024.
>
> A. Correct.
>
> Q. Okay. And what do you attribute that decrease to?
>
> A. I attribute it to the product that CC1 currently has, the malt-based product.[10]

The impairment of the market created and the customer base developed by a distributor constitutes sufficient grounds for the injunction provided for under Law No. 75-1964. Law No. 75-1964 seeks to suppress the undesirable practice whereby a

[10] Id, pages 686-693.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

principal contributes to the deterioration of a distributor's goodwill value once the distributor has succeeded in creating a favorable market for the product or service it distributes pursuant to the distribution contract with the principal. As established by the testimony and evidence **[*48]** presented by the respondent, the introduction of the 50 ml *Fireball Cinnamon Malt Beverage* into local commerce eroded the market obtained and developed by the respondent for the *Fireball Cinnamon Whisky* product. Since the introduction of the new beverage, the sales and customer trends for *Fireball Cinnamon Whisky* began to decline to such a significant extent that they prompted the filing of the cause of action in this case.

In summary, the respondent demonstrated that: (1) it is covered by the status of distributor (the exclusive right in favor of the respondent to distribute the *Fireball Cinnamon Whisky* product); and (2) the petitioning party impaired the goodwill value of the *Fireball Cinnamon Whisky* product.

Before concluding, it is important to add at this point the petitioning party's own admissions regarding the introduction of the new 50 ml Fireball Cinnamon Malt Beverage product into the Puerto Rico market. First, Sazerac's Commercial Director for Central America and the Caribbean admitted that the 50 ml *Fireball Cinnamon Malt Beverage* product was designed to compete with the *Fireball Cinnamon Whisky* beverage:

> Q. The malt Fireball and the whiskey Fireball **[*49]** are sold in the same places. Correct?
>
> A. There is no restriction.
>
> Q. There is no restriction, so they are sold next to each other at gas stations.
>
> A. They may be sold, yes.
>
> Q. And they are sold next to each other in liquor stores. Correct?
>
> A. Yes.
>
> Specifically, the petitioning party argues that the introduction of the new product into the local market did not impair the goodwill value created by the respondent for Fireball Cinnamon Whisky in Puerto Rico.
>
> [...]
>
> Q. However, despite that, it is your testimony that the malt Fireball does not compete with the whiskey Fireball. Is that correct?
>
> A. The malt Fireball does not compete? I—my testimony is that they are different products.
>
> Q. The question is whether they compete or do not compete—for the same consumer.
>
> A. Yes. It could—in different circumstances, it could, yes.[11]

The witness further admitted that the new beverage was created for the purpose of providing an experience similar to Fireball Cinnamon Whisky. He also admitted that the 50 ml Fireball Cinnamon Malt Beverage product belongs to the family of beverage products categorized under the "Fireball" brand:

> Q. Tell me, witness: looking at Exhibit 1, which is entitled "Fireball Cinnamon Whisky," **[*50]** I ask you whether the label identifies the product at the top as "Fireball."
>
> A. Correct.
>
> Q. And it has a red demon.

[11] Id, pages 1034-1036.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

A. Yes.



seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

Q. And it says the words "Red Hot."

A. Yes.

Q. And the malt one at the top says "Fireball." Correct?

A. Correct. Yes.

Q. And it has a red demon.

A. Yes.

Q. And it says "Red Hot."

A. Yes.

Q. Okay. And both products have a cinnamon flavor, cinnamon.

A. Yes.

Q. Okay. And the — Fireball Cinnamon is made so that, to the consumer, it has the same flavor similar to the whisky product. Correct?

A. Correct.

Q. That the effect is that the consumer who does not go to the liquor store in the United States can have a shot of Fireball Cinnamon and have the same experience as with Fireball Cinnamon Whisky. Correct?

A. [...]

Q. In fact, Fireball Cinnamon is sold — it is produced so that the consumer, when taking a shot, can taste the same
— the same flavor and have the same experience as when drinking Fireball Cinnamon Whisky. Correct?

A. Yes. Correct, yes.

Q. A similar experience.

A. Correct.

Q. Yes?

A. Correct.

Q. And you, who know the Puerto Rico market, since you have worked at Diageo, know that here, at all times, consumers know these products as the *[*51]* Fireball product. Correct?

A. "These products," you mean the 50 ml ones, the —

Q. The Fireball Whisky — Cinnamon Whisky product, they know it as "Fireball." Correct?

A. Yes.

Q. And they also know the Fireball Cinnamon product as "Fireball." Correct?

A. Now that they are becoming familiar with it, yes.
[...]

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

Q. And you mentioned a person who is a worldwide brand manager for Fireball. Correct? At Sazerac.

[...]

Q. Christina Donovan.

A. Donovan.

Q. She is a global Fireball brand manager for Sazerac. Correct?

A. Global.

Q. Global. Very good. And she is the global brand manager for the Fireball brand. Correct?

A. She was. Correct.

Q. At the time, she was.

A. Yes.

Q. And she — and she managed both the malt Fireball and the whisky Fireball. Correct?

A. Yes.

Q. Because Sazerac treats the Fireball brand as a single brand. Correct?

A. Fireball brand? Yes.

Q. And, in fact, you know that the trademark registered by Sazerac is Fireball. Correct?

A. Yes.[12]

The executive further acknowledged that the 50 ml Fireball Cinnamon Malt Beverage is a threat to Fireball Cinnamon Whisky:

Q. And one of the threats to the Fireball Cinnamon Whisky product is precisely malt-based products. Correct?

[...]

Q. A threat to the **[*52]** growth and development of the Fireball Whisky product is the introduction of malt-based products. Correct?

A. The threat to Fireball Whisky is malt products in the United States. Is that the question?

Q. In Puerto Rico and in the United States, yes. Do you know what a SWOT analysis is?

A. Yes, in Spanish.

Q. What is a SWOT analysis?

A. FODA.

[12] Id, pages 1037-1042.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

Q. And what does that mean?



A. There are four quadrants. This is something that [Indiscernible]. But there are four quadrants in which the strengths and threats, both of the product and of the industry, are analyzed.

Q. The strengths of the product, the weaknesses of the product, the threats to the product, and the opportunities for the product are identified. Correct?

A. Yes. Correct.

[...]

Q. Page 3 of this exhibit — page 3, tell me whether it is or is not true that, with the Sazerac logo, it is titled "Annual planning template Sazerac brand plan, Puerto Rico, Fireball, Pan American Grain, financial period fiscal year '22." Correct?

A. Correct.

Q. And two pages later, a SWOT analysis is presented.

A. Correct.

Q. And in that SWOT analysis, in the threats quadrant, what does number 4 say?

A. "[Indiscernible] individualistic consumption threats" —

Q. No. The lower **[*53]** right-hand quadrant, number 4.

A. "Threats."

Q. "Threats."

A. I'm reading it.

Q. Threats.

A. That's what I'm reading.

Q. Number 4.

A. "Malt-based products."

Q. This identifies malt products as a threat to the whisky product. Correct?

A. Correct.

Q. So does that refresh your memory about what you did not remember a few minutes ago?

A. It's just that this was before I started working here.

Q. Right, but you shared it, and it was shared with you in January 2022, with the Pan American Properties team. Correct?

A. The team? Elmar sends it here. Yes.

Q. Right.

A. Correct.

[...]

SeSpanish.com Southeast Spanish, Inc. ATA # 264123 Translated/Verified by: Dan Hickman, PhD 877-374-0095

Q. Tell me whether it is or is not true that, as of September 2021, according to this Exhibit 2, Sazerac, through Ken Chapman, notified Pan American Properties that the entire 50 ml format in Puerto Rico was going to change to the malt-based product.

A. That is correct.

Q. Okay. And that the expectation was to sell 50,000 cases of that product per year.

A. Correct.[13]

With respect to the aforementioned admissions, we quote with approval, and incorporate into this opinion, the conclusion of law reached by the lower court on the matter:

> On the other hand, the evidence presented established the existence of an intentional strategy **[*54]** by SCI to: 1) take advantage of the market created for the whisky product by Pan American as the launching pad for the new product; and 2) maintain the confusion between both products in order to increase sales of the new, lower-priced product. This in and of itself constitutes an impairment of the contractual relationship between Pan American and SCI, regardless of whether or not the aforementioned reduction in sales occurred. This is precisely the situation that Law 75 seeks to prevent, pursuant to its statement of legislative intent.
> [...]
> [I]n this case, an act directly impairing the established relationship between SCI, as principal or grantor, and Pan American, as distributor, of the Fireball Cinnamon Whisky product is at issue. Said act of impairment consists specifically of the introduction into the market and commencement of distribution in Puerto Rico of the Fireball Cinnamon Malt Beverage product through a distributor other than Pan American (namely, CC1), with a presentation substantially identical to the 50 ml presentation of Fireball Cinnamon Whisky, at the same points of sale, at a lower price, and with marketing built upon or supported by the marketing developed **[*55]** by Pan American for the distribution of its whisky product.

Once the impairment was established in this case, the petitioner was required to present evidence regarding the detriment that would befall its own businesses, products, or services if it were required to maintain the prohibition on sales pendente lite. We were able to corroborate from the evidence that the impact on CC1's annual sales is not significant; its total sales for 2023 were $700 million. The projected annual sales of $3,900,000 for the 50 ml Fireball Cinnamon Malt Beverage product represent 1% of CC1's annual sales. Consequently, the prohibition on sales pending the litigation would minimally affect the business of the corporations comprising the petitioning party.

Having set forth the respective positions, it was incumbent upon the lower court to balance the interests of the parties in harmony with the public policy pursued by Law No. 75-1964. Next Step Medical v. Biomet, Inc., supra, p. 755. As reflected in the statement of legislative intent of Law No. 75-1964, the Legislature understood that, because of its significance to the local economic welfare, it is necessary to act to halt certain arbitrary practices to the detriment of **[*56]** local businesses. Next Step Medical v. Biomet, Inc., supra, p. 748.

In this case, one of the abusive practices that the law condemns was demonstrated. A principal that impairs the contractual relationship with one of its distributors as soon as the distributor has created a favorable market for one of its products. Law No. 75-1964 was created precisely to prevent a principal from appropriating

[13] Id, pages 1044-1045, 1047-1050.

seSpanish.com Southeast Spanish, Inc. ATA # 264123 Translated/Verified by: Dan Hickman, PhD 877-374-0095

or unfairly taking advantage of the goodwill value of a business after a local distributor has captured the local market and developed a clientele through its business efforts. Next Step Medical v. Bromedicon, supra, p. 489.



The evidence corroborated the commercial effort undertaken by the respondent to open the local market to the petitioning party's whisky product. The undertaking encompassed several years of promotion, delivery of merchandise, and maintenance of local inventory to bring the new product to consumers. According to the evidence, the efforts of the respondent were so successful, in terms of sales and public recognition, that the petitioner itself acknowledged the effectiveness of the strategy and decided to contribute as an equal. Now, after a decade of work on behalf of the joint enterprise **[*57]** conceived by the parties, it is being affected and threatened by a new product designed by the petitioner itself for the purpose of displacing from the local market the product distributed by the respondent.

Law No. 75-1964 describes the type of impairment carried out by the petitioning party:

> For purposes of this chapter, and particularly for purposes of § 278a of this title:
> (a) ....
> (b) It shall be presumed, unless proven otherwise, that a principal or grantor has impaired the established relationship in any of the following cases:
>> (1) When the principal or grantor establishes in Puerto Rico facilities for the direct distribution of merchandise or the provision of services that previously had been handled by the distributor, or that are related to the merchandise or provision of services handled by the distributor because they bear the same trademark or any other trademark of the same principal or grantor, or that the distributor had previously requested to handle.
>> (2) ...
>> (3) ...
>> (4) ...
>> (c) ...
>
> Art. 2A, Law No. 75-1964, 10 L.P.R.A. § 278a-1.

With respect to the balancing of interests, the Supreme Court stated that "[i]t is the interests of the parties and the protection of the public policy underlying the statute that govern its use **[*58]**." Next Step Medical v. Biomet, Inc., supra, p. 754. The respondent impaired the goodwill value created by the petitioning party. Sazerac and CC1 seek to take advantage of the clientele developed and established by the respondent for the Fireball Cinnamon Whisky product in order to distribute the Fireball Cinnamon Malt Beverage product. We were able to corroborate the minimal impact of the injunction on the businesses of Sazerac and CC1. This stands in contrast to the protection of the goodwill value created by the respondent, a principal component of the public policy established in Law No. 75-1964, with respect to which the Legislature established a mandate for special protection over any other interest involved in the context of the distribution and sale of foreign products in our jurisdiction. This is intended to achieve reasonable stability in distribution relationships in Puerto Rico and eradicate certain practices that, beyond contributing to economic stability, affect the legitimate expectations held respectively by the parties involved in a business relationship. Next Step Medical v. Bromedicon, supra, p. 488.

Having examined the parties' positions and corroborated the factual elements **[*59]** necessary in the testimonial and documentary evidence for issuance of the requested remedy, the balance of equities is inclined in favor of the respondent. Issuing the requested injunction advances the public policy set forth in the statute and protects the local market from arbitrary actions by a principal impairing a bona fide contractual relationship with one of its distributors for no reason other than its own desire.

We must emphasize at this point that the principal-distributor relationship is characterized by cooperation, stability, and mutual trust. Roberco, Inc. y Robert Colon v. Oxford Industries, Inc., 122 D.P.R. 115, 131 (1988). The purpose of this relationship is to create, develop, and obtain new clientele. Id. A principal may not impose

SeSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by
Dan Hickman, PhD
877-374-0095

its conditions on the distributor's sales policy, nor vice versa, with the corresponding loss of the economic and legal autonomy of both. Medina & Medina v. Country Pride Foods, 122 D.P.R. 172, 190 (1941).



***-IV-***

For the foregoing reasons, which we hereby incorporate as part of this opinion, we issue the writ of certiorari requested, affirm the appealed Resolution and Order, and set aside our Resolution of February 7, 2025, so that the preliminary injunction issued by the court shall remain fully effective while **[*60]** the litigation is concluded.

Lastly, pursuant to the authority conferred upon us by Rule 35(A)(1) of our Rules, 4 L.P.R.A. App. XXIIB, R. 35(A)(1),[14] the Court of First Instance need not await issuance of the mandate to continue with the proceedings in the referenced case.

So ordered and commanded by the Court, and certified by the Clerk of the Court of Appeals.

Lilia M. Oquendo Solis, Esq.

Clerk of the Court of Appeals

---

End of Document

[14] To the extent pertinent, the cited rule provides that the "issuance of the writ of certiorari shall stay the proceedings in the Court of First Instance, unless the **Court of Appeals orders otherwise**" (emphasis added).

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

LexisNexis®

**User Name:** Christopher Gold
**Date and Time:** Thursday, September 17, 2026 1:42 PM EDT
**Job Number:** 296064873

## Document (1)

1. *PAN AM Props. v. Sazerac Co., Inc.*

**Client/Matter:** -None-
**Search Terms:**
**Search Type:** Natural Language
**Narrowed by:**

| Content Type | Narrowed by |
|---|---|
| | -None- |



SeSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

# PAN AM Props. v. Sazerac Co., Inc.

Tribunal De Apelaciones De Puerto Rico, Region Judicial De San Juan

27 de junio de 2025

KLCE202500119

**Reporter**
2025 PR App. LEXIS 1706 *; 2025 LX 299654; 2025 WL 2048234

PAN AMERICAN PROPERTIES, CORP., Recurrida v. SAZERAC COMPANY, INC. Y CCI BEER DISTRIBUTORS, INC., Peticionarios

**Prior History: [*1]** CERTIORARI procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón. Caso Núm. BY2024CV03030. Sobre: INTERDICTO PRELIMINAR; SENTENCIA DECLARATORIA; LEY 75; INCUMPLIMIENTO DE CONTRATO; DAÑOS Y PERJUICIOS; INTERFERENCIA TORTICERA CON RELACIÓN CONTRACTUAL; CONTRATO EN PERJUICIO DE TERCERO; COMPETENCIA DESLEAL.

**Judges:** PANEL ESPECIAL. Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y el Juez Cruz Hiraldo.

**Opinion by:** Cruz Hiraldo

## Opinion

Cruz Hiraldo, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 27 de junio de 2025.

Comparece la parte peticionaria Sazerac Company, Inc. y CC1 Beer Distributors, Inc., para solicitar la revisión de una *Resolución y Orden* emitida el 4 de febrero de 2025 por el Tribunal de Primera Instancia, Sala Superior de Bayamón. En la cual declaró "con lugar" la solicitud de entredicho preliminar presentada por la parte recurrida, Pan American Properties, Corp. Por ello, prohibió a la parte peticionaria "vender productos de Fireball Cinnamon Malt Beverage en Puerto Rico durante el trámite del pleito de epígrafe".

La parte peticionaria acompañó una *Moción en Auxilio de Jurisdicción*, la cual declaramos "Ha Lugar" el 7 de febrero de 2025. Nuestra resolución tuvo **[*2]** el efecto de paralizar los efectos de la *Resolución y Orden emitida* el 4 de febrero de 2025.

Procedemos a resolver con el beneficio de la comparecencia de las partes y la transcripción estipulada de la prueba oral.

**-I-**

El 24 de mayo de 2024, la parte recurrida presentó una *Demanda* contra los peticionarios, adujo menoscabo a su contrato de distribución exclusiva en violación a la *Ley de Contratos de Distribución*, Ley Núm. 75 de 24 junio de 1964, según enmendada, *10 LPRA § 278, et seq.* (Primera Causa de Acción); Sentencia Declaratoria (Segunda Causa de Acción); daños por violación a la Ley Núm. 75 (Tercera Causa de Acción), daños y perjuicios (Cuarta Causa de Acción); incumplimiento de contrato (Quinta Causa de Acción); intervención torticera con relación



SESpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

contractual (Sexta Causa de Acción): y daños por violaciones a las disposiciones correspondientes del Código Civil relacionadas a la mala fe, la competencia desleal y el enriquecimiento injusto (Séptima Causa de Acción). En resumen, las causas descansan sobre un supuesto menoscabo en la relación contractual entre las partes en donde la parte peticionaria "busca lucrarse injustificadamente de los esfuerzos, la reputación y el buen nombre cultivado por Pan American **[*3]** a lo largo de más de diez (10) años haciendo esfuerzos relacionados a la marca de Fireball Cinnamon Whisky en Puerto Rico". La parte peticionaria solicitó, además, un *injunction preliminar*, según provisto en el *Artículo 3-A de la Ley Núm. 75, 10 LPRA sec. 278b-1.*

En la vista celebrada el 31 de mayo de 2024, el Tribunal denegó la solicitud de desestimación del *injunction* preliminar presentada por la parte peticionaria y señaló fecha para la celebración de la *Vista de Injunction Preliminar* en sus méritos. La vista ocurrió los días 10, 12, 14, 18, 20 y 21 de junio de 2024. Las partes estipularon ciertos hechos y varias piezas de evidencia. Las partes además presentaron prueba documental, demostrativa y testimonial durante la vista.

La prueba testifical de la parte recurrida consistió en el testimonio del Sr. Alberto Fernández González, vicepresidente ejecutivo de Pan American; el Sr. Luis Eduardo Albandoz Acevedo, vicepresidente de ventas de Pan American; el Sr. Javier Alejandro Calancha Figueras, *customer business manager* de la División de Licores de Pan American. La prueba testifical de la parte peticionaria estuvo compuesta por el testimonio del Sr. Juan Carlos Román Hernández, director comercial de Centro América y Caribe de Sazerac., **[*4]** y del Sr. Adrián Jorge Rivera Cebollero, vicepresidente de ventas y mercado de CC1. Celebrada la vista el foro de primera instancia formuló las siguientes determinaciones de hechos:

1. SCI designó a Pan American como distribuidor de Fireball Cinnamon Whisky y Chila Orchata en Puerto Rico mediante una comunicación del 1 de agosto de 2013. (Estipulado)

2. La referida comunicación estableció en lo pertinente lo siguiente:

> Our company, Sazerac Company, Inc. ("SCI"), is the rightful owner of the trademark rights for Fireball Cinnamon Whisky and Chila Orchata and, as such, has the worldwide authority to appoint and terminate its distributors, importers, and agents at its sole discretion.
>
> Therefore, we are pleased to confer to your company, Pan American Properties Corp ("Distributor"), whose main purpose is the distribution of alcoholic beverages in Puerto Rico, authorization to sell the brands noted above in the country of Puerto Rico. This privilege is effective immediately and valid unless sooner terminated by SCI for any reason.
>
> Distributor shall use its best effort to sell, promote, merchandise, and grow overall business in accordance with Puerto Rico laws, and in keeping with SCI´S sales **[*5]** and marketing guidelines and budgets. Distributor agrees to provide SCI with all reporting sales and other information as requested by SCI.
>
> Distributor acknowledges that SCI is the owner or licensee, as applicable, of all brands, formulas, labels, designs, trademarks, trade names, trade dress, designs and other indicia of ownership, origin and quality of the Products ("Intellectual Property") and all of the goodwill attributable thereto. Distributor may make use of the Intellectual Property only as authorized by SCI in writing and any use shall inure solely to the benefit of SCI or its affiliated companies. Distributor further acknowledges that nothing in this Agreement or in its relationship with SCI gives Distributor any right, title or interest in or to such Intellectual Property, other than as a distributor of the Products pursuant this Agreement. Distributor shall make no contrary representations or claims. Distributor shall cease all use of the Intellectual Property upon the termination of this Agreement either in part with respect to a particular Product or in full.

3. La referida comunicación estableció, entre otras cosas, que Pan American emplearía sus mejores esfuerzos ("best **[*6]** efforts") para vender, promocionar, mercadear, comercializar y crecer el negocio relacionado a Fireball Cinnamon Whisky y Chila Orchata, conforme a las leyes de Puerto Rico y según las guías de venta y mercadeo de SCI. (Estipulado)

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

4. Al presente CC1 distribuye Fireball Cinnamon Malt Beverage en Puerto Rico. (Estipulado)

5. Pan American distribuye Fireball Cinnamon Whisky en Puerto Rico. (Estipulado).

6. En cumplimiento con el acuerdo de distribución con SCI, Pan American introdujo la marca Fireball Cinnamon Whisky al mercado de Puerto Rico.

7. Previo al año 2013, la marca Fireball Cinnamon Whisky de SCI no tenía presencia alguna, ni se había vendido en el mercado de Puerto Rico.

8. Desde el año 2013 hasta la introducción del producto Fireball Cinnamon Malt Beverage en mayo de 2024, solamente Pan American había distribuido productos de la marca Fireball Cinnamon en Puerto Rico.

9. Desde el año 2013 hasta el presente, Pan American ha desarrollado la marca Fireball Cinnamon Whisky a través de todo Puerto Rico con el trabajo de su equipo de distribución y mediante inversiones monetarias significativas.

10. Las gestiones realizadas por Pan American en relación a Fireball Cinnamon Whisky incluyen, **[*7]** entre otras, la creación de un fondo especial de mercadeo en el que SCI y Pan American se dividen los costos de manera equitativa (50/50).

11. Cuando Pan American comenzó a vender el Fireball Cinnamon Whisky en Puerto Rico, creo la categoría de "flavored whiskeys".

12. Para el 2022, Fireball Cinnamon Whisky representaba un 97% de las ventas de esa categoría en Puerto Rico. Es decir que Pan American llevó el producto desde cero a 97%, entre el 2013 y el 2022.

13. Pan American ha logrado posicionar a Fireball Cinnamon Whisky como la marca número tres (3) de whisky en el mercado de Puerto Rico del 2019 a 2022.

14. Pan American ha alcanzado que el producto de Fireball Cinnamon Whisky se distribuya en el 98% de los canales de distribución "off-site" en Puerto Rico, en el 99% de las cadenas de tiendas grandes, en el 91% de las cadenas de tiendas pequeñas, y en el 96% de las tiendas de licores.

15. Desde 2013 al presente, la relación de distribución para Fireball Cinnamon Whisky entre SCI y Pan American ha continuado de manera ininterrumpida. De igual manera, los esfuerzos de Pan American han continuado a pesar de las dificultades por las que ha atravesado Puerto Rico recientemente, tales como **[*8]** huracanes, terremotos y la pandemia de COVID-19.

16. Luego de una relación de muchos años, SCI aumentó la cantidad de sus productos a ser distribuidos por Pan American, y en el 2017 y 2018, respectivamente, le otorgó a Pan American la distribución de otros productos en Puerto Rico como el ron Black Magic y Fris Vodka.

17. Desde el comienzo de su relación en el 2013, la conducta de SCI y Pan American ha reconocido que existe una relación exclusiva para la distribución de Fireball Cinnamon Whisky en Puerto Rico.

18. La única entidad que ha distribuido Fireball Cinnamon Whisky en Puerto Rico ha sido Pan American.

19. El vínculo contractual entre Pan American y SCI para la distribución exclusiva de Fireball Cinnamon Whisky en Puerto Rico está documentado mediante las transacciones efectuadas entre ambas entidades, las gestiones de Pan American en el mercado de Puerto Rico y las comunicaciones intercambiadas sobre temas relacionados.

20. A fines de 2019, Pan American hizo negociaciones con Puerto Rico Supply, un distribuidor de productos y bebidas alcohólicas, para distribuir el producto Fireball Cinnamon Whisky a gasolineras y negocios pequeños conocidos en la cadena de distribución como "down **[*9]** the trade".

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

21. SCI, según expresado por su representante en ese momento Ken Chapman, estuvo de acuerdo con dicha estrategia.

22. Como resultado de esa estrategia se añadieron cientos de puntos de venta para la distribución del producto.

23. En relación a esos clientes en los que Puerto Rico Supply entrega los productos, Pan American paga las promociones y negocia los precios. Dichos comercios venden al mismo precio al detal, cualquier costo de Puerto Rico Supply va contra el margen de ganancia de Pan American no se afecta el precio de venta al consumidor.

24. Alrededor de septiembre de 2021, a través del Sr. Ken Chapman, SCI se comunicó con Pan American acerca de la introducción en el mercado de Puerto Rico de un producto nuevo denominado Fireball Cinnamon Malt Beverage a venderse en envases de 50ml.

25. El producto de Fireball Cinnamon Malt Beverage se venderían a un precio menor que el Fireball Cinnamon Whisky. La intención era vender el producto de malta en la botella de 50ml por noventa y nueve centavos ($0.99).

26. El producto de Fireball Cinnamon Malt Beverage no es whisky, sino una bebida de malta ("malt beverage") con sabor a whisky y un nivel de alcohol por volumen de 16.5%, comparado **[*10]** con el 33% de Fireball Cinnamon Whisky.

27. Pan American y SCI intercambiaron múltiples comunicaciones en relación a la contratación de la introducción y distribución del producto de malta en Puerto Rico.

28. Luego de múltiples comunicaciones, no se concretó el acuerdo para la distribución del nuevo producto Fireball Cinnamon Malt Beverage por Pan American, porque no se pusieron de acuerdo en el precio para que pudiera venderse el producto al detal a $0.99 y sin la utilización de subdistribuidores, según la estrategia establecida por SCI.

29. El producto de 50ml de Fireball Cinnamon Malt Beverage es muy similar al de Fireball Cinnamon Whisky de 50ml. Las etiquetas de ambos comparten múltiples elementos distintivos idénticos, tales como: el color amarillo, una figura de un dragón o demonio rojo escupiendo una bola de fuego; las palabras red y hot a cada lado de dicha figura; el diseño del borde de la etiqueta semejante a un papel quemado; el tipo, el tamaño y el color de las letras de la palabra Fireball, hot y red; la ubicación del texto y los colores utilizados en el fondo; la ubicación de los elementos principales (borde, demonio, palabras red, hot, Fireball y Cinnamon) en la composición **[*11]** del diseño de la etiqueta; el sabor a canela, entre otros. Además, la botella de 50ml para ambos productos es del mismo tamaño, tiene la misma forma, tiene una tapa roja y el líquido adentro de la misma tiene el mismo color ámbar.

30. Dada la gran similitud entre la presentación utilizada para Fireball Cinnamon Malt Beverage y la de Fireball Cinnamon Whisky de 50ml, a un consumidor promedio le resultaría difícil distinguir entre ambos productos.

31. SCI reconoce que, debido a su similitud, ambos productos pueden competir cuando se venden en el mismo tamaño. También reconoce que el tamaño de 50ml, a distancia no se puede identificar cuál es uno y cuál es el otro.

32. De acuerdo a SCI, el Fireball Cinnamon Malt Beverage está hecho para que tenga el mismo sabor y provea al consumidor una experiencia similar a la del producto de whisky.

33. SCI conoce que en el mercado de Puerto Rico el consumidor conoce a ambos productos (el de malta y el whisky) como Fireball.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

34. Las diferencias entre ambos productos son: su precio, contenido de alcohol por volumen (whisky tiene 33 % y el 50ml de malta 16.5%), naturaleza del producto por su forma de manufactura (destilado vs. fermentado) y trato de las autoridades **[*12]** fiscales para requisitos de etiquetado y tributación.

35. En Puerto Rico, al igual que en otras jurisdicciones, Fireball Cinnamon Whisky se vende en botellas de 50ml. Además, se vende en botellas de 200ml, 750ml, 1 litro y 3 cuartos.

36. El tamaño que más vende Pan American es el 750ml. Las ventas de ese tamaño representan un 90% del total de las ventas del producto.

37. Los planes de SCI con respecto a la distribución de Fireball Cinnamon Malt Beverage en Puerto Rico incluyen venderlo en botellas de 50ml y actualmente se vende en botellas de ese tamaño.

38. Los planes de SCI con respecto a la distribución de Fireball Cinnamon Malt Beverage en Puerto Rico incluyen venderlo en comercios en donde también se vende Fireball Cinnamon Whisky de 50ml, como gasolineras, tiendas de conveniencia, chinchorros y otros comercios "down the trade". Actualmente se vende de esa forma.

39. La estrategia de mercadeo de Fireball Cinnamon Whisky de 50ml es como compra de impulso. La estrategia para el nuevo producto Fireball Cinnamon Malt Beverage también es como compra de impulso.

40. La posible confusión entre Fireball Cinnamon Malt Beverage y Fireball Cinnamon Whisky es común, razonable y predecible y ha **[*13]** sido objeto de múltiples demandas a nivel federal en otras jurisdicciones.

41. Previo a Fireball Cinnamon Malt Beverage, los únicos productos con la denominación "Fireball Cinnamon" de SCI vendidos en Puerto Rico habían sido distribuidos por Pan American.

42. Los productos de Fireball Cinnamon Malt Beverage son una extensión y un derivado de la marca "Fireball Cinnamon".

43. Los productos de Fireball Cinnamon Malt Beverage constituyen un nuevo modelo de la marca "Fireball" y "Fireball Cinnamon".

44. Las representaciones de SCI a Pan American sobre Fireball Cinnamon Malt Beverage incluyeron expresar que sería un producto revolucionario ("game changer") y que venderían sobre cincuenta mil (50,000) cajas del producto.

45. Como parte de las negociaciones para la distribución del producto de malta, SCI le solicitó expresamente a Pan American que preparara las etiquetas correspondientes de Fireball Cinnamon Malt Beverage a utilizarse en Puerto Rico de conformidad con la reglamentación local aplicable.

46. Pan American hizo las gestiones para lograr la aprobación del etiquetado de Fireball Cinnamon Malt Beverage en el Departamento de Hacienda de Puerto Rico y logró la aprobación gubernamental necesaria **[*14]** para importar los productos a Puerto Rico.

47. SCI aprobó la etiquetación de Fireball Cinnamon Malt Beverage específicamente para Puerto Rico, la cual incluía a Pan American como el distribuidor del producto.

48. El 23 de noviembre de 2021 representantes de SCI llevaron a cabo una visita presencial para conocer el mercado de Puerto Rico ("market visit") junto con representantes de Pan American.

49. Durante la referida visita se discutió específicamente la introducción de los productos de Fireball Cinnamon Malt Beverage al mercado de Puerto Rico. Pan American expresó sus preocupaciones sobre el hecho de que el por ciento de alcohol por volumen (ABV) de Fireball Cinnamon Malt Beverage es más bajo al de Fireball Cinnamon Whisky y el impacto que dicha diferencia podría tener en la percepción de la marca en los consumidores.

SeSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

50. En algunos estados de los Estados Unidos no se puede vender Fireball de whisky en tiendas de conveniencia. Por eso SCI introdujo el Fireball Cinnamon Malt Beverage, para vender producto Fireball en los estados donde no se podían vender el whisky en tiendas de conveniencia.

51. La estrategia de precios y mercadeo que persigue SCI a nivel nacional para la bebida de malta **[*15]** es la venta de ésta (1) a un precio asequible para, con ello, provocar su compra y (2) en puntos de venta, tales como colmados y estaciones de gasolina, sin que intervenga ningún subdistribuidor.

52. SCI reconoce que su estrategia es de no hacer esfuerzos para diferenciar los productos de Fireball Cinnamon Malt Beverage de los productos de Fireball Cinnamon Whisky y en su lugar enfocarse en acceso al mercado ("market access").

53. SCI reconoce que, al analizar las fortalezas y las amenazas, las debilidades y las oportunidades del producto Fireball Cinnamon Whisky, una de las amenazas son los productos de malta.

54. El 17 de diciembre de 2021 Pan American sometió a SCI una orden de compra para adquirir 432 cajas de Fireball Cinnamon Malt Beverage de SCI (la "Primera Orden de Compra").

55. La Primera Orden de Compra de productos de Fireball Cinnamon Malt Beverage nunca fue entregada a Pan American por SCI.

56. En junio de 2022, el Sr. Juan Carlos Román, Director Comercial de Centro América y Caribe de SCI, realizó una visita a Puerto Rico y se reunió con representantes de Pan American. Durante la referida visita el representante de SCI se reunió con el Sr. Alberto Fernández y le indicó que **[*16]** quería negociar la terminación de la relación de distribución exclusiva entre Pan American y SCI para Fireball Cinnamon Whisky en Puerto Rico. Le indicó que no estaba contento con el desempeño de Pan American, que les interesaba consolidar todos sus productos en un solo distribuidor, pero le aclaró que no sería Pan American. Por su parte, Pan American le confirmó que no le interesaba renunciar a sus derechos como distribuidor exclusivo de SCI.

57. El 20 de junio de 2022, SCI envió una carta a Pan American en la que expresó por escrito que estaban insatisfechos con las ventas de sus marcas en Puerto Rico, incluyendo Fireball Cinnamon Whisky. SCI indicó que estaban en proceso de evaluar y analizar sus canales de distribución en Puerto Rico y estaban considerando todas las opciones viables para llegar a una solución que fuese beneficiosa para ambas partes, incluyendo terminar la relación mediante una resolución negociada.

58. Luego de julio de 2022, Pan American sigue siendo el mayor distribuidor de SCI en Puerto Rico.

59. SCI no le ha notificado ninguna insatisfacción con el desempeño de Pan American después julio de 2022.

60. El 8 de julio de 2022, Pan American presentó a SCI una segunda **[*17]** orden de compra para adquirir 216 cajas de Fireball Cinnamon Malt Beverage de SCI (la "Segunda Orden de Compra").

61. La Segunda Orden de Compra para Fireball Cinnamon Malt Beverage nunca fue entregada a Pan American por SCI.

62. El 26 de julio de 2022 SCI envió una carta a Pan American en la que indicó que continuaba habiendo una "desalineación" en cuanto a la mejor estrategia para vender y mercadear sus productos en Puerto Rico. En la misma indicó, que continuaría honrando las órdenes de compra para productos de SCI que previamente habían sido vendidos a Pan American, pero que no aceptarían órdenes de compra para productos que no habían sido vendidos previamente a Pan American incluyendo productos de Fireball Cinnamon Malt Beverage.

63. En o alrededor de octubre de 2023 Pan American advino en conocimiento de que SCI había notificado a ciertos comercios que estaría distribuyendo Fireball Cinnamon Malt Beverage en Puerto Rico a través de otra entidad.

SeSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

64. El 20 de octubre de 2023, Pan American envió una comunicación a SCI y a CC1 mediante sus representantes legales en la que notificó las actuaciones que consideraba ilegales tanto de SCI como de CC1 y reclamó sus derechos como distribuidor **[*18]** exclusivo de la marca Fireball Cinnamon Whisky en Puerto Rico bajo la Ley 75.

65. El 26 de diciembre de 2023, SCI envió una comunicación a Pan American en la que negó que Pan American fuese un distribuidor exclusivo conforme a la Ley 75. Además, indicó que independientemente de la exclusividad que pudiera existir en cuanto a la distribución de productos de Fireball Cinnamon Whisky, Pan American no distribuiría los productos de Fireball Cinnamon Malt Beverage en Puerto Rico debido al uso de subdistribuidores por parte de Pan American.

66. El 15 de febrero de 2024 Pan American contestó la referida misiva exponiendo detalladamente las razones por las cuales entendía que la postura asumida por SCI era errónea y le reiteró su intención de defender sus derechos como distribuidor exclusivo bajo la Ley 75.

67. El 23 de abril de 2024, SCI envió una comunicación formal escrita dirigida a las cadenas de supermercados de Puerto Rico indicando que SCI, como suplidor exclusivo de Fireball Cinnamon Malt Beverage en Puerto Rico, estaba informando que CC1 sería el distribuidor y mercader de Fireball Cinnamon Malt Beverage para todo el territorio de Puerto Rico.

68. CC1 es un distribuidor de bebidas alcohólicas **[*19]** con conocimiento pleno del mercado de Puerto Rico y competidor directo de Pan American.

69. A finales de 2021 CC1 comenzó a distribuir para Puerto Rico el whisky Sheepdog, que es un producto de SCI.

70. CC1 acordó asumir la distribución exclusiva de Fireball Cinnamon Malt Beverage en Puerto Rico.

71. CC1 tenía conocimiento de que Pan American es el distribuidor exclusivo de Fireball Cinnamon Whisky en Puerto Rico cuando suscribió un acuerdo con SCI para la distribución de productos de Fireball Cinnamon Malt Beverage para mediados de 2023.

72. SCI designó a CC1 como el distribuidor exclusivo de Fireball Cinnamon Malt Beverage en Puerto Rico mientras Pan American continuaba siendo el distribuidor de Fireball Cinnamon Whisky en la isla.

73. CC1 comenzó a vender el producto de malta en Puerto Rico el 22 de mayo de 2024.

74. CC1 distribuye Fireball Cinnamon Malt Beverage en puntos de venta de Puerto Rico en los que Pan American distribuye Fireball Cinnamon Whisky.

75. SCI le vende la caja de botella de 50ml a CC1 a $54.00, precio que nunca le ofreció a Pan American.

76. CC1 no utiliza subdistribuidores para vender el Fireball Cinnamon Malt Beverage.

77. El precio de Fireball Cinnamon Malt Beverage **[*20]** de 50ml en puntos de venta mayormente se encuentra a un dólar ($1.00).

78. En su contrato con SCI, CC1 hizo un compromiso de comprarle a SCI 50,000 cajas en por un año.

79. Al 21 de junio de 2024, ya habían llegado a Puerto Rico 4,104 cajas del producto de malta.

80. El precio al cual CC1 les vende a sus detallistas es de $6.50 la caja de 10 botellitas. Cada caja tiene 12 cajitas de 10 botellitas.

81. CC1 ya pagó el arbitrio por las 4,104 cajas recibidas.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

82. La venta bruta de CC1 con relación a las 4,104 cajas ya compradas es $320,112.00. Si se proyecta eso a 50,000 cajas, el total sería $3,900,000.00.

83. La venta total que CC1 realizaría en la eventualidad de que vendiera las 50,000 cajas que es el objetivo, seria $3,900,000.00.

84. Las ventas anuales de CC1 en Puerto Rico para el año 2023 fue de 700 millones de dólares. Por lo tanto, si se proyectara que CC1 cumple con toda la estrategia de venta, la venta total de Fireball Cinnamon Malt Beverage representaría menos del medio del 1% de las ventas totales anuales de CC1.

85. La publicidad que pone CC1, reconoce que el producto de malta es un nuevo Fireball, porque existe otro Fireball. Sin embargo, no destaca que el producto es con base **[*21]** en malta, ni el por ciento (%) de alcohol por volumen. Lo que destaca es el demonio de Fireball y la botella y un precio de $0.99 más IVU.

86. Luego de la introducción del Fireball Cinnamon Malt Beverage al mercado de Puerto Rico, algunos comercios han dejado de ordenarle a Pan American el Fireball Cinnamon Whisky de 50ml y otros han reducidos la cantidad de sus órdenes.

87. Pan American le distribuye Fireball Cinnamon Whisky a las localidades de la cadena de supermercados en Puerto Rico.

88. Algunos supermercados, identifican el paquete de diez (10) botellas de 50ml con la etiqueta de Fireball Cinnamon Malt Beverage, como Fireball Cinnamon.

El tribunal denegó la reconsideración solicitada por la parte peticionaria. Todavía inconforme, la parte peticionaria comparece y señala los siguientes errores:

Erró el Honorable Tribunal de Primera Instancia al emitir un *injunction* preliminar a favor de una parte que no es, ni ha sido, el distribuidor del producto Fireball Malt.

Erró el Honorable Tribunal de Primera Instancia al determinar que la alegada posibilidad de confusión entre los productos Fireball Malt y Fireball Whisky constituye un menoscabo a la relación de distribución bajo la Ley 75 que **[*22]** justifica la concesión de un *injunction* estatutario.

Erró el Honorable Tribunal de Primera Instancia al conceder un remedio de *injunction* ineficaz e inconsistente con la demanda enmendada.

Erró el Honorable Tribunal de Primera Instancia al emitir el *injunction* preliminar solicitado por la recurrida, aun cuando en el balance de intereses la emisión de dicho remedio provisional era improcedente.

Las partes presentaron su respectivo alegato y estipularon la transcripción de la prueba oral. Procedemos a resolver con el beneficio de las posturas de las partes, la transcripción de la prueba y el derecho aplicable.

***-II-***

***-A-***

La *Ley de Contratos de Distribución*, Ley Núm. 75 de 24 junio de 1964, según enmendada, *10 LPRA sec. 278, et seq. ("Ley Núm. 75-1964")* provee remedio en daños cuando las empresas domésticas y extranjeras eliminan o menoscaban sin justa causa las relaciones comerciales establecidas con sus distribuidores, concesionarios o agentes. *Véase*, Exposición de Motivos, Ley Núm. 75-1964. La ley crea una causa de acción en daños a disposición de los distribuidores cuando son despojados, sin justa causa del negocio gestado a favor del producto introducido. *Next Step Medical v. Bromedicon et al., 190 DPR 474, 489 (2014)*; *Cruz Marcano v. Sánchez Tarazona, 172 DPR 526, 540 (2007)*; *Medina & Medina v. Country Pride Foods, Ltd., 122 DPR 172, 189 (1988)*. A

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

tenor con el Artículo 2 de la *Ley de Contratos de Distribución*, *10 LPRA sec. 278a*, un principal **[*23]** no podrá dar por terminada una relación existente en virtud de un contrato de distribución o realizar actos directos o indirectos en menoscabo de la relación establecida o negarse a renovar el contrato a su vencimiento normal, excepto medie justa causa según definido por el estatuto. *Next Step Medical v. Biomet, Inc., 195 DPR 739, 747 (2016)*; *Systema de PR v. Interface Int'l, Inc., 123 DPR 379, 386 (1989)*.

Le corresponde al principal demostrar justa causa para eludir su responsabilidad. *Next Step Medical v. Biomet, Inc., supra*, pág. 754. El Tribunal Supremo explicó:

> La Ley Núm. 75 fue diseñada con el propósito expreso de proteger los derechos legítimos de los distribuidores y remediar los perjuicios causados a éstos. Ello, en relación a las prácticas abusivas de principales que, sin justa causa, menoscaban arbitrariamente las relaciones contractuales con los distribuidores, tan pronto éstos crean un mercado favorable a sus productos y servicios. El aludido esquema legal impide que un principal se apropie injustamente de la plusvalía de un negocio después de que un distribuidor local ha conquistado un mercado y una clientela a través de su gestión empresarial. En mérito de lo anterior, reiteradamente hemos expresado que la Ley Núm. 75 crea una causa de acción a favor de los distribuidores para detener el **[*24]** incumplimiento del principal y ser compensados en daños cuando, luego de introducir productos en el mercado y lograr su reconocimiento social y ventas suficientes, son despojados, sin justa causa, del negocio gestado.
>
> *Next Step Medical v. Bromedicon et al., supra*, pág. 489.

El legislador confirió al tribunal el poder de conceder remedios provisionales o medidas de naturaleza interdictal durante el curso de un litigio al amparo de la Ley Núm. 75-1964. *Véase, Next Step Medical, v. Biomet, Inc., supra*. Ello, pues, se interesaba "evitar la realización de actos que podrían producir daños irreparables, mientras se dilucida la existencia o no, de justa causa para la terminación de la relación contractual". *Next Step Medical, v. Biomet, Inc., supra*, pág. 490. El estatuto busca propiciar estabilidad en las relaciones de distribución en Puerto Rico y erradicar prácticas que, inciden sobre las expectativas legítimas que las partes vinculadas respectivamente ostentan. *Next Step Medical v. Bromedicon et al., supra*, pág. 488. El propósito de estos remedios también es "evita[r] el debilitamiento del distribuidor en esta etapa crucial del conflicto y nivela[r] el poder real de las partes. A manera de **[*25]** un primer auxilio, equivale a un torniquete que evita que se desangre el distribuidor mientras reclama los derechos consagrados en la Ley Núm. 75". *Systema de P.R., Inc. v. Interface Int'l, supra*, pág. 387.

*El Artículo 3-A de la Ley Núm. 75-1964, 10 LPRA sec. 278b-1*, establece que el tribunal puede conceder remedios provisionales o medidas interdictales, a través de las que deberán mantenerse vigentes los términos del contrato de distribución, mientras el tribunal resuelve los méritos de la controversia respecto a la justa causa para la terminación del acuerdo de distribución y si procede la concesión de remedios, al amparo del Artículo 3 de la Ley Núm. 75-1964. *Véase, Next Step Medical v. Bromedicon et al., supra*. El Artículo 3-A lee:

> En cualquier pleito en que esté envuelta directa o indirectamente la terminación de un contrato de distribución o cualquier acto en menoscabo de la relación establecida entre el principal o concedente y el distribuidor, el tribunal podrá conceder durante la pendencia del pleito, cualquier remedio provisional o medida de naturaleza interdictal para hacer o desistir de hacer, ordenando a cualquiera de las partes o a ambas a continuar, en todos sus términos, la relación establecida mediante el contrato de distribución, **[*26]** y/o a abstenerse de realizar acto u omisión alguna en menoscabo de la misma. En todo caso en que se solicite el remedio provisional aquí provisto el tribunal considerará los intereses de todas las partes envueltas y los propósitos de política pública que informa este capítulo.

Corresponde al distribuidor agraviado probar el impacto negativo en sus operaciones comerciales a causa del menoscabo o la terminación de la distribución, según sea el caso, para poder obtener un *injunction* a su favor. La parte peticionaria del remedio no tiene que necesaria o forzosamente probar lo siguiente: (1) la existencia de daños irreparables; (2) la falta de justa causa para el menoscabo o terminación del vínculo contractual, y (3) la probabilidad de prevalecer en el juicio en su fondo. *Next Step Medical v. Bromedicon, supra*, págs. 497-499. Por su parte, el principal debe refutar los argumentos presentados por el promovente o evidenciar el detrimento que

sespanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

sobrevendrá a sus negocios, productos, o servicios, de obligarlo a mantener la relación *pendente lite*. *Véase, Systema de PR v. Interface Int'l, supra*. El juzgador deberá evaluar las posturas de cada parte conforme al propósito socioeconómico del estatuto. **[*27]** *Next Step Medical v. Biomet, Inc., supra*, pág. 755.

El remedio que contempla el Artículo 3-A es provisional. El estatuto limita su aplicación a un término de tiempo definido. Expresamente dispone que el tribunal podrá conceder cualquier medida interlocutoria "durante la pendencia del pleito". Artículo 3-A de la Ley Núm. 75-1964, *supra*.

***-B-***

El auto de *certiorari* es el vehículo procesal extraordinario utilizado para que un tribunal de mayor jerarquía pueda corregir un error de derecho cometido por un tribunal de menor jerarquía. *Pueblo v. Colón Mendoza, 149 DPR 630, 637 (1999)*. Distinto al recurso de apelación, el tribunal de superior jerarquía tiene la facultad de expedir el auto de *certiorari* de manera discrecional, por tratarse de ordinario de asuntos interlocutorios. Sin embargo, nuestra discreción debe ejercerse de manera razonable, procurando siempre lograr una solución justiciera, como ya señalamos. *Torres Martínez v. Torres Ghigliotty, 175 DPR 83, 98 (2008)*; *Negrón v. Srio. de Justicia, 154 DPR 79, 91 (2001)*.

Por su parte, la Regla 40 del Reglamento de este Tribunal, establece los criterios que debemos tomar en consideración al atender una solicitud de expedición de un auto de *certiorari*. A esos efectos, la referida Regla dispone:

> El Tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:
>
> > A. **[*28]** Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
> >
> > B. Si la situación de hechos planteada es la más indicada para el análisis del problema.
> >
> > C. Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
> >
> > D. Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
> >
> > E. Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.
> >
> > F. Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
> >
> > G. Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.
> >
> > 4 LPRA Ap. XXII-B, R. 40.

***-III-***

Por medio de sus cuatro señalamientos de error, la parte peticionaria argumenta sobre la improcedencia del entredicho provisional autorizado por el tribunal. Conforme aduce, la relación contractual entre las entidades comerciales no gira en torno a la distribución exclusiva del producto *Fireball Cinnamon Malt Beverage*. Por ello, el remedio **[*29]** interdictal no puede estar disponible a la parte recurrida en relación con un producto que nunca distribuyó. Según el peticionario, el remedio provisional emitido tuvo el efecto de rescribir las relaciones contractuales entre las partes y, además, contraviene el *Artículo 3-A de la Ley de Contratos de Distribución, Ley*

sespanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

*Núm. 75-1964, 10 LPRA sec. 278b-1*. Esto, ya que, el vínculo legal entre Pan American y Sazerac es únicamente en torno a la distribución del *Fireball Cinnamon Whisky* en Puerto Rico, y no del producto *Fireball Cinnamon Malt Beverage*. Así, el peticionario nos invita a revisar los contornos estatuidos para la puesta en vigor del entredicho establecido en la Ley Núm. 75-1964.

La doctrina interpretativa del Artículo 3-A señala los confines conforme a los cuales el tribunal debe adjudicar una petición de tal naturaleza. El análisis de la expedición del remedio extraordinario requiere *prima facie* al recurrido establecer su carácter de distribuidor y, por ende, que está cobijado por las disposiciones de la Ley Núm. 75-1964. *Next Step Medical v. Bromedicon, supra*, pág. 464. En gran medida, de ello dependerá la procedencia del remedio interdictal solicitado, y la probabilidad de que, el recurrido prevalezca bajo la acción instada al amparo del estatuto. *Íd.*, págs. 494-495. **[*30]**

En el presente caso no existe controversia sobre el carácter de distribuidor que ostenta la parte recurrida respecto al producto *Fireball Cinnamon Whisky* en Puerto Rico. La parte peticionaria nombró a la recurrida como agente y distribuidor exclusivo de varios de sus productos en Puerto Rico, entre ellos *Fireball Cinnamon Whisky*. El contrato no especifica el plazo de duración de la relación comercial. Los precios de los productos se fijan por mutuo acuerdo. La parte recurrida tiene a su cargo la promoción del producto y ambas partes comparten los gastos publicitarios. Por tanto, la parte recurrida es un distribuidor protegido por la Ley Núm. 75-1964. *Íd.*

La finalidad del *injunction* preliminar objeto de este recurso es prevenir infracciones a las disposiciones de la Ley Núm. 75-1964. Por tal razón, el escrutinio con respecto a su expedición o denegatoria debe ceñir si el remedio cumple con las disposiciones y exigencias del estatuto del cual proviene. *Íd.*, pág. 497. En atención a tales lindes, correspondía al recurrido también, probar el impacto negativo en sus operaciones comerciales a causa del menoscabo alegado. En otras palabras, demostrar un menoscabo y que tal acción afectó negativamente **[*31]** la operación comercial del recurrido.

El alegato del recurrido expone una supuesta disminución en clientes y ventas del producto *Fireball Cinnamon Whisky* por la introducción al mercado del *Fireball Cinnamon Malt Beverage 50 ml* por Sazerac mediante un distribuidor distinto, CC1. En particular la parte recurrida aseguró la disminución en sus ventas, confusión entre los productos y el aprovechamiento de CC1 del mercado creado por Panamerican Grain Properties para el *Fireball Cinnamon Whisky*.

El vicepresidente ejecutivo de la parte recurrida, el señor Alberto Fernández González, testificó sobre los esfuerzos de la corporación para la introducción al mercado local de la bebida *Fireball Cinnamon Whisky* para el año 2013:

> P. Explíquele al Tribunal qué esfuerzo, si alguno, hizo Pan American Properties para introducir ese producto de Fireball al mercado en Puerto Rico.
>
> R. Pues una de las razones que, cuando Chapman vino a mi oficina, fue que él había evaluado el mercado de Puerto Rico, había visto lo que nosotros estábamos haciendo con Gasolina Sangría, y entonces, pues, dijo: "Ustedes tienen uno accesos al mercado, tiene una muy buena distribución, y Fireball va a ser un buen complemento".
>
> Entonces **[*32]** nosotros usamos esa iniciativa de incluir a Fireball en actividades y eventos de Gasolina para introducir el producto al mercado en Puerto Rico.
>
> P. Cuántos productos bajo la marca Fireball existían en ese momento?
>
> R. Uno nada más.
>
> P. Cuál era?
>
> R. Fireball Cinnamon Whisky.
>
> P. Okey. Puede usted describirle al Tribunal en qué consiste ese producto?

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

R. Es un licor de Whisky con sabor a canela.

[...]

P. Qué conocimiento, si alguno, usted tiene sobre el consumidor del producto Fireball que usted ha mencionado, en Puerto Rico?

R. Bueno, yo personalmente estuve envuelto en el lanzamiento de Fireball. Y puse muchas noches en muchos eventos, en muchas barras de noche, cuando estábamos viendo cómo introducir el producto, porque era un producto novel. En la categoría de whisky no había un flavored whisky. Y tratar de venderlo a los clientes de nosotros, "Prueba un whisky de canela", pues al principio fue bastante complicado poder expresar eso.

Una de las estrategias que hicimos, en aquella época había un producto llamado — que todavía existe — Jägermeister, que se usaba mucho de shot, y entonces nosotros fuimos con la estrategia de atacar ese mercado de shot y poner máquinas al lado de Jägermeister, hasta **[*33]** que eventualmente desplazamos prácticamente a Jägermeister del mercado.[1]

El ejecutivo continuó su testimonio sobre los esfuerzos de distribución e inversiones de mercadeo para lograr el reconocimiento del consumidor local de la nueva marca:

P. En esa etapa inicial, cuando están introduciendo el producto al mercado de Puerto Rico, allá para el año 2013-2014, qué inversión, si alguna, usted conoce haya — hizo Sazerac para promocionar ese producto en Puerto Rico?

R. Bueno, en esos primeros dos años iniciales aproximadamente, habíamos quedado que se iba a hacer una contribución de cinco dólares por caja, si la memoria no me falla, que se estaba dividiendo 50 por ciento y 50 por ciento. Pero eso estaba limitado a gastos realmente relacionados con productos gratis, promociones que se hicieran en barras, y una que otra — comprar una que otra máquina de las que se usaban para enfriar el producto para shots en las barras.

No incluía, y eso lo que nosotros veníamos haciendo con Gasolina Sangría y con Gasolina, los gastos de billboards, eventos especiales, festivales, fiestas patronales. Ellos no creían en eso, entonces se limitó el 50 por ciento a esa partida, que es **[*34]** lo que ellos autorizaban.

Pero nosotros incurrimos en otros gastos a pesar de que no fuimos reembolsados por Sazerac.[2]

El resultado de los esfuerzos de la corporación quedó verificado en el siguiente testimonio del vicepresidente ejecutivo:

P. Y cómo, si de alguna manera, se han reportado las ventas de ese producto a través de los años en Puerto Rico?

R. Las ventas fueron incrementando a un nivel que en un momento Sazerac nos dice a nosotros, a través de Ken Chapman, "Lo que ustedes están haciendo en Puerto Rico no es lo que hacemos en Estados Unidos, porque nosotros vamos más tipo" - a lo que definen "guerilla" - a las barras. Lo que ustedes están haciendo está funcionando en Puerto Rico. Sazerac va a aprobar ir 50 y 50, con todos los gastos completos, incluyendo los billboards, festivales — todas las actividades que ustedes hagan, las vamos a poner dentro del mismo pote van a cualificar". Y era por la ejecutoria de nosotros y el crecimiento de ventas que estábamos teniendo con Fireball en Puerto Rico.[3]

---

[1] *Transcripción de la prueba oral*, págs. 31-34.

[2] *Íd.*, págs. 35-36.

[3] *Íd.*, págs. 36-38.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

El resto de la transcripción de la prueba oral, y documental presentada durante la vista del entredicho provisional comprueban preponderantemente el trabajo, esfuerzo y dedicación del **[*35]** personal de la parte recurrida en la creación de una demanda local para la bebida de *fireball whisky*. La parte recurrida continuó su actuación conforme a la prestación debida, y creó un espacio comercial para la nueva marca a tal punto que constituía uno de los productos de mayor demanda para el tipo de bebida. El testimonio del *customer business manager* de la *División de Licores* de la parte recurrida, el señor Alejandro Calancha Figueras coteja lo anterior:

P. En el 2014, cuando se introdujo este producto Fireball de cinnamon whisky al mercado de Puerto Rico, puede usted describir cuál fue el mayor reto para cobrar tracción en el consumidor puertorriqueño?

R. Bueno, primero que nada, que la gente lo conociera, porque aquí nadie sabía qué era ese producto. Sabes? Un producto que a lo mejor en los Estados Unidos la genta lo conocía, pero aquí no tenía ningún tipo de publicidad, ni la gente exterior - sabes?, interiormente la genta en el exterior lo veía.

So que aquí fue llevar a la gente a ese paradigma de que "Me estoy dando un whisky con canela", sabes? La gente no sabe lo que es eso, la gente, pues, piensa "un whisky, pero me lo bebo con agua, con coco, con diferente" - otro mixer. **[*36]** Pero el whisky con canela...

Y obviamente se hizo un trabajo bastante arduo en términos de representación y de llevarlo a que era el producto de la fiesta, del party. Y así logró llegar - sabes?, la gente le empezó a coger el paladar al producto, sabes?, y fuimos creciendo y fuimos pasándole a los otros productos que — lo que eran "shooters" en aquel momento, pues estamos hablando de Jägermeister o un tequila. O sea, son productos que acostumbran a pedir en shots.

P. y quién lideró ese esfuerzo de introducir el producto Fireball Cinnamon Whisky en el mercado de Puerto Rico?

R. Pan American. Nosotros, Pan American Properties, con el equipo de...

P. En ese proceso que usted ha descrito de introducir el producto a los clientes, que fueran adquiriendo ese paladar hacia un whisky de cinnnamon, qué participación directa con el cliente tuvo Sazerac?

R. Participación directa?

P. Sí.

R. Bueno, era la comunicación que tenía con nosotros, pero nosotros éramos los que estábamos en la calle.

P. Okey.

R. Sabes? Y en un comienzo no había como que algo, sabes?, no era una relación — no era una relación, sino prácticamente lo hacíamos nosotros. Luego de que ya la marca fue creciendo, fue que empezó a haber **[*37]** una participación de parte de Sazerac en términos de gastos en conjunto con Pan American Properties.

P. Y antes de que Sazerac participara en el gasto de promoción del producto en Puerto Rico, quién incurría en el gasto de promoción?

R. Pan American Properties.

[...]

P. Y le pregunto: aproximadamente en qué año fue que Sazerac comenzó a compartir o de alguna manera aportar en los gastos de promoción del producto Fireball en Puerto Rico?

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

R. Bueno, yo entiendo que la inclusión de Sazerac, cuando ya estábamos teniendo un volumen alto en términos de gasto, entiendo que fue alrededor del 2016, finales de 2016 puede ser.[4]

El señor Calancha Figueras continuó con su testimonio sobre el valor económico creado sobre la marca *Fireball* consecuencia del trabajo de mercadeo y promoción efectuado por la parte recurrida desde el año 2014 cuanto introdujo al mercado de Puerto Rico la bebida *Fireball Cinnamon Whisky*:

P. Y qué tipo de inversiones publicitarias o promociones a través de todos estos años ha realizado Pan American Properties para promover la venta y distribución de ese producto Fireball en Puerto Rico?

R. Muchas. Estamos hablando desde auspicio de eventos, conciertos, eventos personalizados de **[*38]** la misma marca Fireball, happy hour, promotoras — obviamente apoyos de promotoras y empujes de venta en diferentes negocios, billboards, convenciones, todo lo que puede haber en términos de apoyo al mercado.[5]

El *customer business manager* también testificó sobre el esfuerzo efectuado para llevar el producto de *Fireball Cinnamon Whisky* a un nivel de ventas sobresaliente en el mercado local:

P. Okey. Cuál es el SKU o el envase de producto Fireball de mayor crecimiento en venta en Puerto Rico en la actualidad?

R. En la actualidad, el 50 ml.

P. Cuándo usted inició a trabajar o, como parte de sus funciones en Pan American Properties, comenzó a trabajar con el producto Fireball?

R. Desde el comienzo en el 2014.

P. Cuál ha sido la tendencia en ventas de ese producto Fireball en Puerto Rico que distribuye Pan American Properties, desde que usted inició a trabajar con el producto?

R. Bueno, desde que nosotros - desde que — en el momento que yo inicié, era un producto que apenas mucha gente lo conocía. Sabes?

Nosotros hicimos mucho trabajo — hablo "nosotros" incluyéndome a mí, verdad?, porque también yo trabajaba en muchas actividades de eventos con el equipo de mercadeo y el equipo de promociones **[*39]** en aquel entonces.

Fuimos poco a poco llevándolo a muchas fiestas, trabajando muchos happy hours, haciendo mucha rotulación en la calle para que fuera creciendo.

Que en su — o sea mientras fue pasando el tiempo, 2014 a 2016, ya estamos hablando que un dos mil — entre el 2016 al 2019, era el producto de preferencia de shot en Puerto Rico, porque el producto es un whiskey, pero es lo que nosotros le llamamos un "shooter", que la gente lo que acostumbra es pedirlo también por shot.

Y en ese entonces, pues estamos hablando que ya Fireball era el líder y era el tercer whisky de mayor venta en todo Puerto Rico.

P. En qué - en qué años fue eso?

R. Ya — estamos hablando como desde el 2019 al dos mil - 2019 al 2021; todavía - 2022 todavía seguía siendo el tercer whisky de mayor venta en Puerto Rico.

---

[4] *Íd.*, págs. 776-778.

[5] *Íd.*, pág. 779.

seSpanish.com Southeast Spanish, Inc. ATA # 264123 Translated/Verified by: Dan Hickman, PhD 877-374-0095

P. Y cuando usted dice "el tercer whisky de mayor venta en Puerto Rico, a qué usted se refiere cuando describe la categoría de whisky?

R. Bueno, eso se ve por unas datas de mercado que trabajan unas compañías, en este caso IRI, que por — periódicamente ellos pasan una data que ellos van evaluando la venta en diferentes comercios, y ahí ellos le ponen lo que le llaman el "market share", que es el nivel **[*40]** de venta de cada producto en términos de cuál se vende más, cuál se vende menos en diferentes mercados.[6]

Pudimos verificar en la prueba una tendencia positiva en ventas en el producto hasta la introducción del *Fireball Cinnamon Malt Beverage 50 ml* en el mercado de bebidas en Puerto Rico. El testimonio del vicepresidente ejecutivo muestra la consecuencia sobre las ventas de *Fireball Cinnamon Whisky* de la entrada del *Fireball Cinnamon Malt Beverage 50 ml* al mercado:

P. Okey. Qué si algo, ha sido — cuáles han sido los hallazgos de — sobre lo que ha ocurrido en el mercado, referente a ese producto de Fireball de malta?

R. Que ya eso nos está afectando en las — en la venta. Hay clientes de nosotros que están dejando de comprarnos, y el producto de nosotros no está rotando como — como rotaba antes de que se lanzara el producto en versión de malta.

P. Okey. Tiene usted conocimiento personal de cómo se está vendiendo este producto con base en malta en las gasolineras y — y down the trade?

R. Bueno, fui a echar gasolina, casualmente, la semana — el jueves o viernes de la semana pasada, en la gasolinera de — de San Patricio, y cuando entré, están los dos productos, uno al lado del otro, detrás **[*41]** de la caja registradora -

P. y en qué envase se está vendiendo este producto?

R. 50 ml.

P. El de malta?

R. El de malta.

P. Okey. Le pregunto si usted tiene conocimiento de — cómo, si de alguna manera, se han afectado las ventas del producto Fireball de whiskey a raíz de esa introducción de ese producto de malta en las últimas dos semanas.

R. El gerente — el vicepresidente de ventas ha visto una una merma en las ventas de los — de los clientes también.[7]

Es significativo destacar que, desde un principio la parte peticionaria tenía previsto distribuir la nueva bebida de malta mediante la parte recurrida. Durante varios años, las partes negociaron sobre el asunto. La parte recurrida completó varios trámites gubernamentales para introducir el producto en Puerto Rico. Las partes preliminarmente acordaron precio, un plan de venta, y la forma de mercadear el nuevo producto. Inclusive, a mediados del 2024 la parte recurrida hizo la primera orden para el *Fireball Cinnamon Malt Beverage*. Según el testimonio del vicepresidente ejecutivo, el señor Fernández González existía un plan mediante el cual *Fireball Cinnamon Malt Beverage 50 ml* reemplazaría a su contraparte el *Fireball Cinnamon Whisky 50 ml* **[*42]** en Puerto Rico:

---

[6] *Íd.*, págs. 773-775.

[7] *Íd.*, págs. 329-330.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

R. Cuando nosotros estábamos planificando la estrategia con — de la mano con Sazerac, había [indiscernible] un phase-in del producto de malta y un phase-out del producto de whiskey — del 50 ml. Pero al final, era un bolsillo nuestro a otro bolsillo nuestro. Inclusive, se habló de transicionar [sic] al formato de 200 ml también -

P. Transicionar [sic] qué producto al formato de 200 ml?

R. El Fireball. Primero se iba a lanzar el de 50 ml, y posteriormente se iba a introducir el de 200 ml a base de — con base de malta también.[8]

Pero justo en esa fase comenzó la dificultad entre Sazerac y Pan American Properties. Sazerac no honró la primera orden de la parte recurrida para comenzar la venta de la nueva bebida en Puerto Rico. De repente la línea de crédito de la parte recurrida era insuficiente para honrar las órdenes de compra. La situación continuó durante meses hasta que, en abril de 2024, Sazerac notificó por escrito a la parte recurrida su decisión de distribuir el nuevo producto por vía de otra compañía de distribución. La data sobre ventas recopilada por la parte recurrida en aquel periodo muestra una disminución en ventas del producto *Fireball Cinnamon Whisky* correlativo **[*43]** a la introducción del producto *Fireball Cinnamon Malt Beverage 50 ml* en los puntos de ventas utilizados por Pan American Properties. El vicepresidente de ventas de la parte recurrida, el señor Luis Eduardo Albandoz Acevedo, testificó sobre estos extremos:

P. En cuanto al producto del Fireball Cinnamon Whiskey en su formato de 50 ml, en el año 2023 - ya sea de enero a diciembre de 2023, cuál ha sido la tendencia de ventas de ese producto? o cuál fue la tendencia de ventas de ese producto?

R. Bueno, la tendencia de venta de Fireball 50 ml siempre ha sido crecimiento. Sin embargo, en los últimos 2 meses, si vemos la venta de marzo y abril y lo comparamos contra marzo y abril del año anterior, vemos una disminución de 230 clientes menos, que esto es una disminución del 26.5 por ciento.

P. Okey. Pero en el año 2023, cuál era la tendencia de ese formato en cuanto a ventas?

R. Crecimiento.

P. Okey.

R. Sí.

P. Cómo le consta esa información?

R. Porque nosotros tenemos data de venta, POS [purchase on spot], de cada uno de los clientes.

P. Cómo, si de alguna manera, usted recopila esa data de venta?

R. Yo recopilo esa data básicamente de la facturación que se hace en cada uno de los clientes.

[...]

P. Qué **[*44]** es este documento?

R. Este documento es la venta histórica de Fireball 50 ml 2022 versus 2023.

P. Okey. Quién preparó este documento?

R. Yo lo — yo lo preparé.

P. Qué formato de productos están representados en esta data?

---

[8] *Id.*, págs. 333-334, 336.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

R. Únicamente y exclusivamente el 50 ml.

P. Y de dónde usted obtuvo la data para preparar esta tabla?

R. De la venta histórica de los clientes, que aparece a nivel de facturación?

P. Y qué formato de productos están representados en esta tabla?

R. Única y exclusivamente el 50 ml, en el formato 10-pack?

[...]

P. Testigo, yendo al contenido de este documento, pudiese usted explicarle al Tribunal lo que usted mencionó ahorita sobre la tendencia en las ventas de este producto en el formato 50 ml en el año 2023?

R. Bueno, año 2023 vemos un crecimiento sostenido de básicamente, en el mes de enero, un 102 por ciento, en febrero un 46, en marzo un 87, en abril un 255 - y en todos los meses se veía un alza. Sin embargo, en el mes de julio hubo una disminución en las ventas de 1.99 por ciento. Y cuando vemos el total y lo comparamos el año anterior, vemos un crecimiento de 45.21 por ciento.

P. Okey. Explíquele al Tribunal, en cuanto a los porcientos, qué es lo que está usted comparando **[*45]** en esta tabla?

R. Yo estoy comparando el mismo mes en el año anterior.

P. Okey. Y de qué años?

R. 2022 versus 2023.

P. Okey. Entonces, cuántos — cuántas 10-packs de este producto de 50 ml se vendieron en total en el año 2022, según esta tabla?

R. 2022 estamos hablando que fue 10,085.

P. Okey. Y en el año 2023?

R. 14,644.

P. Y cuál fue el porciento de crecimiento en esas ventas?

R. 45.21.

P. Okey. Oiga, y le pregunto, la parte inferior de esta tabla, de este documento que usted preparó, puede usted explicar qué es lo que usted hizo en esa tabla?

R. La parte inferior estamos comparando lo que es 2022 versus 2023 de los meses de enero a mayo.

P. Y cuántas unidades de este 10-pack habían vendido en los primeros cinco meses del año 2023?

R. En los primeros meses: en el 2023, 6,100, y en el 2024, 5,635.

P. Y cuál ha sido la tendencia en comparación de las ventas mensuales de 2023 y 2024 de enero a mayo?

R. Vemos una disminución en venta. Básicamente, en enero, de 1.72 por ciento; en febrero, de 5.83 por ciento; en marzo, de 13.27; abril, 5.43 negativo, y mayo, 9.02 por ciento negativo.[9]

---

[9] *Íd.*, págs. 686-693.

SeSpanish.com Southeast Spanish, Inc. ATA # 264123 Translated/Verified by: Dan Hickman, PhD 877-374-0095

El vicepresidente de ventas continuó su explicación del deterioro en ventas del producto *Fireball Cinnamon Whisky* por **[*46]** la entrada al mercado del *Fireball Cinnamon Malt Beverage 50 ml*:

P. Okey. Señor Albandoz, qué conocimiento, si alguno, tiene usted sobre el producto de Fireball Cinnamon Malt en Puerto Rico — y su venta en Puerto Rico?

R. Conocimiento de la venta?

P. No, qué conocimiento tiene usted sobre ese producto?

R. Bueno, ese producto entró al mercado en abril de este año y es un producto que tiene 16.5 por ciento de alcohol versus el Fireball Whisky, que tiene un 33.

P. Oiga, y quién está distribuyendo ese producto en Puerto Rico?

R. CC1.

P. Okey. Oiga, usted dice que ese producto inició en abril de 2024.

R. Correcto.

P. La tabla que usted preparó refleja una reducción en ventas desde enero de 2024. Puede usted explicarle al Tribunal por qué - a qué usted le atribuye esa — esa reducción desde enero?

R. Bueno, esa disminución desde enero nosotros la estamos viendo — se ha comportado de esa manera porque la categoría ya, en lo que es 50 ml, está bastante madura por el tiempo que lleva. Y este año estaba básicamente flat al principio. Sin embargo, en los últimos dos meses, que es abril y mayo, ahí vemos una disminución en venta más allá de lo que ponen estos números; cuando lo comparamos los 841 clientes **[*47]** que compraron en ese periodo de tiempo, una disminución de 231 clientes en la data. Que esto significa que hay una disminución de 26.5 por ciento a nivel de la base de clientes de Fireball 50 ml Whisky.

[...]

P. Explíqueme nuevamente. O sea, qué - cuál es la tendencia que usted ha visto en términos de clientes?

R. De clientes?

P. Sí.

R. Un 26.5 por ciento menos clientes comprando, comparándolo con el año anterior en el mismo periodo.

P. O sea, que ustedes tienen 26.5 por ciento de sus clientes existentes están comprando menos el producto este año 2024.

R. Correcto.

P. Okey. Y qué usted le atribuye esa reducción?

R. Yo le atribuyo al producto que tiene CC1 al día de hoy, malt-base.[10]

El menoscabo del mercado creado y la clientela conquistada por un distribuidor constituye fundamento suficiente para la procedencia del interdicto codificado en la Ley Núm. 75-1964. La Ley Núm. 75-1964, busca suprimir la indeseable práctica por parte del principal de contribuir al deterioro de la plusvalía del distribuidor una vez este logró crear un mercado favorable para el producto o servicio que distribuye, en virtud del contrato de distribución

[10] *Id.*, págs. 686-693.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

con el principal. Conforme verificado en el testimonio y prueba **[*48]** ofrecida por la parte recurrida la introducción del *Fireball Cinnamon Malt Beverage 50 ml* al tráfico del comercio local erosionó el mercado obtenido y desarrollado por la parte recurrida para el producto *Fireball Cinnamon Whisky*. Desde la introducción de la nueva bebida, la tendencia en ventas y clientes del *Fireball Cinnamon Whisky* comenzó a decaer en números de tal consideración que motivaron la presentación de la causa de acción del epígrafe.

En resumen, la parte recurrida logró demostrar que: (1) está cobijada bajo la figura del distribuidor (el derecho de exclusividad a favor de la parte recurrida para distribuir el producto *Fireball Cinnamon Whisky*); (2) la parte peticionaria menoscabó la plusvalía del producto *Fireball Cinnamon Whisky*.

Antes de concluir, es importante añadir en este punto las propias admisiones de la parte peticionaria en cuanto a la introducción al mercado de Puerto Rico del nuevo producto *Fireball Cinnamon Malt Beverage 50 ml*. Primero, el director comercial de Centro América y el Caribe de Sazerac admitió que, el producto *Fireball Cinnamon Malt Beverage 50 ml* fue diseñado para competir con la bebida *Fireball Cinnamon Whisky*:

> P. Que el Fireball de malta y el Fireball **[*49]** de whiskey se venden en los mismos lugares. Correcto?
>
> R. No hay restricción.
>
> P. No hay restricción, así que se venden una al lado del otro en las gasolineras.
>
> R. Podrán venderse, sí.
>
> P. Y se venden uno al lado de otro en los liquor stores. Correcto?
>
> R. Sí.
>
> En específico, la parte peticionaria argumenta que la introducción del nuevo producto al mercado local no menoscabó la plusvalía creada por la parte recurrida para el *Fireball Cinnamon Whisky* en Puerto Rico.
>
> [...]
>
> P. Sin embargo, a pesar de eso, es su testimonio que el Firewall de malta no compite con el Fireball de whisky. Eso es correcto?
>
> R. El Fireball de malta no compite? Yo — mi testimonio es que son productos distintos.
>
> P. La pregunta es si compiten o no compiten con — para el mismo consumidor.
>
> R. Sí. Podría — en ocasiones distintas podría, sí.[11]

Inclusive, el testigo admitió que, la nueva bebida fue creada con el propósito de proveer una experiencia similar al *Fireball Cinnamon Whisky*. También admitió la pertenencia del producto *Fireball Cinnamon Malt Beverage 50 ml* bajo la familia de productos de bebidas categorizados bajo la marca "Fireball":

> P. Dígame, testigo: viendo el Exhibit 1, que es el que se llama "Fireball Cinnamon Whisky", **[*50]** le pregunto si la etiqueta identifica el producto en la parte superior como "Fireball".
>
> R. Correcto.
>
> P. Y tiene un demonio rojo.
>
> R. Sí.

---

[11] *Íd.*, págs. 1034-1036.

seSpanish.com Southeast Spanish, Inc. ATA # 264123 Translated/Verified by: Dan Hickman, PhD 877-374-0095

P. Y dice las palabras "Red Hot".

R. Sí.

P. Y el de malta en la parte superior dice "Fireball". Correcto?

R. Correcto. Sí.

P. Y tiene un demonio rojo.

R. Sí.

P. Y dice "Red Hot".

R. Sí.

P. Okey. Y los 2 productos tienen un sabor a cinnamon, a canela.

R. Sí.

P. Okey. Y el de — Fireball Cinnamon está hecho para que tenga ante el consumidor el mismo sabor similar al producto de whisky. Correcto?

R. Correcto.

P. Que el efecto es que el consumidor que no va al liquor store en Estados Unidos pueda tomarse un shot del Fireball Cinnamon y tener la misma experiencia que con el Fireball Cinnamon Whisky. Correcto?

[...]

P. En efecto, es que el Fireball Cinnamon se vende — se produce para que el consumidor, cuando se toma un shot, pueda sentir el mismo — el mismo sabor y la misma experiencia que cuando bebe el Fireball Cinnamon Whisky. Correcto?

R. Sí. Correcto, sí.

P. Una experiencia similar.

R. Correcto.

P. Sí?

R. Correcto.

P. Y usted que conoce el mercado de Puerto Rico, desde que trabaja en Diageo, sabe que aquí en todo momento el consumidor conoce estos productos como el producto **[*51]** Fireball. Correcto?

R. "Estos productos", te refieres a los de 50 ml, al -

P. Al producto Fireball Whisky — Cinnamon Whisky, lo conoce como "Fireball". Correcto?

R. Sí.

P. Y el producto Fireball Cinnamon lo conoce como "Fireball" también. Correcto?

R. Ahora que lo está conociendo sí.

[...]

SeSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

P. Oiga, y usted habló de una persona que es una worldwide brand manager de Fireball. Correcto? En Sazerac.

[...]

P. Christina Donovan.

R. Donovan.

P. Ella es una Fireball brand manager worldwide para Sazerac. Correcto?

R. Global.

P. Global. Muy bien. Y ella es la brand manager global de la marca Fireball. Correcto?

R. Era. Correcto.

P. En su momento lo fue.

R. Sí.

P. Y la — y manejaba tanto el Fireball de malta como el Fireball de whisky. Correcto?

R. Sí.

P. Porque Sazerac trata la marca Fireball como una sola marca. Correcto?

R. Marca Fireball? Sí.

P. Y de hecho, usted tiene conocimiento que la marca que tiene registrada Sazerac es Fireball. Correcto?

R. Sí.[12]

El ejecutivo reconoció además que, el *Fireball Cinnamon Malt Beverage 50 ml* es una amenaza al *Fireball Cinnamon Whisky*:

P. Y una de las amenazas del producto de Fireball Cinnamon Whisky son precisamente los productos con base a malta. Correcto?

[...]

P. Amenaza en **[*52]** el crecimiento y desarrollo del producto de Fireball Whisky es la introducción de los productos con base en malta. Correcto?

R. Amenaza al Fireball Whisky son los productos de malta en Estados Unidos. Esa es la pregunta?

P. En Puerto Rico y en Estados Unidos, sí. Usted sabe lo que es un SWOT análisis?

R. Sí, en español.

P. Qué es un SWOT análisis?

R. FODA.

P. Y qué significa eso?

---

[12] *Id.*, págs. 1037-1042.

SeSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

R. Son cuatro cuadrantes. Esto es algo que [Indiscernible]. Pero son cuatro cuadrantes donde se analizan las fortalezas, las amenazas, tanto del producto como de la industria.

P. Se identifican las fortalezas del producto, las debilidades del producto, las amenazas del producto y las oportunidades del producto. Correcto?

R. Sí. Correcto.

[...]

P. La página 3 de este exhibit — página 3, dígame si es o no es cierto que con el logo de Sazerac, y se titula "Annual planning template Sazerac bran plan, Puerto Rico, Fireball, Pan American Grain, financial period fiscal year ´22. Correcto?

R. Correcto.

P. Y en las - 2 páginas más adelante se presenta un SWOT análisis.

R. Correcto.

P. Y ese SWOT análisis en el cuadrante de amenazas, el número 4 qué dice?

R. "[indiscernible] individualistic consumption threats" -

P. No. El cuadrante **[*53]** número 4 inferior del lado derecho.

R. "Threats"

P. "Threats".

R. Estoy leyendo.

P. Amenazas.

R. Eso estoy leyendo.

P. El número 4.

R. "Malt-based products".

P. Esto está identificado, los productos de malta, como una amenaza al producto de whisky. Correcto?

R. Correcto.

P. Eso le refresca entonces la memoria sobre lo que usted no recordaba hace unos minutos?

R. Es que esto es antes de que yo comenzara a trabajar acá.

P. Claro, pero usted lo compartió y se compartió con usted en enero de 2022, con el equipo de Pan American Properties. Correcto?

R. El equipo? Elmar lo envía aquí. Sí.

P. Claro.

R. Correcto.

[...]

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

P. Dígame si es o no es cierto que, para septiembre de 2021, según este Exhibit 2, Sazerac, a través de Ken Chapman, le notifica a Pan American Properties que todo el formato de 50 ml en Puerto Rico va a cambiar al producto con base en malta.

R. Eso es correcto.

P. Okey. Y que la expectativa era vender 50,000 cajas de ese producto al año.

R. Correcto.[13]

En cuanto a las referidas admisiones, citamos con aprobación, e incorporamos a esta sentencia la conclusión de derecho efectuada por el tribunal recurrido sobre el asunto:

Por otra parte, la prueba presentada estableció la existencia de una estrategia **[*54]** intencional de SCI de: 1) aprovechar el mercado creado para el producto de whisky por Pan American como base de lanzamiento del nuevo producto; y 2) de mantener la confusión entre ambos productos para incrementar las ventas del nuevo producto de menor precio. Ello constituye por sí mismo un menoscabo de la relación contractual entre Pan American y SCI, independientemente de la ocurrencia o no de la mencionada reducción en las ventas. Esta situación es precisamente la que la Ley 75 pretende evitar, conforme a su exposición de motivos.

[...]

[E]n este pleito está envuelto directamente un acto de menoscabo de la relación establecida entre SCI como principal o concedente y Pan American como distribuidor, del producto Fireball Cinnamon Whisky. Dicho acto de menoscabo consiste concretamente en la introducción al mercado y el comienzo de la distribución en Puerto Rico del producto Fireball Cinnamon Malt Beverage a través de un distribuidor distinto a Pan American (entiéndase CC1), con una presentación sustancialmente igual a la presentación de 50ml del Fireball Cinnamon Whisky, en los mismos puntos de venta, a un precio menor y con un mercadeo montado o apoyado sobre el mercadeo desarrollado **[*55]** por Pan American para la distribución de su producto de whisky.

Sentado el menoscabo en el caso, el peticionario debió presentar prueba sobre el detrimento que, sobrevendrá a sus propios negocios, productos, o servicios, de obligarlo a mantener la prohibición de ventas *pendente lite*. Pudimos corroborar en la prueba que, el impacto sobre las ventas anuales de CC1 no es significativo, sus ventas totales para el año 2023 fueron de 700 millones de dólares. La venta anual proyectada de $3,900,000 del producto *Fireball Cinnamon Malt Beverage 50 ml* representa 1% de la venta anual de CC1. En consecuencia, la prohibición de venta pendiente el pleito afectaría mínimamente el negocio de las corporaciones que componen la parte peticionaria.

Expuestas las respectivas posiciones, correspondía al tribunal apelado balancear los intereses de las partes en armonía con la política pública perseguida por la Ley Núm. 75-1964. *Next Step Medical v. Biomet, Inc., supra*, pág. 755. Según reflejado en la exposición de motivos de la Ley Núm. 75-1964, la Legislatura entendió que, por su trascendencia en el bienestar económico local, es necesario actuar para detener ciertas prácticas arbitrarias en detrimento de **[*56]** empresas locales. *Next Step Medical v. Biomet, Inc.*, supra, pág. 748.

En este caso quedó demostrada una de las prácticas abusivas que la ley aborrece. Un principal que, menoscaba la relación contractual con uno de sus distribuidores, tan pronto el distribuidor creó un mercado favorable para uno de sus productos. La Ley Núm. 75-1964 fue creada precisamente para impedir a un principal apropiarse o aprovechar injustamente la plusvalía de un negocio después de que un distribuidor local conquistó el mercado local y desarrolló una clientela a través de su gestión empresarial. *Next Step Medical v. Bromedicon, supra*, pág. 489. La prueba corroboró el esfuerzo comercial efectuado por la parte recurrida para abrir el mercado local al producto de *whisky* de la parte peticionaria. La gestión abarcó varios años de promoción, entrega de mercancía, mantenimiento del inventario local para allegar el nuevo producto al consumidor. Según la prueba, la labor de la parte recurrida fue

[13] *Íd.*, págs. 1044-1045, 1047-1050.

seSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

tan exitosa, en términos de ventas y reconocimiento social que, el propio peticionario aceptó la eficacia de la estrategia y decidió contribuir como igual. Ahora después de una década de trabajo a favor de la empresa en común **[*57]** concebida entre las partes, esta es afectada y amenazada por un producto nuevo diseñado por la propia peticionaria con el propósito de desplazar del mercado local el producto distribuido por el recurrido.

La Ley Núm. 75-1964 describe el tipo de menoscabo efectuado por la parte peticionaria:

A los efectos de este capítulo, y particularmente a los efectos de la sec. 278a de este título:

(a) ....

(b) Se presumirá, salvo prueba en contrario, que un principal o concedente ha *menoscabado* la relación establecida en cualquiera de los siguientes casos:

(1) Cuando el principal o concedente establece en Puerto Rico instalaciones para la distribución directa de mercancía o la prestación de servicios que previamente han estado a cargo del distribuidor, o que se relacionen con la mercancía o la prestación de servicio a cargo del distribuidor al ser de la misma marca comercial o cualquier otra del mismo principal o concedente, o que el distribuidor haya solicitado previamente tener a su cargo.

(2) ...

(3) ...

(4) ...

(c) ...

*Art. 2A, Ley Núm. 75-1964, 10 LPRA § 278a-1.*

En cuanto al balance de intereses, el Tribunal Supremo expresó que "[s]on los intereses de las partes y la protección de la política pública que informa el estatuto los que rigen su uso **[*58]** ". *Next Step Medical v. Biomet, Inc., supra*, pág. 754. La parte recurrida menoscabó la plusvalía creada por la parte peticionaria. Sazerac y CC1 pretenden aprovecharse de la clientela desarrollada y establecida por la parte recurrida para el producto *Fireball Cinnamon Whisky* para distribuir el producto *Fireball Cinnamon Malt Beverage*. Pudimos corroborar el impacto mínimo del interdicto sobre los negocios de Sazerac y CC1. Esto en contraposición a la protección de la plusvalía creada por la parte recurrida, pieza principal en la política pública establecida en la Ley Núm. 75-1964 y sobre la cual el legislador estableció un mandato de protección especial sobre cualquier otro interés involucrado en el contexto del negocio de distribución y ventas de productos foráneos en nuestra jurisdicción. Ello, con el fin de lograr una razonable estabilidad en las relaciones de distribución en Puerto Rico y erradicar ciertas prácticas que, más allá de contribuir a la estabilidad económica, inciden sobre las expectativas legítimas que las partes vinculadas en un negocio ostentan respectivamente. *Next Step Medical v. Bromedicon, supra*, pág. 488.

Examinada las posturas de las partes, corroborados los elementos **[*59]** fácticos necesarios en la prueba testimonial y documental para la expedición del remedio solicitado, el balance de equidades está inclinado a favor de la parte recurrida. Expedir el entredicho solicitado promueve la política pública esgrimida en el estatuto, protege el mercado local de las actuaciones arbitrarias efectuadas por principal en menoscabo de una relación contractual *bona fide* con uno de sus distribuidores sin otra razón que su propio deseo.

Debemos resaltar en este punto que, la relación principal-distribuidor se caracteriza por la cooperación, la estabilidad y la confianza mutua. *Roberco, Inc. y Robert Colón v. Oxford Industries, Inc., 122 DPR 115, 131 (1988).* La finalidad de esta relación es crear, desarrollar y obtener nueva clientela. *Íd.* No es posible al principal imponer sus condiciones a la política de venta del distribuidor o viceversa, con la correspondiente pérdida de la autonomía económica y jurídica de ambos. *Medina & Medina v. Country Pride Foods, 122 DPR 172, 190 (1941).*

SeSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

***-IV-***

Por los fundamentos antes expuestos, los que hacemos formar parte de este dictamen, *expedimos* el auto de *certiorari* solicitado, *confirmamos* la *Resolución y Orden* recurrida, y *dejamos* sin efecto nuestra *Resolución* del 7 de febrero de 2025 para que la orden de entredicho provisional emitida por el tribunal surta todo su efecto mientras **[*60]** culmina el pleito.

Por último, al amparo de la autoridad que nos confiere la Regla 35(A)(1) de nuestro Reglamento, 4 LPRA Ap. XXII-B, R.35(A)(1),[14] el Tribunal de Primera Instancia no tendrá que esperar por la remisión del mandato para continuar con el trámite del caso de referencia.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís

Secretaria del Tribunal de Apelaciones

End of Document

[14] En lo pertinente, la citada regla dispone que la "expedición del auto de certiorari suspenderá los procedimientos en el Tribunal de Primera Instancia, **salvo que el Tribunal de Apelaciones disponga lo contrario**" (énfasis suplido).

SeSpanish.com
Southeast Spanish, Inc.
ATA # 264123
Translated/Verified by:
Dan Hickman, PhD
877-374-0095

# EXHIBIT

# 19

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| SAZERAC COMPANY, INC.,<br>a Louisiana corporation,<br><br>Plaintiff,<br><br>v.<br><br>STOUT BREWING COMPANY, LLC,<br>a North Carolina corporation,<br><br>Defendant. | Civil Action No. 4:15CV-107-JHM |

**COMPLAINT**

1. This is a Complaint for trademark and trade dress infringement and unfair competition arising out of the use by defendant Stout Brewing Company ("Stout" or "Defendant") of a trademark and trade dress that are confusingly similar to those of plaintiff Sazerac Company, Inc. ("Sazerac") on and in connection with the sale of a competing product that is distributed and sold through the same outlets and to the same purchasers as Sazerac's FIREBALL cinnamon whisky product.

**PARTIES**

2. Sazerac is a Louisiana corporation with its principal place of business in Metairie, Louisiana. Sazerac also owns and operates several distilleries in the Commonwealth of Kentucky, including the Glenmore Distillery in Owensboro, Kentucky, one of the distilleries where Sazerac bottles and labels its FIREBALL cinnamon whisky.

3. On information and belief, Stout is a North Carolina corporation with a principal place of business in Kings Mountain, North Carolina.

**JURISDICTION AND VENUE**

4. This is an action for federal trademark and trade dress infringement and unfair competition arising under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*., and common law trademark infringement in violation of Kentucky state law.

5. This court has original jurisdiction over the federal trademark and trade dress infringement and unfair competition claims pursuant to 15 U.S.C. §§ 1121 and 1125 and 28 U.S.C. §§ 1331 and 1338.

6. Supplemental jurisdiction is proper for the state law claims under 28 U.S.C. § 1367(a) as the claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

7. This Court has personal jurisdiction over Stout for all of the following reasons: the Kentucky long-arm statute (KRS 454.210(2)(a)) reaches STOUT because Sazerac's claims arise from Stout (1) "[c]ausing tortious injury by an act . . . in this Commonwealth"; (2) "[t]ransacting . . . business in this Commonwealth"; and (3) "[c]ontracting to supply . . . goods in this Commonwealth." Further, Stout has minimum contacts with Kentucky such that the maintenance of this suit does not offend traditional notions of fair play and substantial justice.

8. Venue is proper in the United States District Court for the Western District of Kentucky under 28 U.S.C. § 1391(b) because: (1) Defendant's tortious conduct has occurred in this district; (2) Defendant conducts regular and systematic business in this district; and/or (3) a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

9. This case involves Defendant's willful trademark infringement of Sazerac's FIREBALL trademarks and trade dress for its FIREBALL cinnamon whisky product. Sazerac's claims arise out of Defendant's use of its confusingly similar FIRE FLASK mark and product packaging for a competing product.

### Sazerac and its FIREBALL Marks and FIREBALL Trade Dress

10. Sazerac is a leading distiller of spirits and the namesake of America's first commercially promoted and sold cocktail – the Sazerac Cocktail. Sazerac produces, bottles, and/or distributes a variety of distilled spirits, including vodka, whiskeys, and liqueurs. In particular, Sazerac produces, bottles, and/or distributes numerous types of whiskeys, including American cinnamon whiskey (bourbon, rye and other varieties), Scotch whisky, and Canadian whisky.

11. Sazerac's FIREBALL cinnamon whisky is a Canadian whisky flavored with real, natural cinnamon and is the top selling cinnamon whisky in North America.

12. FIREBALL whisky was originally developed by Seagram Company Ltd. ("Seagram") and marketed and sold under the name "Dr. McGillicuddy's Fireball Whisky" exclusively in Canada. Sazerac purchased the worldwide rights to the DR. MCGILLICUDDY'S FIREBALL mark in 2000 and began producing, marketing, and distributing cinnamon whisky under the FIREBALL mark in interstate commerce in the United States shortly thereafter.

13. Sazerac distills, ages, and bottles its FIREBALL cinnamon whisky at distilleries in multiple locations, including Kentucky, Maine, and Montreal, Canada.

14. Sazerac's FIREBALL cinnamon whisky is one of the most popular and widely-consumed liquor brands in the United States. FIREBALL is sold in many different channels

throughout the United States, including liquor stores, mass retail outlets, grocery stores, bars, clubs, restaurants, and other retail locations. FIREBALL has also been extensively advertised and promoted in various media in the United States, including online through the FIREBALL website (fireballwhisky.com) and social media sites such as Facebook.

15. The FIREBALL product is well-known and highly regarded. Since its launch, FIREBALL cinnamon whisky has received several awards, including but not limited to a bronze medal at the International Wine & Spirits 2007 Competition and a gold medal at the San Francisco World Spirits Competition in 2010.

16. Sazerac's product packaging for its FIREBALL cinnamon whisky is well-known and distinctive. Sazerac's FIREBALL cinnamon whisky is golden brown in color and is marketed in a clear flask-shaped bottle bearing an orange-yellow label that features charred edges and burn holes to convey a "burnt" image. The label also features a red fire-breathing devil creature with flames shooting off the back of its head and out if its mouth and a long serpent-like tail (hereinafter, the "Dragon-Man Logo"). The FIREBALL mark is displayed above the Dragon-Man Logo in bold black font, and the words "Cinnamon Whisky" are displayed below the Dragon-Man Logo. The dominant color combination for the product packaging is black, red, and orange. Every bottle of FIREBALL cinnamon whisky also features a distinctive red cap. The distinctive appearance of the bottle, label design, and Dragon-Man Logo used to market FIREBALL is referred to hereinafter as the "FIREBALL Trade Dress." An image of the FIREBALL Trade Dress is depicted below:




17. Sazerac has marketed and sold its cinnamon whisky in bottles featuring the FIREBALL Trade Dress in interstate commerce since at least as early as 2006.

18. The FIREBALL trademark, bottle label, and marketing indicia create a commercial impression comprised of flames and burnt edges and holes, as well as demon/hell imagery.

19. The FIREBALL Trade Dress is also used on various promotional materials, clothing, and accessories including barbeque sauces, cell phone cases, duffel bags, key chains, backpacks, shirts, tank tops, hooded sweatshirts, bathing suits, jackets, and caps in the US. Examples of such uses are depicted below:




20. Sazerac's FIREBALL cinnamon whisky is marketed as a Canadian whisky flavored with real, natural cinnamon and is targeted to adult purchasers and adult consumers of alcoholic beverage products.

21. Sazerac distributes its FIREBALL whisky throughout the United States, Canada, and Europe. Sazerac owns the following federal trademark registrations for its FIREBALL trademark and other FIREBALL-component marks (collectively, hereinafter, the "FIREBALL Marks"):

- FIREBALL (stylized), U.S. Reg. No. 2852432, issued June 15, 2004 for "liqueurs."
- DR. MCGILLICUDDY'S FIREBALL, U.S. Reg. No. 2997888, issued September 20, 2005 for "Cinnamon Whisky-based liqueurs."
- FIREBALL, U.S. Reg. No. 3550110, issued December 23, 2008 for "whisky."
- FIREBALL and Design, U.S. Reg. No. 3734227, issued January 5, 2010 for "Cinnamon Whisky."

Copies of these trademark registrations are attached hereto as Exhibit A.

22. In addition to its federally registered marks, Sazerac owns common law rights in its FIREBALL Marks and FIREBALL Trade Dress for whisky and related marketing and promotional goods.

23. As a result of its continuous, widespread, and extensive use in connection with FIREBALL-branded alcoholic beverages, apparel, and other merchandise, Sazerac's FIREBALL Marks and Trade Dress are well-known and highly respected among consumers and have come to embody the goodwill of Sazerac. Sazerac's FIREBALL Trade Dress has acquired secondary meaning in the marketplace.

24. Sazerac's FIREBALL Marks and Trade Dress have become famous within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), and are entitled to the widest scope of protection under federal and state anti-dilution laws.

**Defendant's Use of the FIRE FLASK Mark and Packaging**

25. On information and belief, Defendant develops, produces, bottles, and distributes alcoholic beverages under the business name Stout Brewing Company.

26. On information and belief, in June 2015 – more than fourteen years after Sazerac's first sale of its FIREBALL cinnamon whisky – Defendant introduced an alcoholic malt beverage designed to compete with Sazerac's product and adopted the confusingly similar FIRE FLASK mark and product packaging in order to pass off its own product as Sazerac's FIREBALL cinnamon whisky. An image of the FIRE FLASK product is depicted below:




27. On information and belief, Defendant is the owner of allowed U.S. Application No. 86337244 for the mark FIRE FLASK for "beer," claiming a date of first use in interstate commerce of June 30, 2015. On information and belief, this application will soon be registered on the Principal Register.

28. On information and belief, Defendant did not use its FIRE FLASK mark and product packaging in commerce prior to Sazerac's commencement of its use of the FIREBALL Marks and the FIREBALL Trade Dress.

29. On information and belief, Defendant chose its FIRE FLASK mark and packaging to exploit and trade on the longstanding goodwill, reputation, and success of Sazerac's FIREBALL product and to create a likelihood of consumer confusion in the marketplace.

30. Defendant's FIRE FLASK mark incorporates the identical and dominant "FIRE" component of Sazerac's FIREBALL Marks.

31. Defendant's FIRE FLASK mark and packaging are substantially similar to Sazerac's FIREBALL Marks and FIREBALL Trade Dress. As with Sazerac's FIREBALL cinnamon whisky, FIRE FLASK malt specialty beer is golden brown in color, cinnamon-

flavored, and is marketed in clear bottles featuring a label with the same color combination of Sazerac's FIREBALL Trade Dress, namely orange-yellow, red, and black. In addition, as with Sazerac's FIREBALL product packaging, the label is darkened along its edges, thus conveying a "charred" or "burnt" feel, and features an image of a red horned demon-man with flames emanating from his beard. This image is substantially similar to the red Dragon-Man logo portrayed on Sazerac's FIREBALL labels. The words FIRE FLASK are written in bold black font above the demon-man logo just as FIREBALL is featured above the Dragon-Man logo on Sazerac's FIREBALL label. The FIRE FLASK product even features a red cap which is exactly the same as the red cap used on FIREBALL cinnamon whisky bottles. A representative depiction of Defendant's FIRE FLASK product alongside Sazerac's FIREBALL product is included below:



32. Accordingly, in light of the similarity in overall commercial impression between Defendant's FIRE FLASK mark and Sazerac's FIREBALL Marks, the FIRE FLASK mark is likely to give rise to confusion among consumers as to the source or sponsorship of Defendant's products.

33. In addition, the similarity between the FIRE FLASK packaging and Sazerac's FIREBALL Trade Dress is likely to give rise to confusion among consumers as to the source or sponsorship of Defendant's products.

34. On information and belief, Defendant currently markets and distributes its FIRE FLASK product throughout the United States, including, but not limited to, liquor and/or retail stores in Georgia, Indiana, Florida, Kansas, Kentucky, Michigan, Missouri, South Carolina, and Texas.

35. On information and belief, Defendant currently markets and promotes its FIRE FLASK product to wholesalers, distributors, and retailers as "naturally flavored with caramel color added."

36. On information and belief, Sazerac's FIREBALL product and Defendant's FIRE FLASK product are competing, or will compete, in identical retail outlets – for example, liquor stores, bars, restaurants, and online retail sites. On further information and belief, Defendant, as Sazerac does, markets its FIRE FLASK product to adult consumers and adult purchasers of alcoholic beverage products.

37. Sazerac's use of the FIREBALL Marks and product packaging long predate Defendant's use of the FIRE FLASK mark and product packaging and, on information and belief, Defendant's trademark and trade dress infringement is willful.

38. Defendant had constructive knowledge of Sazerac's FIREBALL Marks based on Sazerac's federal registrations (*see* Exhibit A). In addition, on information and belief, Defendant had actual knowledge of Sazerac's cinnamon whisky and alcoholic beverage product sold under the FIREBALL Marks and FIREBALL Trade Dress at the time Defendant introduced its FIRE FLASK product.

39. Defendant certainly had actual knowledge of the FIREBALL Marks and FIREBALL Trade Dress since at least as early as July 24, 2015, when counsel for Sazerac sent a trademark cease and desist letter to Defendant.

## CLAIMS AND CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF – TRADEMARK INFRINGEMENT
### 15 U.S.C. § 1114

40. Sazerac realleges Paragraphs 1 through 39 of the Complaint.

41. Sazerac is the owner of U.S. trademark Registration Nos. 2852432, 2997888, 3550110, and 3734227.

42. Defendant is not authorized to use Sazerac's registered FIREBALL Mark or any mark that is confusingly similar to the mark.

43. Defendant's use and anticipated registration of its FIRE FLASK mark is likely to confuse consumers into believing that the goods offered by Defendant originate from, or are authorized by Sazerac, or that Defendant and Sazerac are somehow affiliated.

44. Defendant intentionally and knowingly infringes Sazerac's trademark rights.

45. Upon information and belief, Defendant's infringing activities are likely to cause damage to Sazerac's hard-earned reputation and goodwill, and to divert sales and opportunities away from Sazerac and to Defendant.

46. Defendant is therefore infringing Sazerac's rights in violation of 15 U.S.C. § 1114 and has caused irreparable harm to Sazerac by the infringement and Sazerac has no adequate remedy at law.

**SECOND CLAIM FOR RELIEF – FEDERAL UNFAIR COMPETITION**
**15 U.S.C. § 1125(a)**

47. Sazerac realleges Paragraphs 1 through 46 of the Complaint.

48. Sazerac has been using one or more of its FIREBALL Marks on and in connection with cinnamon whisky in interstate commerce well before Defendant and has developed substantial goodwill in these marks in Sazerac's common law territory, the entire United States, prior to Defendant's adoption and use of the FIRE FLASK mark in commerce.

49. Defendant's use of its FIRE FLASK mark in interstate commerce is likely to cause mistake, and/or to deceive as to an affiliation, connection, or association of Defendant with Sazerac, and/or as to the origin, sponsorship, and/or approval by Sazerac of Defendant's goods or commercial activities related to Defendant's alcoholic beverage.

50. Defendant is therefore engaged in unfair competition and false designation of origin in violation of 15 U.S.C. § 1125(a) and has caused Sazerac irreparable harm by the infringement and Sazerac has no adequate remedy at law.

**THIRD CLAIM FOR RELIEF – FEDERAL TRADE DRESS INFRINGEMENT**
**15 U.S.C. §1125(a)**

51. Sazerac realleges Paragraphs 1 through 50 of the Complaint.

52. Sazerac utilizes a distinctive trade dress, the FIREBALL Trade Dress, to market its FIREBALL cinnamon whisky product. The FIREBALL Trade Dress has acquired distinctiveness in the marketplace.

53. Defendant is not authorized to use Sazerac's FIREBALL Trade Dress or any trade dress confusingly similar or that in any way represents or implies that Defendant's goods are in any way associated with Sazerac.

54. Defendant's use of its FIRE FLASK product packaging – including its yellow, black, and red color scheme with charred-looking edges similar to that of the FIREBALL label, bold black lettering for the identification of the product, depiction of a version of Sazerac's "Dragon-Man" logo, and the same red cap – for an alcoholic beverage is likely to confuse consumers into believing that the goods offered by Defendant originate from, or are authorized by Sazerac, or that Defendant and Sazerac are somehow affiliated.

55. Defendant intentionally and knowingly infringes Sazerac's trade dress rights.

56. Defendant's infringing activities are likely to cause damage to Sazerac's hard-earned reputation and goodwill, and to divert sales and opportunities away from Sazerac and to Defendant.

57. Defendant is therefore infringing Sazerac's rights in violation of 15 U.S.C. § 1125(a) and has caused irreparable harm to Sazerac by the infringement and Sazerac has no adequate remedy at law.

**FOURTH CLAIM FOR RELIEF – FEDERAL TRADEMARK DILUTION**
**15 U.S.C. § 1125(c)**

58. Sazerac realleges Paragraphs 1 through 57 of the Complaint.

59. Sazerac's FIREBALL Marks and Trade Dress are famous and distinctive and have been for many years prior to the first sale of any FIRE FLASK product by Defendant.

60. Without authorization or license from Sazerac, Defendant is using a mark and product packaging in commerce that impairs the distinctive quality, and harms the reputation, of Sazerac's famous FIREBALL Marks and Trade Dress.

61. The acts and conduct of Defendant alleged herein occurred after Sazerac's FIREBALL Marks and Trade Dress became famous and constitute dilution by blurring and dilution by tarnishment in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

62. On information and belief, Defendant's acts of dilution and tarnishment are willful, deliberate, and in bad faith.

63. Sazerac has no adequate remedy at law.

64. Defendant's acts and conduct are causing immediate and irreparable injury to Sazerac, to its goodwill and reputation, and to the public, and will continue to cause such injury unless enjoined by this Court.

65. Sazerac is entitled to injunctive relief and to recover Sazerac's actual damages and an award of Sazerac's profits, as well as costs and Sazerac's reasonable attorney's fees, under 15 U.S.C. §§ 1025(c), 1116, and 1117.

**FIFTH CLAIM FOR RELIEF – COMMON LAW TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, AND PASSING OFF**

66. Sazerac realleges Paragraphs 1 through 65 of the Complaint.

67. Sazerac owns common law trademark rights in its FIREBALL Marks and FIREBALL Trade Dress and all such rights owned by Sazerac are superior to any rights that the Defendant may claim to have in the FIRE FLASK mark and FIRE FLASK product packaging.

68. Defendant's unauthorized use of a trademark and trade dress confusingly similar to the FIREBALL Marks and FIREBALL Trade Dress and/or confusingly similar to variations

thereof, in connection with the sale of alcoholic beverages is likely to cause confusion as to the source or sponsorship of these goods, and likely to lead the public to believe that Sazerac is affiliated with or sponsors or endorses Defendant and/or Defendant's products, and is likely to mislead persons in the ordinary course of purchasing Defendant's goods and induce them to believe they are purchasing genuine goods of Sazerac, thereby injuring the reputation and goodwill and unjustly diverting from Sazerac to Defendant the benefits arising therefrom.

69. Defendant's unlawful activities constitute trademark infringement, unfair competition, and passing off as proscribed by common law.

70. Defendant's acts of trademark infringement, unfair competition, and passing off were committed and are continuing to be committed willfully, knowingly, intentionally and in bad faith.

71. Defendant's acts of trademark infringement, unfair competition, and passing off, unless enjoined by this Court, will continue to cause Sazerac irreparable damage, loss, and injury for which Sazerac has no adequate remedy at law.

## PRAYER FOR RELIEF

Plaintiff Sazerac Company, Inc. prays for the following:

A. That Defendant, its employees, representatives, and agents, including any distributors and retailers, be enjoined from using the FIRE FLASK mark and FIRE FLASK product packaging, or any marks, designs, or graphics confusingly similar to the FIREBALL Marks and FIREBALL Trade Dress in conjunction with the marketing, distribution, and sale of beverages and related services;

B. That Defendant be directed to file with the Court and serve upon Sazerac's counsel within thirty (30) days of entry of such judgment a report in writing and under oath setting forth in detail the manner and form in which Defendant has complied with the above;

C. That Defendant be ordered to publish for a period of not less than twelve months corrective advertising in all media in which the infringing mark and product packaging had been published, explaining to customers that Defendant and its FIRE FLASK product were not and are not affiliated with or endorsed by Sazerac;

D. That Defendant be ordered to recall from all distribution channels and deliver up for impoundment and destruction, or show proof of destruction, of all products, packaging, labels, advertising, promotional materials, or other materials in the possession, custody, or control of Defendant bearing (i) Defendant's FIRE FLASK mark, (ii) Defendant's FIRE FLASK product packaging, and/or (iii) any other marks or symbols that are found to adopt or dilute any of Sazerac's FIREBALL Marks or Trade Dress;

E. That an accounting be ordered and that Sazerac be granted the amount of Defendant's profits realized and/or of the actual damages and/or enhanced damages sustained by Sazerac as a result of Defendant's unlawful acts as found by the Court, together with appropriate interest on such damages;

F. That the United States Patent and Trademark Office be ordered to cancel the anticipated registration for FIRE FLASK;

G. That the Court grant any and all relief to which Sazerac may be entitled pursuant to the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, including treble damages and Sazerac's attorneys' fees;

H. That the Court grant any and all relief to which Sazerac may be entitled pursuant to state law and state common law, including enhanced damages and attorneys' fees;

I. That the costs of this action be taxed against Defendant; and

J. That the Court grant Sazerac such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff Sazerac Company, Inc. demands a trial by jury on all issues so triable.

Date: August 14, 2015

By: /s/ Scott P. Zoppoth

Scott P. Zoppoth (KY Bar No. 83905)
THE ZOPPOTH LAW FIRM
601 West Main Street
Suite 500
Louisville, KY 40202
Telephone: (502) 568-8884
Fax: (502) 568-1319
spz@zoplaw.com

Peter J. Willsey, Esq. (*pro hac vice* to be filed)
Vincent J. Badolato, Esq. (*pro hac vice* to be filed)
COOLEY LLP
1299 Pennsylvania Avenue, N.W.
Suite 700
Washington, DC 20004-2400
Telephone: (202) 842-7800
Fax: (202) 842-7899
pwillsey@cooley.com
vbadolato@cooley.com

*Attorneys for Plaintiff Sazerac Company, Inc.*

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
Sazerac Company, Inc., a Louisiana corporation

**DEFENDANTS**
Stout Brewing Company, LLC, a North Carolina corporation

**(b)** County of Residence of First Listed Plaintiff: Jefferson Parish, LA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant: Cleveland County, NC
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Scott P. Zoppoth, The Zoppoth Law Firm, 601 West Main Street, Suite 500, Louisville, KY 40202; telephone: (502) 568-8884

Attorneys *(If Known)*
Registered Agent: Paul H. Bass, Esq., 8145 Ardrey Kell Road, Suite 202, Charlotte, NC 28277-5721

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☒ 840 Trademark | ☐ 375 False Claims Act<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| | | | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | ☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from Another District *(specify)* ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
15 U.S.C. Sections 1121 and 1125; U.S. 28 U.S.C. Sections 1331 and 1338

Brief description of cause:
Trademark and trade dress infringement and unfair competition

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ______ DOCKET NUMBER ______

DATE
08/14/2015

SIGNATURE OF ATTORNEY OF RECORD
/s/ Scott P. Zoppoth

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the six boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# Exhibit A

**Int. Cl.: 33**

**Prior U.S. Cls.: 47 and 49**

**Reg. No. 2,852,432**

**United States Patent and Trademark Office** **Registered June 15, 2004**

**TRADEMARK**
**PRINCIPAL REGISTER**

# FIREBALL

SAZERAC COMPANY, INC. (LOUISIANA CORPORATION)
803 JEFFERSON HIGHWAY
P.O. BOX 52821
NEW ORLEANS, LA 701522821

FOR: LIQUEURS, IN CLASS 33 (U.S. CLS. 47 AND 49).

FIRST USE 9-0-1988; IN COMMERCE 9-0-1988.

SER. NO. 76-337,349, FILED 11-14-2001.

ESTHER BELENKER, EXAMINING ATTORNEY

**Int. Cl.: 33**

**Prior U.S. Cls.: 47 and 49**

**Reg. No. 2,997,888**

**United States Patent and Trademark Office** **Registered Sep. 20, 2005**

## TRADEMARK
### PRINCIPAL REGISTER

# DR. MCGILLICUDDY'S FIREBALL

SAZERAC COMPANY, INC. (LOUISIANA CORPORATION)

P.O. BOX 52821

803 JEFFERSON HIGHWAY

NEW ORLEANS, LA 70152

FOR: WHISKEY-BASED LIQUEURS, IN CLASS 33 (U.S. CLS. 47 AND 49).

FIRST USE 3-0-2001; IN COMMERCE 3-0-2001.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 2,847,730 AND 2,852,432.

SER. NO. 78-457,249, FILED 7-27-2004.

MICHAEL WEBSTER, EXAMINING ATTORNEY

**Int. Cl.: 33**

**Prior U.S. Cls.: 47 and 49**

**Reg. No. 3,550,110**
**Registered Dec. 23, 2008**

**United States Patent and Trademark Office**

**TRADEMARK**
**PRINCIPAL REGISTER**

# FIREBALL

SAZERAC COMPANY, INC. (LOUISIANA CORPORATION)
P.O. BOX 52821
803 JEFFERSON HIGHWAY
NEW ORLEANS, LA 701522821

FOR: WHISKY, IN CLASS 33 (U.S. CLS. 47 AND 49).

FIRST USE 4-0-2007; IN COMMERCE 4-0-2007.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 2,847,730, 2,997,888 AND OTHERS.

SER. NO. 77-471,284, FILED 5-11-2008.

MICHELLE DUBOIS, EXAMINING ATTORNEY

# United States of America

## United States Patent and Trademark Office




**Reg. No. 3,734,227**
Registered Jan. 5, 2010

**Int. Cl.: 33**

TRADEMARK
PRINCIPAL REGISTER

SAZERAC COMPANY, INC. (LOUISIANA CORPORATION)
P.O. BOX 52821
803 JEFFERSON HIGHWAY
NEW ORLEANS, LA 701522821

FOR: WHISKEY, IN CLASS 33 (U.S. CLS. 47 AND 49).

FIRST USE 4-0-2007; IN COMMERCE 4-0-2007.

OWNER OF U.S. REG. NOS. 2,847,730, 3,550,110 AND OTHERS.

THE MARK CONSISTS OF FIERY HEADED, LONG TAILED CREATURE SPEWING FLAMES UNDER THE CURVED TEXT "FIREBALL".

SER. NO. 77-760,567, FILED 6-16-2009.

SAMUEL E. SHARPER JR., EXAMINING ATTORNEY

UNITED STATES PATENT AND TRADEMARK OFFICE · DEPARTMENT OF COMMERCE

David J. Kappos

Director of the United States Patent and Trademark Office